IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Atef Abuelenin
6584 Austin St, SV, Rego park, NY, 11374
Mailing @ P.O Box 73, NY, NY, 10018

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**-against-**

USCIS, et al,

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**Complaint for a Civil Case**

Case No. ______________________

*(to be filled in by the Clerk's Office)*

Jury Trial: ☐ Yes ☒ No
*(check one)*

RECEIVED
AUG 19 2025
PRO SE OFFICE

REC'D IN PRO SE OFFICE
AUG 19 '25 PM1:15

**I. The Parties to This Complaint**

**A. The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name: Atef Abuelenin

Street Address: [redacted]

City and County:

State and Zip Code:

Telephone Number:

E-mail Address: eleynin@gmail.com

Mailing Address: P O Box 73, NY, NY, 10018

**B. The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

Name: USCIS

Job or Title (if known): Agency

Street Address: 26, Federal plaza, NY,

City and County: NY, 10278

State and Zip Code:

Telephone Number:

E-mail Address (if known):

Defendant No. 2

Director of USCIS

Name: Alejandro Mayorkes

Job or Title (if known): DHS Secretary

Street Address: 2707 Martin Luther King Jr,

City and County: Ave, SE, Washington DC, 20528

State and Zip Code — washington, DC, 20528
Telephone Number
E-mail Address
(if known)

Defendant No. 3

Name — merrick Garland
Job or Title (if known) — Attorney General of the US
Street Address City and County State and Zip Code — 950 pennsylvania Ave, NW washington, DC 20530
Telephone Number
E-mail Address (if known)

Defendant No. 4 A.A

Name — USCIS Director
Job or Title (if known) X
Street Address City and County State and Zip Code — 950 Pennsylvania Ave, NW, washington, DC 20530
Telephone Number
E-mail Address (if known)

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

A. **If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

8 U.S.C 1447b - This action arises under the immigration & Nationality act which gives & provides federal Courts jurisdiction to adjudicate a pending N-400 case if USCIS fails to project a decision.

B. **If the Basis for Jurisdiction Is Diversity of Citizenship**

1. The Plaintiff(s)

a. If the plaintiff is an individual

The plaintiff, *(name)* ________________, is a citizen of the State of *(name)* ________________.

b. If the plaintiff is a corporation

The plaintiff, *(name)* ________________, is incorporated under the laws of the State of *(name)* ________________, and has its principal place of business in the State of *(name)* ________________.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

a. If the defendant is an individual

The defendant, *(name)* ________________, is a citizen of the State of *(name)* ________________. *Or* is a citizen of *(foreign nation)* ________________.

b. If the defendant is a corporation

The defendant, *(name)* ______________________, is incorporated under the laws of the State of *(name)* ______________________, and has its principal place of business in the State of *(name)* ______________________. *Or* is incorporated under the laws of *(foreign nation)* ______________________, and has its principal place of business in *(name)* ______________________.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

______________________________________________________________

______________________________________________________________

______________________________________________________________

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

plaintiff was interviewed for naturalization in 2022. USCIS previously denied first case based on "set up" interview. USCIS is refusing to produce a decision under the flag of national security. Under 8 U.S.C 1447b, court has jurisdiction to adjudicate the application & protect plaintiff.

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Grant plaintiff Naturalization without remanding case to USCIS that may be hostile towards plaintiff.

Grant such other relief as the Court deems Just & proper.

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 8 19th, 2025

Signature of Plaintiff [signature]

Printed Name of Plaintiff Atef Abuelenin

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF NEW YORK

**CIVIL COVER SHEET**

---

PLAINTIFF:

Atef Sabry Abuelenin

[redacted]

Mailing Address: P.O. Box 73

New York, NY 10018

Email: eleynin@gmail.com

RECEIVED
AUG 19 2025
PRO SE OFFICE

REC'D IN PRO SE OFFICE
AUG 19 '25 PM1:15

DEFENDANTS:

U.S. Citizenship and Immigration Services (USCIS)

Director, USCIS

Secretary of the Department of Homeland Security

Attorney General of the United States

---

I. BASIS OF JURISDICTION:

☑ [ ] 3 — Federal Question (U.S. Government Defendant)

REC'D IN PRO SE OFFICE
AUG 19 '25 PM1:15

II. CITIZENSHIP OF PRINCIPAL PARTIES:

- Plaintiff: Lawful Permanent Resident (Alien)
- Defendants: United States Government Entity

III. ORIGIN OF ACTION:

☑ [ ] 1 — Original Proceeding

IV. NATURE OF SUIT:

☑ [ ] 461 — Habeas Corpus: Immigration/Naturalization

(Complaint for Naturalization under 8 U.S.C. § 1447(b))

V. CAUSE OF ACTION:

Petition pursuant to 8 U.S.C. § 1447(b) requesting judicial intervention and naturalization relief due to USCIS's failure to adjudicate Plaintiff's application within 120 days of the examination, in violation of statutory and constitutional due process.

VI. RELIEF REQUESTED:

- Judicial adjudication of Plaintiff's naturalization application
- Declaratory and/or injunctive relief as appropriate
- Any further relief the Court deems just and proper
- Attorney's fees under the Equal Access to Justice Act, if applicable

VII. REQUEST FOR JURY TRIAL:

☑ [ ] No

VIII. RELATED CASES, IF ANY: None

---

CONFIDENTIALITY NOTICE:

Plaintiff respectfully requests that no part of this filing, including any references to Plaintiff's mental health, housing status, financial hardship, or personal history, be disclosed to the media or published without explicit judicial authorization. This request is made to protect Plaintiff's privacy, dignity, and personal safety in accordance with the spirit of the Privacy Policy of the United States Courts and applicable Local Civil Rules.

---

DATE: August 5, 2025

SIGNATURE OF PLAINTIFF:

Atef Sabry Abuelenin



# PLAINTIFF'S OBJECTION TO REFERENCE TO A MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**ATEF SABRY ABUELENIN**,
Plaintiff,
v.
**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al.**,
Defendants.

**Civil Action No.:** (To be assigned)

## PLAINTIFF'S NOTICE OF NON-CONSENT AND OBJECTION TO MAGISTRATE JUDGE ASSIGNMENT

Pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73(b), and Local Civil Rule 72.2, Plaintiff **Atef Sabry Abuelenin**respectfully submits this written notice that he **does not consent** to proceed before a United States Magistrate Judge for any dispositive matters in this action, including the adjudication of his pending naturalization application under **8 U.S.C. § 1447(b)**.

Plaintiff specifically **objects to any reference or reassignment** of this case to a magistrate judge for final disposition, and requests that all dispositive matters remain before an **Article III District Judge**.

### Grounds for Objection

1. **Statutory Entitlement to District Judge Review:**
   Under 8 U.S.C. § 1447(b), Plaintiff is entitled to a **de novo judicial hearing** on the merits of his naturalization application, which Congress explicitly intended to be conducted by a **District Court** judge, not a magistrate.
2. **Constitutional Claims and Relief Sought:**
   Plaintiff asserts multiple claims under the **Fifth Amendment**, the **Administrative Procedure Act**, and the **Rehabilitation Act**, which involve constitutional issues that require adjudication by a district court judge pursuant to **Article III** of the U.S. Constitution.

3. **Lack of Consent:**
   Plaintiff, proceeding **pro se**, has not and does not consent to final disposition by a magistrate judge as required under **28 U.S.C. § 636(c)(1)** and **Fed. R. Civ. P. 73(b)(1)**.
4. **Nature of Relief Requested:**
   Plaintiff seeks the extraordinary remedy of judicial naturalization, which involves equitable and constitutional determinations unsuitable for magistrate resolution absent express consent.

## Conclusion

Accordingly, Plaintiff respectfully requests that this matter **remain assigned to a United States District Judge**, and that no dispositive proceedings be conducted before a magistrate judge absent Plaintiff's express written consent, which is hereby withheld.

Dated: August 7, 2025
Respectfully submitted,

**Atef Sabry Abuelenin**
Plaintiff, pro se
A#: 201-132-868
Email: eleynin@gmail.com
Mailing Address: P.O. Box 73, NYC, NY 10018

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Atef S. Abuelenin,

Plaintiff,

v.

United States Citizenship and Immigration Services, et al.,

Defendants.

Case No.: To Be Assigned

---

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1 and in support of his Complaint under 8 U.S.C. § 1447(b), Plaintiff Atef Sabry Abuelenin respectfully submits the following Statement of Material Facts for the Court's consideration:

1. Plaintiff is a lawful permanent resident and asylee residing in Queens, New York (A# 201-132-868).
2. Plaintiff was granted asylum in the United States in 2011 based on credible fear of persecution in Egypt due to his pro-democracy views.
3. Plaintiff became a lawful permanent resident in 2012.
4. Plaintiff filed his first N-400 naturalization application in or about 2016.
5. That application was denied in 2021 based on uncorroborated and misleading statements allegedly made during a coercive FBI interview in 2020.
6. Plaintiff refiled a second N-400 application in or about February 2022.
7. Plaintiff attended a naturalization interview on that application in September 2022 and passed all required tests.
8. Under 8 U.S.C. § 1447(b), USCIS was required to make a decision within 120 days of the interview — by January 2023.
9. As of the filing of the Complaint (August 2025), approximately 34 months have elapsed since the interview, with no lawful adjudication issued within the statutory timeframe.
10. Plaintiff has made repeated inquiries to USCIS about his case, and received only vague responses citing "security checks."

11. USCIS later issued a denial only after Plaintiff prepared this federal action, citing vague and unsupported "foreign intelligence" allegations.
12. Plaintiff was never issued a Notice of Intent to Deny (NOID) or given the opportunity to rebut those allegations as required by 8 C.F.R. § 103.2(b)(16).
13. Plaintiff has never been arrested for any serious crime, never charged under FARA, 18 U.S.C. § 951, or any other espionage or terrorism law.
14. Plaintiff has no disqualifying conduct under 8 U.S.C. §§ 1427, 1429, or 1101(f), and continues to demonstrate good moral character.
15. Plaintiff seeks de novo adjudication of his naturalization application under 8 U.S.C. § 1447(b), due to USCIS's failure to timely decide the case and the procedural unfairness in its handling.

Respectfully submitted,

Dated: August 7, 2025

Atef S. Abuelenin, Plaintiff Pro Se

SUMMARY OF ISSUES PRESENTED FOR REVIEW

Plaintiff: Atef S. Abuelenin | Pro Se

This action is brought under 8 U.S.C. § 1447(b) seeking a de novo judicial adjudication of Plaintiff's second naturalization application, which has been unlawfully delayed and mishandled by USCIS.

Key Issues Presented:

1. Unlawful Delay Under § 1447(b):

   USCIS failed to adjudicate Plaintiff's naturalization application within 120 days of his September 2022 interview, in violation of federal law and regulation (8 C.F.R. § 335.3(a)).

2. Violation of Due Process:

   Plaintiff was denied a fair opportunity to rebut allegations before denial, in violation of 8 C.F.R. §§ 103.2(b)(16), 335.3, and the Fifth Amendment. Serious accusations were based on a coerced 2020 FBI interview with no corroborating evidence and no opportunity to respond.

3. Procedural and Substantive APA Violations:

   The denial and multi-year delay constitute arbitrary and capricious agency action, lacking both a factual basis and legal process, in violation of 5 U.S.C. §§ 555(b), 706(1), and 706(2).

4. Discriminatory and Retaliatory Conduct:

   The record suggests Plaintiff's Egyptian origin, asylum history, and disability (PTSD) contributed to his being flagged for unjust scrutiny. USCIS's actions reflect disparate treatment, suggestive of invidious discrimination, in violation of the Fifth Amendment Equal Protection component and § 504 of the Rehabilitation Act.

5. Remedy Sought:

   Plaintiff respectfully asks this Court to:

   - Assume jurisdiction over the naturalization application under § 1447(b),
   - Conduct de novo review and grant citizenship,

- Issue injunctive relief to prevent retaliation or future discrimination,
- Award costs, and
- Provide any other just and proper relief.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Atef S. Abuelenin,

Plaintiff,

-vs-

United States Citizenship and Immigration Services (USCIS);

Alejandro Mayorkas, Secretary of the U.S. Department of Homeland Security;

Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services;

Christopher A. Wray, Director of the Federal Bureau of Investigation;

Merrick B. Garland, Attorney General of the United States;

Defendants.

Case No. ____ (to be assigned)

COMPLAINT FOR HEARING ON NATURALIZATION APPLICATION UNDER 8 U.S.C. § 1447(b)

# Preliminary Statement

Nature of the Action: Plaintiff Atef Sabry Abuelenin ("Plaintiff") brings this action under 8 U.S.C. § 1447(b) seeking de novo judicial adjudication of his long-delayed naturalization application. Over 120 days have long passed since Plaintiff's naturalization examination (indeed,

nearly three years), yet Defendants have failed to render a decision. Plaintiff respectfully asks this Court to assume jurisdiction over the application and to grant the U.S. citizenship that he has qualified for and which Defendants have unlawfully withheld.

Grounds for Relief: Defendants' conduct has been marked by extreme delay and improper handling of Plaintiff's case. Plaintiff is an asylee and lawful permanent resident with an extensive record of education, public service, and good moral character. Despite his qualifications, his first naturalization application was denied based on vague and unsubstantiated "national security" allegations stemming from a misleading FBI interview in 2020. Now, with Plaintiff's second naturalization application, Defendants have engaged in an ongoing failure to act, leaving the application in limbo far beyond the 120-day statutory timeframe. Defendants' actions and inaction violate the Immigration and Nationality Act (INA), the Administrative Procedure Act (APA), and Plaintiff's rights under the U.S. Constitution. Plaintiff turns to this Court to enforce the rule of law and ensure a fair, timely determination of his citizenship application.

## Jurisdiction and Venue

Jurisdiction: This Court has subject-matter jurisdiction pursuant to 8 U.S.C. § 1447(b), which authorizes an applicant to seek a hearing in U.S. District Court if USCIS fails to make a determination on a naturalization application within 120 days after the examination. Federal question jurisdiction is also proper under 28 U.S.C. § 1331 because this action arises under the laws of the United States (including the INA and APA). The Court additionally has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act) and the APA. Sovereign immunity is waived by the APA for the relief sought, and the Court may compel agency action unlawfully withheld or unreasonably delayed (5 U.S.C. §§ 555(b), 706).

Venue: Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(e). Plaintiff resides in Queens County, New York, within this District. The USCIS Field Office handling Plaintiff's application is located in Queens (Long Island City), and a substantial part of the events or omissions giving rise to the claims (including the naturalization interview and subsequent delays) occurred in this District.

# Parties

Plaintiff: Atef Sabry Abuelenin is a 44-year-old lawful permanent resident of the United States (Alien Registration No. A201-132-868) who resides in Queens, New York. He was granted asylum in 2011 and became a lawful permanent resident in 2012. He is the applicant for naturalization at issue in this case. Plaintiff is proceeding pro se.

Defendant U.S. Citizenship and Immigration Services (USCIS): USCIS is an agency of the U.S. Department of Homeland Security (DHS) responsible for administering the nation's immigration and naturalization laws, including adjudication of naturalization applications. USCIS is named as a Defendant in its official capacity as the agency tasked with processing Plaintiff's application.

Defendant Alejandro Mayorkas: Secretary Mayorkas is the Secretary of DHS, which oversees USCIS. He is sued in his official capacity pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e). In his role as DHS Secretary, Defendant Mayorkas has ultimate authority over USCIS and is responsible for ensuring lawful administration of immigration benefits.

Defendant Ur M. Jaddou: Director Jaddou is the former Director of USCIS (serving from August 3, 2021 to January 20, 2025, encompassing the period of Plaintiff's 2021 naturalization denial and the ensuing delay on his second application). She is sued in her official capacity. As USCIS Director, Defendant Jaddou was responsible for USCIS policy and oversight of naturalization adjudications during the relevant time.

Defendant Christopher A. Wray: Director Wray is the Director of the Federal Bureau of Investigation (FBI) and is sued in his official capacity. The FBI conducts background checks for naturalization applicants and played a role in events related to Plaintiff's applications (specifically the 2020 interview described below). Defendant Wray is responsible for the conduct of FBI agents in security screenings or investigations tied to Plaintiff's immigration matters.

Defendant Merrick B. Garland: Attorney General Garland is the Attorney General of the United States and is sued in his official capacity. The Attorney General is the head of the U.S. Department of Justice, which includes the FBI, and has overall responsibility for enforcing federal laws. Defendant Garland is named because of his supervisory authority over agencies

involved in Plaintiff's background investigations and as the chief law enforcement officer of the United States.

(Hereinafter, all references to "Defendants" refer to all the above-named Defendants and their officers, agents, and successors in their official capacities.)

# Factual Background

## I. Plaintiff's Immigration and Asylum History

Plaintiff first arrived in the United States in 1994 as a child visitor, an experience that opened his eyes to a society vastly different from the turmoil of his youth. His childhood was marked by hardship and instability – growing up under repressive conditions and facing personal suffering that left him feeling marginalized and yearning for security. During that initial visit, Plaintiff caught a glimpse of the freedom, stability, and hope that America offered, and it left an indelible impression on him. He formed an emotional and cultural attachment to the United States from a young age, admiring its principles of tolerance and justice and dreaming that one day he might belong to this land. In 2010, at the age of thirty, Plaintiff returned to the United States determined to make a better life in the only country where he had ever felt truly free. Since that time, he has worked tirelessly to integrate into American society and to contribute to his community. He learned English fluently, pursued higher education and professional training, and devoted himself to public-service work – all in an effort to give back to the nation that became his sanctuary. Through volunteerism, civic engagement, and everyday acts of productivity and kindness, Plaintiff has continually demonstrated his commitment to American values and his gratitude to the country that he now calls home . His life's journey – from a traumatized youth seeking refuge to a resilient adult striving to serve his community – reflects a profound loyalty and attachment to the United States, the home of his most cherished ideals.

Entry into the United States and Fear of Persecution: Plaintiff lawfully entered the United States on November 5, 2010. He immediately sought asylum due to a well-founded fear of persecution in Egypt, his country of origin. Plaintiff's fear was based on his political opinions and activities: he is an outspoken advocate for secular governance, human rights, and opposition to extremist organizations (including the Muslim Brotherhood in Egypt). Prior to fleeing Egypt, Plaintiff was subjected to severe persecution by both government authorities and extremist actors. He was arrested, beaten, tortured, sexually assaulted, and repeatedly threatened because of his pro-democracy, pro-American views and his public criticism of Islamist extremism. These abuses left Plaintiff with lasting physical and psychological scars. He was diagnosed with Post-Traumatic Stress Disorder (PTSD) and severe anxiety as a result of the trauma. Fearing for his life, Plaintiff sought refuge in the United States — a nation he admired for its principles of freedom and tolerance.

Asylum Grant and Lawful Permanent Residence: The U.S. government found Plaintiff's claims credible and well-supported. On May 17, 2011, Plaintiff was granted asylum. In 2012, he adjusted status to become a lawful permanent resident (LPR). Since then, Plaintiff has made the United States his permanent home. He has lived in New York, paid his taxes, obeyed all laws, and endeavored to contribute positively to society. Notably, Plaintiff continues to cope with the PTSD and anxiety stemming from his past persecution — conditions recognized as disabilities under the Americans with Disabilities Act (ADA). Despite these challenges, he has remained a productive and law-abiding member of the community.

Continued Advocacy and American Alignment: After finding safety in the U.S., Plaintiff remained engaged in issues of human rights and counter-extremism. For example, he participated in peaceful public demonstrations in New York in 2013–2014 during political upheavals in Egypt, exercising his First Amendment rights to oppose the Muslim Brotherhood's agenda and support secular, democratic governance in his homeland. In one such protest in 2014, Plaintiff confronted supporters of the Muslim Brotherhood. This incident led to a minor altercation and a disorderly conduct citation (as described later), but it underscored the sincerity of Plaintiff's convictions. In sum, Plaintiff's personal history — enduring persecution for pro-American, anti-extremist beliefs — reflects a deep commitment to the principles of freedom and opposition to terrorism, principles that align with U.S. interests. He has repeatedly stood up against extremist ideologies and embraced American values at great personal risk.

## II. Plaintiff's Contributions and Good Moral Character

Educational Achievements: Plaintiff has invested heavily in his education to better serve his community and country. He holds multiple advanced degrees from U.S. institutions, including: an M.A. in Diplomacy with a concentration in International Terrorism (Norwich University, 2015); an M.A. in International Relations and International Security (Norwich University, 2018); and an M.A. in Data and Intelligence Analysis (American Military University, 2020). In addition, he earned a Bachelor's degree in Modern Languages and Linguistics (with a minor in Spanish and Latin literature) from October 6 University in Egypt. Plaintiff has also obtained various professional certifications (for example, training in trauma-informed therapy, compliance and ethics, anti-human-trafficking strategies, and leadership development through Dale Carnegie courses). These educational accomplishments demonstrate Plaintiff's commitment to personal development and to fields of study that are important to public welfare and national security.

Professional and Public Service: Plaintiff has applied his skills in several roles that serve the public interest and national security:

- Child Welfare and Protection: He worked for years as a supervisor in the child welfare field, protecting children from abuse, neglect, and human trafficking. In this capacity, Plaintiff frequently appeared in New York family courts and helped ensure that children were removed from dangerous situations and that perpetrators were brought to justice. This role demanded a high level of trust and responsibility, which Plaintiff fulfilled with dedication and compassion for society's most vulnerable.
- Compliance and Anti-Fraud Enforcement: Plaintiff later served in compliance and ethics positions, including conducting high-risk investigations into Medicaid fraud across multiple states. In these roles, he helped draft and enforce policies on whistleblower protections and anti-kickback laws, working to safeguard public funds and ensure that healthcare programs were not abused.
- Linguistic and Intelligence Support: With fluency in Arabic, English, and Spanish and deep cultural knowledge, Plaintiff has voluntarily cooperated with U.S. law enforcement and security agencies. He has worked as a contract linguist and cultural analyst for government entities (including components of DHS such as ICE, as well as the Social Security Administration) on matters of national security. By providing translation, interpretation, and cultural insights in counterterrorism contexts, Plaintiff directly assisted U.S. efforts to combat extremist threats.
- Community Education and Advocacy: Plaintiff has engaged in community outreach, educating others on secular values and warning of the dangers of radicalization. Even while overcoming personal hardships (including periods of homelessness in the past), he remained civically active and eager to contribute to the public good.

Good Moral Character: Plaintiff's conduct and record exemplify the "good moral character" required for naturalization (INA § 316(a), 8 U.S.C. § 1427(a)). He has continuously resided in the United States since 2010 (well over the required five-year period) and has complied with all laws and regulations. He has demonstrated rehabilitation, responsibility, and positive contributions to society, consistent with the standards in 8 C.F.R. § 316.10. He has consistently paid his taxes, maintained employment or actively sought work, and acted with honesty and integrity in his personal and professional dealings. There is no indication of any conduct that would disqualify him from citizenship on moral character grounds. To the contrary, Plaintiff's life story — from surviving persecution to pursuing higher education and serving his community — reflects the perseverance, loyalty, and integrity that Congress intended to reward with the privilege of U.S. citizenship.

Minor Past Incidents (Resolved and Not Disqualifying): The only blemishes on Plaintiff's record consist of a few minor, non-violent incidents from many years ago, none of which renders him ineligible for citizenship:

- 2014 Incident: Plaintiff was cited for disorderly conduct (a violation-level offense in New York, not a crime) during a heated but non-violent political protest (the demonstration against Muslim Brotherhood supporters noted above). He paid a fine or otherwise resolved this citation. This did not result in any criminal conviction.
- 2018 Incident: During a period of extreme financial hardship in 2018, Plaintiff was accused of a minor petit theft (shoplifting a pair of shoes due to being homeless with an injured knee). This charge was dismissed in its entirety by the court and resulted in no conviction. (Plaintiff has never been convicted of any theft or any felony; the dismissal confirms the matter had no legal merit or responsibility on his part.)
- Panhandling Citation: Around the same period, Plaintiff received a summons for panhandling (soliciting charity) while he was homeless. That minor charge was also dismissed with no penalties.

All of these incidents were low-level matters that either were dismissed or resulted in minimal consequences (such as a small fine or community service). Importantly, they occurred several years ago and are well outside the statutory good moral character review period for Plaintiff's current application. Under immigration law and policy, minor offenses of this nature do not preclude a finding of good moral character, especially when weighed against an applicant's positive attributes and rehabilitation. Indeed, the Board of Immigration Appeals has instructed that adjudicators must balance past minor mistakes against evidence of reform and contribution (see Matter of Marin, 16 I&N Dec. 581 (BIA 1978)). Here, any minor infractions are far outweighed by Plaintiff's decade-plus of lawful behavior, service to the community, and personal rehabilitation. In fact, Plaintiff has maintained a spotless record since 2018 (over seven years with no incidents). He has unquestionably reformed and matured, fully meeting the good moral character standard required by INA § 316(a).

Summary of Eligibility: By 2020, Plaintiff had satisfied all the fundamental requirements for naturalization: he had well over five years of continuous residence as an LPR, the required physical presence in the U.S., proficiency in the English language and U.S. civics (as demonstrated later in his interview), and good moral character during the statutory period and up to the present. There is no lawful basis under INA §§ 312 or 316 (8 U.S.C. §§ 1423, 1427), or any other provision, to deny Plaintiff citizenship. He is ready and eager to take the Oath of Allegiance and continue his service to the United States as a fully enfranchised citizen. Unfortunately, as detailed below, Defendants have improperly impeded Plaintiff's path to citizenship through a series of actions and inactions that violate the law.

## III. First Naturalization Application (2016) and 2020 FBI Interview

Initial Naturalization Application in 2016: Plaintiff first applied to become a U.S. citizen by filing Form N-400 in or around 2016, as soon as he believed he met the eligibility requirements. USCIS did not adjudicate this application for several years. Finally, on January 25, 2021, USCIS issued a decision denying Plaintiff's 2016 N-400 application. The denial letter alleged that Plaintiff lacked the required attachment to the Constitution and good moral character, on the theory that he had acted as "an agent" of the Egyptian government. This shocking accusation was based on statements attributed to Plaintiff during an encounter with FBI agents in late 2020. At the time of that encounter, Plaintiff had no legal counsel and was blindsided by the nature of the government's questioning and claims.

Orchestrated FBI Encounter (November 2020): In or about November 2020, while Plaintiff's 2016 naturalization application was still pending, Plaintiff was contacted by two individuals who identified themselves as FBI agents. They represented that they were recruiting candidates for high-level national security positions and expressed interest in Plaintiff's unique background (including his advanced degrees in counterterrorism and intelligence). Believing this to be a legitimate opportunity to serve the country, Plaintiff agreed to meet with them. The meeting took place on or about November 19, 2020, at an FBI field office in New York. Plaintiff, who has always aspired to assist the United States in counterterrorism efforts, was enthusiastic and attended in good faith, under the impression that he was being evaluated for potential government employment.

Coercive Interrogation Tactics: The meeting at the FBI office was not a genuine job interview; it was effectively a surreptitious interrogation. The agents used manipulative techniques – including leading questions, flattery, and psychological pressure – apparently aiming to induce Plaintiff into making speculative or boastful statements. Unbeknownst to Plaintiff, their goal was to probe him about matters unrelated to any job and perhaps to create a pretext for denying his naturalization. Plaintiff, who at the time was struggling with PTSD and severe anxiety, became extremely nervous during the questioning. Eager to impress what he believed were potential employers, and operating under stress, Plaintiff overstated or embellished certain aspects of his background and responded to hypothetical scenarios in an exaggerated manner. These statements did not reflect actual events or intentions; rather, they were the product of an intimidating environment and Plaintiff's misguided attempt to please the interviewers. In hindsight, Plaintiff realizes he was manipulated into discussing scenarios and "capabilities" that had no basis in reality. He deeply regrets speaking without counsel or clarification, but at the time he did not understand that this was not a bona fide recruitment interview.

No Actual Wrongdoing by Plaintiff: Despite any misleading impressions created by that FBI encounter, the truth remains: Plaintiff has never engaged in espionage, illegal intelligence-gathering, or any unlawful acts on behalf of a foreign government. He has never been asked by Egyptian authorities (or anyone else) to collect U.S. information, and he has never passed

sensitive information to any foreign entity. He has never acted as a "foreign agent" and has never been required to register as one under the Foreign Agents Registration Act (FARA). In short, nothing in Plaintiff's conduct has ever compromised U.S. national security or betrayed the country that granted him refuge. Any interactions Plaintiff had with Egyptian officials in the U.S. were limited to routine consular matters or public events related to his activism (for example, voicing opposition at demonstrations) – never covert or illicit activities. In fact, far from undermining U.S. interests, Plaintiff has consistently sought to support U.S. law enforcement and security efforts (for instance, through his work as a linguist and his public stance against extremism).

USCIS's Reliance on Uncorroborated Statements: In its denial letter dated January 25, 2021, USCIS quoted or paraphrased portions of Plaintiff's exaggerated statements from the November 2020 FBI encounter and fashioned them into an incriminating narrative. For example, the denial asserted that Plaintiff had "collected and passed information to a foreign intelligence service," that he conducted "physical surveillance of Islamic centers in New York," and that he gathered information on a U.S. Senator for Egyptian intelligence. USCIS presented these claims as if they were established facts. In reality, they were nothing more than unverified snippets from an ambush interview, taken out of context. USCIS cited no tangible evidence – no documents, no communications, no witness statements – to support these serious allegations. There have been no criminal charges or investigations against Plaintiff for any such conduct. Tellingly, Defendants did not reference any action under FARA (22 U.S.C. § 611 et seq.) or any criminal statute, because none exists. Essentially, USCIS treated Plaintiff's own nervous utterances (elicited under deceptive circumstances) as sufficient to brand him a disloyal person, without meeting any standard of proof that such an allegation would normally require. This approach is contrary to the requirement that naturalization decisions be based on reliable, verified information rather than conjecture or suspicion. USCIS's Policy Manual instructs officers to evaluate good moral character by considering the totality of circumstances, including evidence of rehabilitation and the applicant's overall record. Here, instead of weighing Plaintiff's lifetime of lawful behavior and contributions, USCIS cherry-picked uncorroborated statements from a single stressful interview and ignored all context, reaching what appears to have been a predetermined conclusion to deny.

Denial Lacked Fundamental Fairness: The denial of Plaintiff's first application was not only factually unfounded, but also procedurally unfair. USCIS never gave Plaintiff prior notice of these specific derogatory allegations or any chance to rebut them before issuing the denial. Plaintiff was not provided with the FBI report or any summary of the interview statements during the naturalization process, nor afforded a hearing or interview to explain or contest the allegations. In effect, USCIS acted as investigator, prosecutor, and judge, without allowing Plaintiff an opportunity to defend himself – a process fundamentally at odds with due process principles and with USCIS's own regulations. For instance, 8 C.F.R. § 103.2(b)(16)(i) requires that if USCIS intends to base a decision on derogatory information that the applicant is unaware of, the applicant must be advised of that information and given an opportunity to rebut it. In

Plaintiff's case, to the extent USCIS relied on information from a secret FBI interview or any other sources unknown to him (such as an erroneous DHS record noted below), it did not inform him or allow a rebuttal. By relying on undisclosed, untested information obtained through deceptive means, Defendants deprived Plaintiff of a fair process to which he was entitled. USCIS ignored key safeguards such as the importance of intent (there was no evidence of any willful intent by Plaintiff to harm the U.S., a critical consideration when accusing someone of disloyalty) and the need for a neutral adjudicator. The result was a decision that would not withstand scrutiny in a truly impartial forum.

Implausibility of the "Foreign Agent" Allegations: Moreover, the notion that Plaintiff was acting as a covert "sleeper agent" for Egypt is implausible to the point of absurdity, given Plaintiff's circumstances. At the time USCIS suggests Plaintiff was involved in espionage, Plaintiff was a recently homeless torture survivor struggling with trauma, lacking stable employment or income, and at times living in shelters. He had no access to classified or sensitive information. It defies logic that any foreign intelligence service would recruit and rely on someone in Plaintiff's position – an outspoken regime opponent who had been granted U.S. asylum, who was living in poverty and dealing with PTSD. Common sense and the publicly known facts about Plaintiff's life flatly contradict the idea that he was some kind of clandestine operative. The far-fetched nature of these allegations suggests that USCIS seized upon Plaintiff's naïve exaggerations (made under duress) as a pretext to deny his application. In doing so, the agency ignored overwhelming evidence of Plaintiff's loyalty to the United States and the patent inconsistency of the "spy" narrative. It appears that bias or a grave misunderstanding influenced the decision, rather than an objective assessment of Plaintiff's character. Put simply, the theory underlying the denial collapses under even modest scrutiny.

USCIS Record Discrepancy and Lack of Rebuttal Opportunity: To compound matters, USCIS also appeared to rely on a discrepancy in Plaintiff's immigration records without giving him notice. Specifically, DHS's electronic records did not show Plaintiff's first entry into the U.S. (which was a lawful admission on a B-2 visa in 1995), instead only reflecting his 2010 entry. This omission might have led USCIS to question Plaintiff's continuity of residence or truthfulness. Under 8 C.F.R. § 103.2(b)(16)(i), if an apparent gap or derogatory information (such as a missing record of an entry that the applicant claims) will be used to make an adverse decision, the applicant must be informed and allowed to rebut it. Here, Plaintiff was never informed that USCIS considered his 1995 entry "unverified" in their system. Had he been told, he could have produced his passport stamp and I-94 from 1995 or other proof. By not disclosing the record discrepancy and allowing Plaintiff to explain or correct it, USCIS violated its own regulation and fundamental fairness. Any decision that silently relied on an incomplete DHS record without Plaintiff's knowledge was arbitrary and capricious. In short, USCIS may have based its conclusions on a faulty factual premise (a perceived residence gap or misrepresentation) without giving Plaintiff a chance to address it, further undermining the integrity of the 2021 denial.

Improper "Second Interview" Tactics: After Plaintiff's formal naturalization interview (for the 2016 application) and before the denial was issued, individuals acting on behalf of the government conducted an unauthorized follow-up interview with Plaintiff under false pretenses. Plaintiff was led to believe that this meeting — with persons presenting themselves as recruiters for a federal contractor (referred to as "OBI") — was part of a potential employment opportunity leveraging his skills. They even instructed him to follow up with a phone call about the job (a call that was never returned). In reality, this encounter appears to have been a sham designed to elicit additional statements from Plaintiff outside the normal USCIS adjudication process. Plaintiff was not under oath during this meeting, nor was he aware that it was effectively a continuation of the government's security inquiry. He candidly (and perhaps enthusiastically) discussed his interest in helping U.S. law enforcement or intelligence efforts — as any loyal immigrant might when speaking to prospective employers in that field. He never admitted to any wrongdoing during this conversation. Unbeknownst to Plaintiff, the agents conducting this "interview" were mining his statements to find any pretext to deny his naturalization. Such tactics are extraordinarily improper. By law, naturalization examinations are to be conducted by authorized USCIS officers, under oath, and with the applicant informed of the nature of the inquiry (see INA § 335(b), 8 U.S.C. § 1446(b)). Any second interview or follow-up interrogation regarding the application should be formally scheduled and on the record (8 C.F.R. § 335.2, § 335.3, and § 335.5). Instead, the agency (or those working with it) circumvented these safeguards by orchestrating an off-the-record interrogation under a false guise. USCIS then took the contents of that unofficial interrogation and "weaponized" them against Plaintiff — stripping comments of context to construct a narrative of disloyalty. Such a "gotcha" approach offends basic due process and the American tradition of fair play. If genuine concerns about Plaintiff existed, the proper course would have been to conduct a lawful investigation and notify Plaintiff of the specific issues, giving him a chance to respond (for example, by issuing a Notice of Intent to Deny). Instead, USCIS relied on information gathered through trickery and kept Plaintiff in the dark, which is unacceptable in a proceeding as important as naturalization.

After the second military coup in Egypt in July 2013 – which removed the Muslim Brotherhood-led government from power – Plaintiff traveled to Egypt and obtained a new Egyptian passport as a result of the regime change. This routine administrative step following a governmental upheaval has been mischaracterized by USCIS as evidence of "foreign government collaboration," despite a complete lack of factual support. In reality, it is implausible to suggest that Plaintiff was serving as any kind of foreign agent. At the time, he was living in a homeless shelter, had no vehicle, and lacked access to any intelligence tools or platforms – circumstances wholly inconsistent with clandestine activity . Indeed, the notion that an individual in such dire and limited conditions could operate as a covert operative for a foreign government defies common sense. Tellingly, Plaintiff has never been investigated or charged under any law pertaining to foreign agents or national security, including the Foreign Agents Registration Act (which would require registration for true agents of a foreign principal) or 18 U.S.C. § 951 (which criminalizes acting as an unregistered agent of a foreign government), nor does he fall within any disqualifying category of INA § 101(f). No law enforcement agency has ever treated him as a foreign agent, and USCIS can point to no proceedings under FARA, 18 U.S.C. § 951, or any other statute to corroborate its accusations. In short, USCIS's allegation that Plaintiff

"collaborated" with a foreign government is unfounded and absurd and cannot justify the denial of his naturalization.

Summary of Legal Violations in the 2021 Denial: In misusing Plaintiff's coerced statements and denying his application without fair procedures, Defendants violated multiple legal requirements: (a) The INA's examination provisions (INA § 335, 8 U.S.C. § 1446) and implementing regulations, by failing to conduct the naturalization examination in a fair, above-board manner and possibly by using an interview not in compliance with legal standards; (b) 8 C.F.R. § 103.2(b)(16)(i), by not disclosing derogatory information (the misconstrued statements and any record discrepancies) and affording Plaintiff an opportunity to rebut them before deciding; (c) 8 C.F.R. §§ 316.10 and 335.3, by not basing the good moral character determination on credible, verified evidence and by not deciding the application on the record of the actual examination as required; (d) the Administrative Procedure Act, by acting in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law (5 U.S.C. §§ 555(b), 706) – the decision lacked a rational basis grounded in evidence and was reached through improper procedure; and (e) the Fifth Amendment Due Process Clause, by effectively entrapping Plaintiff and then depriving him of any meaningful opportunity to be heard or challenge the allegations. Furthermore, there is concern that Plaintiff was targeted for who he is (an Egyptian-born asylum seeker from a Muslim-majority country with dissenting political views) rather than anything he has done. To the extent the decision was influenced by Plaintiff's nationality, religion, or origin (or by retaliatory animus due to his prior asylum case or complaints), it would also violate principles of equal protection embodied in the Fifth Amendment and federal non-discrimination law. In sum, the handling of Plaintiff's first naturalization application reflected a predisposition to deny and a departure from lawful, impartial adjudication.

## IV. Second Naturalization Application (2022) and Unlawful Delay

Filing of Second N-400 in 2022: After the denial of his first application in January 2021, Plaintiff chose to reapply for naturalization rather than immediately appealing. He filed a new N-400 in or about February 2022. In doing so, Plaintiff fully disclosed the prior denial and the surrounding circumstances, confident that with the passage of time and his continued exemplary conduct, a fresh application would receive fair consideration. Plaintiff has remained eligible for naturalization throughout, and he approached the second application in good faith with the hope that USCIS would evaluate him on the merits, free of any prior bias.

Naturalization Interview (September 2022): USCIS scheduled Plaintiff for an interview on the second N-400, which took place in September 2022 at the USCIS Queens Field Office. Plaintiff attended and answered all questions truthfully. He also passed all required tests with perfect scores, including the English language and U.S. history/civics examinations. The interviewing officer did not indicate any problem or deficiency with Plaintiff's application during the

interview. By the conclusion of that interview, Plaintiff had successfully completed every requirement on his part for naturalization. Under the law, USCIS was obligated to make a decision on the application within 120 days of that examination. Specifically, 8 C.F.R. § 335.3(a) provides that a USCIS officer "shall grant or deny the application" at the time of the initial examination or, at the latest, within 120 days after the date of the initial examination. Likewise, 8 U.S.C. § 1447(b) reflects Congress's intent by allowing an applicant to seek judicial relief if a decision is not made within 120 days after the examination. As of the filing of this Complaint, approximately 34 months (nearly three years) have passed since Plaintiff's September 2022 interview, far in excess of the 120-day deadline, and USCIS has issued no decision. This failure to timely adjudicate is a clear violation of the INA's provisions and its implementing regulations. The expiration of the 120-day period has triggered Plaintiff's right under 8 U.S.C. § 1447(b) to seek a hearing in this Court on his application.

Ongoing, Unexplained Delay: Defendants have never provided a specific or credible explanation for the extraordinary delay in deciding the second application. Plaintiff, or individuals on his behalf, made numerous inquiries to USCIS about the status of the case in 2022, 2023, and 2024. Each time, USCIS offered only vague and generic responses, such as that the application was undergoing "additional background checks" or delayed due to unspecified "national security concerns." For example, in response to a Congressional inquiry made on Plaintiff's behalf, USCIS replied that the case remained under "security review" but gave no details or estimated timeline. These boilerplate explanations strongly suggest that Plaintiff's file has been labeled with a generic security hold without substantive justification. Invoking "national security" in such a conclusory manner cannot indefinitely excuse the failure to perform a mandatory duty. Courts have noted that the 120-day timeframe set by Congress may not be bypassed with vague security justifications absent evidence; an open-ended security check is not a lawful basis to ignore the statutory deadline. In reality, Plaintiff's background had already been extensively vetted during his asylum process, again during his first N-400 process, and presumably again prior to the 2022 interview. It is standard USCIS procedure that FBI name-checks and other security clearances are completed before an applicant is scheduled for the naturalization interview. Therefore, any claim by Defendants that "background checks" are still pending years after the interview strains credulity — especially nearly three years later. The nearly three-year silence and inaction, shrouded by references to "security," appears to be nothing more than a pretext to mask an unlawful delay. In short, no legitimate cause for the delay has been communicated to Plaintiff.

Hostile Treatment During Status Inquiries: On multiple occasions between 2022 and 2025, Plaintiff visited the USCIS Queens Field Office in person (through InfoPass appointments or walk-in inquiries permitted by 8 C.F.R. § 103.2(b)(19)) to request updates on his case. Unfortunately, during these visits Plaintiff encountered hostile and dismissive treatment from certain USCIS personnel. Officers responded to his questions with impatience or irritation, at times implying that his persistence in asking about his long-delayed application was unwelcome. This hostile treatment left Plaintiff feeling humiliated and intimidated. The anxiety from these

interactions, combined with the protracted uncertainty, exacerbated Plaintiff's PTSD and stress. He has experienced sleeplessness and heightened fear that pursuing his rights might invite further mistreatment. The manner in which field office staff handled Plaintiff's inquiries further reinforced his concern that the continued delay is driven not by legitimate factors, but by bias or a punitive attitude toward him (whether due to his prior conflict with the agency or his background). Such conduct by agency staff is inconsistent with the expectation of impartial service and has effectively discouraged Plaintiff from seeking information through normal channels.

Plaintiff's Continued Eligibility and Absence of Any New Concerns: It must be emphasized that nothing about Plaintiff's situation has changed that would justify an extended hold or revisit of his eligibility. Plaintiff's life since 2011 (when he was granted asylum and then LPR status) has been an open book to the U.S. government. He has lived and worked under his real name, paid taxes, undergone federal background checks for employment, and even assisted U.S. agencies as described. In over a decade and a half in this country, Plaintiff has never been arrested for any serious offense, never been charged with any national security-related infraction, and has never had his immigration status revoked. The U.S. Government itself recognized Plaintiff's need for protection by granting him asylum and a green card, which inherently required security vetting. If Plaintiff truly posed a threat to national security or public safety (as Defendants vaguely imply by the delay), the Government has had ample tools and opportunity to act: for instance, he could have been arrested, placed in removal (deportation) proceedings, or had his asylum/LPR status rescinded on security grounds. None of that has happened. On the contrary, in the years since his asylum was granted, no enforcement action of any kind has been taken against Plaintiff. Under the INA, even individuals suspected of terrorism or espionage can be swiftly removed or denied benefits (see INA §§ 237 and 238, 8 U.S.C. §§ 1227, 1228). The fact that Plaintiff remains in good legal standing, and has even been trusted in roles serving U.S. interests, undermines any insinuation that he is a danger. Defendants' posture — treating Plaintiff as a security concern for purposes of naturalization, while never actually pursuing any security-related action against him — is inherently contradictory. It strongly suggests that the "national security" rationale for delaying his citizenship is a pretext rather than reality. In other words, there is no evidence-based reason for the delay; Plaintiff appears to be unfairly singled out, likely because of the now-discredited 2020 FBI episode and possibly due to improper profiling (as an asylee from a Muslim-majority country who has been vocally anti-extremist). Such disparate treatment is unjust and unlawful if based on factors unrelated to Plaintiff's qualifications for citizenship.

Subsequent USCIS Denial Without Proper Process: After Plaintiff began seeking judicial relief for the delay (by preparing to invoke § 1447(b)), USCIS proceeded to issue a denial of Plaintiff's second naturalization application in mid-2025. This denial (which came roughly three years after the interview and only after Plaintiff signaled intent to escalate the matter) is rife with vague and unfounded allegations. For example, the decision alleges that Plaintiff worked for the Egyptian intelligence service (Mukhabarat) "for several years," that he surveilled an Islamic center, and that he "targeted" a sitting U.S. Senator (by name) for intelligence purposes. Plaintiff

categorically denies each of these claims as utterly false. The denial letter cites no specific dates, locations, or evidence for these accusations — no surveillance footage, no witnesses, no documents. The allegations appear to be nothing more than a distorted repackaging of the same snippets of Plaintiff's own words from the coerced 2020 interview, now presented out of context and exaggerated to sound nefarious. USCIS has provided zero concrete evidence to substantiate these serious charges; they are, at best, speculative conclusions drawn from mischaracterized statements.

No Opportunity to Rebut (Violation of Procedure): Compounding the due process concerns, USCIS never gave Plaintiff notice that it was contemplating these new accusations or a chance to respond before issuing the denial. Normally, if potentially disqualifying derogatory information comes to light after an interview, USCIS regulations and policy call for the agency to issue a Notice of Intent to Deny (NOID) or a Request for Evidence (RFE) to the applicant, detailing the concerns and giving the applicant an opportunity to rebut or clarify. See, e.g., 8 C.F.R. §§ 335.3 and 103.2(b)(8)(iv). In Plaintiff's case, despite the sensational nature of the allegations (which insinuate national security and bad moral character issues), no NOID or other prior notice was provided. Plaintiff was never informed that USCIS was considering these specific claims, nor asked for additional information or explanation. He was blindsided by the denial. This failure to follow standard procedure violated 8 C.F.R. § 103.2(b)(8) and (b)(16), which exist to prevent exactly what happened here: a decision based on information the applicant never had a fair chance to address. By proceeding straight to denial on the basis of untested allegations, Defendants denied Plaintiff the fair process mandated by both agency regulations and the APA (which requires agencies to engage in reasoned decision-making and give interested parties a chance to participate in the process, see 5 U.S.C. § 555(b)). A decision based on secret or unchallenged assertions is inherently arbitrary and capricious. It lacks the "satisfactory explanation" and reasoned factual basis that the law requires for agency action. In short, the belated denial of 2025 only underscores the arbitrariness of Defendants' handling of Plaintiff's case and further demonstrates why judicial intervention is warranted.

Consequences of Defendants' Delay and Actions: The protracted delay and unfair treatment in this naturalization process have caused Plaintiff significant hardship. The uncertainty and lack of resolution have strained Plaintiff's family and financial stability. His marriage has suffered under the stress, and at one point Plaintiff became homeless, having to seek shelter in a New York City homeless shelter due to the combined effect of job instability and legal limbo. Furthermore, because Plaintiff remains stuck in LPR status, his ability to secure certain employment and benefits is limited, and it has impeded immigration benefits for his immediate family (for instance, his wife's ability to obtain work authorization has been delayed, as it was tied to Plaintiff's status progression). These difficulties are a direct result of Defendants' failure to timely grant an immigration benefit to which Plaintiff is legally entitled. Such an outcome is precisely what Congress sought to avoid by imposing a 120-day deadline in § 1447(b) – to prevent applicants from languishing in procedural limbo to the detriment of their lives and families. Plaintiff has done everything right and met every requirement; yet, due to no fault of his

own, he has been left in a state of uncertainty and increasing desperation. He now turns to this Court to put an end to this undue delay and deliver a just result.

Need for Judicial Intervention: In light of the above, judicial intervention under 8 U.S.C. § 1447(b) is not only warranted but necessary. By taking over jurisdiction of the naturalization application, this Court can ensure that Plaintiff's case is decided on the merits and according to law, free from the bias, pretext, and procedural unfairness that have plagued it. Court intervention can remedy the compounded harms – restoring Plaintiff's dignity, reuniting and stabilizing his family's situation, and realigning the handling of this case with the rule of law. Only through a de novo review by this Court can the process be reset on a fair footing and the promise of our immigration laws be upheld in Plaintiff's case.

# Causes of Action

Count I – Failure to Timely Adjudicate Naturalization Application (Violation of 8 U.S.C. § 1447(b) & 8 C.F.R. § 335.3): Defendants have violated their duty under the immigration laws by failing to adjudicate Plaintiff's naturalization application within the time frame required by law. 8 C.F.R. § 335.3(a) mandates that USCIS "shall" make a decision on a naturalization application at the time of the initial examination or within 120 days thereafter. In this case, Plaintiff's naturalization interview took place in September 2022, but Defendants allowed approximately 34 months to elapse without issuing any decision. This delay flagrantly exceeds the 120-day limit set by Congress and the agency's own regulations. Under 8 U.S.C. § 1447(b), once the 120-day period passed, Plaintiff gained the right to seek a hearing on his application in this Court. By operation of the statute, this Court now has exclusive jurisdiction over the application. Defendants' retention of the case beyond the 120-day period – without granting or denying the application – is unlawful agency inaction. The failure to act within the prescribed time is not excused by any pending background checks or vague security concerns; courts have consistently recognized that the 120-day clock is triggered by the date of the examination, regardless of additional internal steps the agency may claim to be undertaking. By violating the statutory timeline, Defendants have withheld action that Plaintiff is entitled to (a timely decision, one way or the other) and have effectively refused to perform a duty mandated by law. Plaintiff asks this Court, pursuant to § 1447(b), to take jurisdiction over the application and adjudicate it de novo, thereby remedying Defendants' violation of the law.

Count II – Unreasonable Delay / Agency Action Unlawfully Withheld (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 555(b) & 706(1)): Defendants' nearly three-year delay in adjudicating Plaintiff's naturalization application, as well as their earlier prolonged handling of the first application, constitutes agency action unlawfully withheld and unreasonably

delayed under the APA. 5 U.S.C. § 555(b) requires federal agencies to conclude matters presented to them "within a reasonable time." Likewise, 5 U.S.C. § 706(1) empowers courts to compel agency action that is unlawfully withheld or unreasonably delayed. Here, USCIS and DHS have failed to proceed with Plaintiff's application in a time frame that could be considered reasonable. An almost three-year period of inaction after all requirements were met is, per se, unreasonable – especially given the Congress-imposed benchmark of 120 days after an interview. Defendants have offered no sufficient justification for this delay. Boilerplate references to extended "security checks" do not render the delay reasonable, particularly when Plaintiff's case had already been subject to extensive vetting and when such checks ordinarily would have been completed long before the interview was ever scheduled. By failing to conclude the naturalization process for such an extraordinary duration, Defendants are in violation of the APA's mandate for timely administrative action. Plaintiff requests that this Court, under § 706(1), compel Defendants to issue a decision on the application forthwith (or to itself adjudicate the application, pursuant to § 1447(b), which provides the same remedy of prompt decision).

Additionally, to the extent Defendants' actions (or inactions accompanied by stated positions) can be reviewed under 5 U.S.C. § 706(2), those actions have been arbitrary, capricious, and not in accordance with law. The APA prohibits agency decisions that rely on factors Congress did not intend, that offer explanations contrary to the evidence, or that are so implausible that they cannot be ascribed to agency expertise. In Plaintiff's case, USCIS's handling of his applications reflects arbitrary and capricious decision-making: the 2021 denial was based on irrelevant, unverified information (while ignoring the abundant evidence of Plaintiff's good character), and the ongoing delay undermines the very purpose of the INA's naturalization provisions. Defendants have failed to act as required and have taken positions unsupported by the record, thus violating the APA. Plaintiff asks that the Court declare the agency's delay unlawful and order Defendants to promptly do what they were obligated to do – i.e. render a fair decision on Plaintiff's naturalization application. In sum, by both withholding action and by engaging in procedurally and substantively improper actions, Defendants have violated the APA.

Count III – Violation of Fifth Amendment Due Process: Defendants, acting under color of federal law, have deprived Plaintiff of his right to due process guaranteed by the Fifth Amendment. An applicant for naturalization, while not entitled to approval, is entitled to a fair process in the consideration of his application. Procedural due process requires notice of the government's concerns and a genuine opportunity to be heard by an impartial adjudicator. Defendants have violated these principles in multiple ways:

- Denial without Fair Hearing: USCIS's 2021 denial of Plaintiff's first application was issued without giving Plaintiff any meaningful opportunity to address or rebut the serious allegations against him. He was not provided the derogatory evidence or interview report before the decision, nor afforded any hearing or interview focused on those accusations. The agency effectively made a determination of lack of good moral character (and

attachment to the Constitution) based on contested, second-hand information, without ever allowing Plaintiff to tell his side of the story in a proper forum. This one-sided process fell short of fundamental fairness, especially given the gravity and stigmatizing nature of the allegations (branding him a foreign agent).

- Bias and Predetermination: USCIS's conduct in handling Plaintiff's second application indicates that the agency had prejudged Plaintiff and was not acting as a neutral decision-maker. The openly hostile treatment Plaintiff received from some field office personnel when he inquired about his case status, coupled with the indefinite stall on his application, suggest that USCIS had no intention of giving him a fresh or fair evaluation. It appears the agency carried over a negative preconception from the first case and "flagged" Plaintiff in a way that tainted the second application process. An impartial adjudicator is a core requirement of due process, yet here Plaintiff's quest for citizenship was overseen by officials who, on information and belief, were influenced by improper bias or animus (whether due to Plaintiff's prior disputes with the agency, his disability, his ethnic/religious background, or other irrelevant factors).
- Use of Coerced and Unreliable Evidence: Defendants have heavily relied on the November 2020 FBI interview – an interview obtained through deception and conducted without counsel or proper context – as the linchpin for both denying the first application and delaying/denying the second. The use of such evidence violates due process. It is a fundamental principle that government decisions, especially those affecting important interests like the right to obtain citizenship, should be based on reliable evidence and that individuals should have a chance to contest evidence used against them. Here, USCIS rested its decisions on statements that were not only uncorroborated and elicited under duress, but also never subjected to any adversarial testing or opportunity for rebuttal by Plaintiff. Basing adverse decisions on such dubious evidence, without procedural safeguards, is fundamentally unfair and unconstitutional.
- Deprivation of a Timely Decision / Liberty Interest: The extraordinary delay itself implicates due process concerns. While naturalization is a privilege, not a guaranteed right, once Plaintiff met all statutory criteria and passed his examination, he obtained a statutory entitlement to a decision within a reasonable time (the 120 days prescribed by Congress). By flouting that rule and leaving Plaintiff in indefinite limbo, Defendants have effectively deprived him of the ability to enjoy the benefits of citizenship (a liberty interest in the broader sense) without due process of law. Congress created § 1447(b) specifically to prevent applicants from being in procedural limbo; Defendants' refusal to act has forced Plaintiff to remain an LPR for years longer than necessary, with associated burdens and without the full rights of a citizen. In essence, he has been denied an outcome – either approval or denial with recourse to appeal – and thus denied closure and the privileges that come with a favorable decision, all without the protections of a fair administrative process.

For all the above reasons, Defendants have violated Plaintiff's Fifth Amendment right to due process of law. The appropriate remedy is for this Court to take up Plaintiff's naturalization application and ensure de novo review in a fair proceeding. This Court's intervention can cure the procedural deficiencies by providing Plaintiff the hearing he never received and by

evaluating the evidence impartially. If the Court finds Plaintiff eligible (as the reliable evidence overwhelmingly indicates), it should grant naturalization. In the alternative, due process would at least require the Court to order a properly conducted re-adjudication with all necessary safeguards – but given the agency's record here, Plaintiff submits that the Court itself should decide the application on the merits.

Count IV – Violation of Fifth Amendment Equal Protection (Invidious Discrimination): The Fifth Amendment's Due Process Clause encompasses an equal protection component that forbids the federal government from unjustifiably discriminating between individuals. Plaintiff alleges that Defendants have intentionally subjected him to disparate, harsher treatment in the naturalization process on account of prohibited characteristics, such as his national origin, ethnicity, and prior asylum status (and associated religious/political background). Such treatment, if proven, violates equal protection principles. Upon information and belief:

- Plaintiff's Middle Eastern (Egyptian) origin and Muslim background (notwithstanding the fact that he is a vocal opponent of Islamist extremism) triggered heightened suspicion and extra scrutiny not applied to many other applicants. It is well-documented that, in past years, USCIS had internal programs (e.g., the now-discontinued "Controlled Application Review and Resolution Program" or CARRP) that disproportionately targeted applicants from Muslim-majority countries or those perceived as security risks, often causing long delays and higher denial rates for those individuals. Plaintiff's case bears hallmarks of such disparate treatment. His file was labeled with national security concerns and stalled for an inordinate time, similar to patterns seen under CARRP (which has been criticized as profiling).
- Plaintiff's identity as an Egyptian dissident and an asylum seeker may have also contributed to differential treatment. Rather than viewing his background as a refugee from persecution as a positive factor (he received asylum due to opposing an authoritarian regime), certain officials may have improperly viewed him with mistrust. His outspoken political opinions against the Muslim Brotherhood and other oppressive actors—activities protected by the First Amendment—might have been misconstrued or held against him due to bias.
- Comments and attitudes encountered by Plaintiff at the field office (as described above) further suggest a lack of neutrality. For instance, a USCIS officer's dismissive remarks to Plaintiff when he inquired about his case implied that his persistence was not welcome, and the indignity he experienced in those interactions hints that he was being treated as an "undesirable." Such hostility is not commonly reported by applicants absent some form of prejudice or preconceived negative judgment.
- Defendants have offered no legitimate, individual-specific reason why Plaintiff's application remains unresolved when thousands of other naturalization applications (including of individuals with far more complicated backgrounds) are granted routinely within months. Many applicants with issues (even some with minor criminal records or prior immigration violations) receive timely decisions or at least a chance to respond to concerns. By contrast, Plaintiff — who has no disqualifying issues — has been singled out for an extraordinary delay and extraordinary accusations. The only distinguishing

factors in his case appear to relate to who Plaintiff is (an Egyptian-born asylee from a Muslim-majority country, with disabilities and a history of criticizing extremist groups) and what he has said (comments from the 2020 interview and his political activism). Targeting him for these reasons is unconstitutional.

- The equal protection violation is evident in that if Plaintiff were not Egyptian or not from a Muslim background (or if he had not been an asylum applicant with a "security" flag), it is highly likely his application would have proceeded like a normal case. The disparate delay and scrutiny he has faced are not justified by any legitimate government interest, especially after such a long time with no concrete derogatory evidence produced.

By treating Plaintiff differently based on suspect classifications (national origin/religion) or in retaliation for his protected activities (expression of political opinions and pursuit of legal rights), Defendants have violated the equal protection guarantee of the Fifth Amendment. Plaintiff is entitled to relief that ensures he is treated equally to other applicants — meaning his application should be decided on the actual merits, without bias, and without regard to his ethnicity, religion, or status as an asylum seeker. The Court's de novo review can provide that equal treatment, and any future conduct by Defendants can be enjoined to prevent discriminatory practices.

Count V – Violation of Rehabilitation Act § 504 (Discrimination Based on Disability): Plaintiff is a qualified individual with disabilities – specifically, PTSD and severe anxiety disorder – which substantially limit major life activities (including sleeping, concentrating, and handling extreme stress). These conditions are well-documented and stem from the severe trauma he suffered due to persecution. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits federal agencies (and entities receiving federal funding) from discriminating against individuals on the basis of disability in their programs and activities. The policies of the Americans with Disabilities Act (ADA) similarly seek to ensure that persons with disabilities receive equal opportunity and reasonable accommodations, and these principles apply to federal agencies through analogous provisions and as a guide to Section 504 compliance.

In the handling of Plaintiff's naturalization process, Defendants failed to accommodate Plaintiff's known mental health condition and then effectively penalized him for behavior that was a direct product of his condition. Defendants were or should have been aware that Plaintiff is a survivor of torture with PTSD and anxiety: his immigration file reflects his asylum claim based on torture, and during interactions (such as the 2020 FBI interview and subsequent USCIS visits) he exhibited obvious signs of anxiety and distress. Yet instead of adjusting their approach to account for his vulnerability, government agents exploited it. The FBI agents in 2020 took advantage of Plaintiff's suggestibility and intense desire to please – symptoms related to his PTSD – to coax exaggerated statements from him. USCIS then took those distorted statements at face value, without context, and used them as a basis to brand Plaintiff as a security risk. In effect, USCIS failed to give Plaintiff an equal opportunity to benefit from the naturalization

process because it factored in his disability in a prejudicial way. A person without PTSD in the same situation might not have made the ill-considered remarks that Plaintiff did; or, if USCIS had properly understood the influence of Plaintiff's PTSD (statements made under duress and severe anxiety), it would have discounted those remarks rather than treat them as evidence of bad character.

Furthermore, when Plaintiff later engaged with USCIS at the field office to inquire about his case, the hostile and intimidating environment he faced exacerbated his psychiatric symptoms. Instead of offering any accommodation or patience (for example, allowing him to explain his situation calmly or considering medical evidence of his condition), USCIS personnel's conduct worsened his anxiety to the point that a person with his disability could hardly navigate the interaction. This could be seen as a constructive denial of services based on disability. At no point did Defendants suggest any reasonable accommodation for Plaintiff's condition – such as permitting him to provide clarifying information in writing or with the assistance of medical testimony regarding his behavior under stress – before labeling him with derogatory conclusions.

Federal law requires agencies to make reasonable accommodations for known disabilities and to refrain from actions that amount to discrimination. By leveraging Plaintiff's psychological vulnerability against him (using statements made under mental duress as a sword, and by treating him brusquely when he sought help), Defendants violated Section 504 of the Rehabilitation Act (which applies to DHS/USCIS) and acted contrary to the spirit of the ADA. The result is that Plaintiff's path to citizenship has been impeded because of his disability-related behavior, which is unlawful. Plaintiff seeks appropriate relief to ensure that his disability is not held against him going forward. This includes having the naturalization decision be based on objective facts and merits, not on manifestations of his PTSD, and that any adjudication account for and accommodate his condition rather than punish him for it.

# Prayer for Relief

WHEREFORE, Plaintiff Atef Sabry Abuelenin respectfully requests that this Honorable Court grant the following relief:

A. Assume Jurisdiction Over Naturalization Application: Pursuant to 8 U.S.C. § 1447(b), take exclusive jurisdiction over Plaintiff's pending Form N-400 Application for Naturalization, removing the matter from USCIS's control. Given the excessive delay and the circumstances of

this case, Plaintiff asks the Court to retain jurisdiction rather than remanding the application back to USCIS.

B. Conduct De Novo Hearing and Adjudication: Conduct a de novo hearing and adjudicate Plaintiff's eligibility for naturalization. Plaintiff requests that the Court independently review all pertinent facts and law, receive any additional evidence or testimony as needed, and determine that Plaintiff meets all requirements for naturalization under the INA (including the requirements of INA §§ 316 (good moral character), 318, and 335, among others). Upon confirming Plaintiff's statutory eligibility, the Court is requested to approve the naturalization application.

C. Order Naturalization and Oath Administration: If Plaintiff is found eligible for naturalization, enter an order granting Plaintiff's application for naturalization and direct that he be administered the Oath of Allegiance at the earliest possible date. The Court's order should ensure that Plaintiff is sworn in as a citizen of the United States without any further delay or interference by Defendants.

D. Injunctive Relief Against Retaliation or Adverse Actions: Issue appropriate injunctive relief to prevent Defendants (including USCIS, DHS, the FBI, and their officers/agents) from engaging in any form of retaliation or punitive action against Plaintiff for asserting his rights in this litigation or for the circumstances that led to this lawsuit. Such injunctive relief should include: (1) prohibiting Defendants from using the filing of this lawsuit or Plaintiff's prior complaints/opposition to agency actions as a negative factor in any future adjudications involving Plaintiff or his immediate family; (2) prohibiting Defendants from taking any adverse immigration action against Plaintiff or his family members that is not legally warranted on the merits of their cases; and (3) ensuring that, upon Plaintiff's naturalization, he and his family are not subjected to any lingering "flags" or undue scrutiny that would deprive them of the full rights and benefits of U.S. citizenship and lawful permanent residence.

E. Costs and (If Applicable) Attorneys' Fees: Award Plaintiff the costs he has incurred in this action, including filing fees, service fees, and other litigation expenses. As Plaintiff is currently pro se, no attorneys' fees are sought at this time; however, in the event Plaintiff retains counsel or is otherwise eligible in the future, he reserves the right to seek reasonable attorneys' fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, or other applicable law, due to the government's lack of substantial justification for its actions.

F. Such Other and Further Relief as the Court Deems Just and Proper: Grant any other relief – legal or equitable – that the Court finds just, proper, and necessary to fully resolve this matter. This may include declaratory relief (for example, a declaration that Defendants' delay and handling of Plaintiff's application were unlawful) and any additional orders needed to protect Plaintiff's rights and ensure the prompt and fair administration of justice in this case.

Respectfully submitted,

Dated: August 7, 2025

Atef Sabry Abuelenin (Plaintiff, pro se)

Address: [redacted]

Mailing Address: P.O. Box 73, New York, NY 10018

Contact: A# 201-132-868 – Email: eleynin@gmail.com

# AFFIDAVIT OF LOYALTY AND CATEGORICAL REBUTTAL OF ERRONEOUS FOREIGN AGENT ALLEGATIONS

I, **Atef Sabry Abuelenin**, Alien Registration Number A201-132-868, being duly sworn, do hereby declare and affirm under penalty of perjury, pursuant to **28 U.S.C. § 1746**, as follows:

## Foundational Loyalty to the United States

1. From the earliest days of my life, I have been shaped not by privilege or ease, but by hardship, persecution, and unwavering admiration for the principles enshrined in the Constitution of the United States—liberty, equality, democracy, and the inherent dignity of every human being.
2. Born and raised in Egypt, I endured systemic oppression for no other reason than my affinity for the ideals of the United States and my rejection of extremism, authoritarianism, and religious intolerance.
3. As a child, I embraced the English language—not merely as a linguistic tool—but as a symbol of intellectual emancipation, freedom of expression, and hope for a more just world. I spoke American English with fluency, not as an affectation, but as an act of quiet rebellion against the oppressive forces surrounding me.
4. For daring to adopt Western ideals and pro-American views, I was subjected to relentless abuse, humiliation, and violence. I was branded a "disbeliever," "infidel," "traitor," and worse, simply for advocating secular governance, human rights, and my support for U.S. foreign policy.
5. My refusal to conform to extremist ideologies resulted in brutal retaliation. I was [redacted]
6. I have also survived the invisible wounds of trauma: I endured [redacted]
7. It is not hyperbole, but fact, that my life's trajectory has been defined by my admiration for the United States and my unrelenting defense of its ideals, even when doing so endangered my own safety.

# Fleeing Persecution and Building a Life of Service

8. Fearing for my life, I lawfully sought refuge in the United States, a nation I revere as a beacon of hope and freedom. On November 5, 2010, I entered this country and applied for asylum, supported by credible evidence of my persecution.
9. The United States, recognizing the legitimacy of my fear and the gravity of my suffering, granted me asylum on May 17, 2011, and lawful permanent resident status on July 25, 2012.
10. I have since devoted my life to honoring this nation—not merely in words, but through concrete actions rooted in public service, education, and the protection of the most vulnerable.
11. I have earned **three Master's degrees** from respected American institutions, each focused on areas vital to national security and public welfare:

- *M.A. in Diplomacy with a concentration in International Terrorism* (Norwich University)
- *M.A. in International Relations and International Security* (Norwich University)
- *M.A. in Data and Intelligence Analysis* (American Military University)

12. My professional career reflects these academic commitments. I have:

- Served in child welfare investigations, protecting children from abuse, neglect, and trafficking;
- Worked in corporate compliance and Medicaid fraud prevention, safeguarding public resources and promoting ethical governance;
- Assisted U.S. government agencies as a linguist and cultural analyst, contributing to counterterrorism and national security efforts.

13. I have achieved these milestones while battling the psychological aftermath of persecution [redacted] both [redacted]

# Absolute Rebuttal of False Foreign Agent Allegations

14. I unequivocally and categorically deny the baseless, offensive, and damaging allegations that I have ever operated as a foreign intelligence agent, engaged in espionage, or compromised the security of the United States.
15. These allegations, which surfaced during my naturalization process, are not only false—they are fundamentally incompatible with the totality of my life story, my documented sacrifices, and my unwavering allegiance to the United States.
16. The record speaks for itself:

- I have never registered under the **Foreign Agents Registration Act (FARA),** 22 U.S.C. § 611 et seq., because I have never acted as a foreign agent, nor has such registration ever been warranted.
- I have never been arrested, charged, or convicted of espionage, foreign intelligence activities, or any offense implicating national security.

- My few trips to Egypt were undertaken openly, solely for family reasons, and never in connection with clandestine operations and after the downfall of Mubarak and Muslim Brotherhood administrations or regimes.
- I have lived transparently in the United States, subjected to background checks, public service employment, and community engagement, all of which contradict the notion of hidden foreign allegiances.

17. To suggest that a man who fled Egypt under threat of death for defending U.S. values, who lived in American homeless shelters, who overcame severe trauma, who invested in counterterrorism education, and who dedicated himself to public service—could simultaneously be a covert agent of a foreign power is not only illogical but deeply insulting.
18. Such allegations disregard basic principles of fairness, evidence, and the presumption of good moral character outlined in **8 U.S.C. § 1427(a)** and **8 C.F.R. § 316.10**, which require a holistic, fact-based assessment of eligibility for naturalization.

# Enduring Commitment to the United States and Its Ideals

19. My loyalty to the United States is not a fleeting sentiment—it is an enduring, lived reality demonstrated by:

- Over **14 years** of continuous lawful residence in the United States;
- Completion of all statutory naturalization requirements, including civics and English proficiency tests;
- Active contributions to child protection, public welfare, and institutional integrity;
- Advocacy against extremist groups, including the Muslim Brotherhood, whose ideologies threaten global peace and democracy.

20. I have risked everything for the opportunity to live under the protection of the U.S. Constitution and to serve this nation. The mere suggestion that I would undermine the United States—the very nation that sheltered me from persecution—is not only unfounded but offensive to the truth of my life's sacrifices.
21. It is inconceivable that I would jeopardize the freedoms I fought to obtain, or betray the country that offered me refuge when my homeland sought to silence me.

# Closing Statement and Plea for Justice

22. I respectfully submit this affidavit not merely to defend my reputation, but to affirm my unwavering allegiance to the United States and my rightful place within its civic community.
23. The allegations against me are rooted in conjecture, mischaracterization, and an unfortunate distortion of facts. They do violence to the principles of due process, equal protection, and human dignity upon which this nation was founded.

24. I implore this Honorable Court to look beyond the shadows of suspicion and to see the truth of my journey: a man who, despite suffering grave abuse, refused to abandon his ideals; who, despite relentless adversity, pursued education and public service; who, despite false allegations, remains loyal to the United States.
25. I submit this affidavit in good faith, under oath, and in pursuit of truth, justice, and the fair adjudication of my naturalization application. I do so with profound respect for this Court and the constitutional principles it upholds.

**Executed on August 5th, 2025, in Queens, New York.**

**Signature:** Atef Sabry Abuelenin

**Atef Sabry Abuelenin**

Alien Registration Number: A201-132-868

Email: eleynin@gmail.com

# MOTION FOR PRELIMINARY INJUNCTION

**UNITED STATES DISTRICT COURT**

Eastern District of New York

**Atef Abuelenin,**

Petitioner,

v.

**United States Citizenship and Immigration Services (USCIS), et al.,**

Respondents.

**Case No.:** [To be assigned]

# EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND PROTECTION OF COURT JURISDICTION

**Petitioner, Atef Abuelenin**, respectfully moves this Honorable Court for the issuance of a preliminary injunction enjoining Respondents from taking any final adjudicative action on his pending Form N-400, Application for Naturalization, that would have the effect of depriving this Court of exclusive jurisdiction under **8 U.S.C. § 1447(b)**, unless such action is taken under the supervision and authority of this Court.

This motion is brought pursuant to **Rule 65 of the Federal Rules of Civil Procedure**, **28 U.S.C. § 1651(a)** (the All Writs Act), and the Court's inherent power to protect its jurisdiction and prevent manipulation of judicial review.

This relief is necessary to prevent irreparable harm to Petitioner's statutory and constitutional rights, safeguard the integrity of this Court's jurisdiction, and deter retaliatory agency action inconsistent with due process and administrative fairness.

Additionally, under **28 U.S.C. § 1651(a)**, courts may issue injunctions to preserve their jurisdiction and prevent interference with judicial proceedings (*United States v. New York Telephone Co.*, 434 U.S. 159 (1977)).

# III. ARGUMENT

## A. Likelihood of Success on the Merits

Petitioner satisfies all statutory requirements for this Court to assume jurisdiction under **8 U.S.C. § 1447(b)**:

- Petitioner filed his N-400 application in **February 2022**;
- Petitioner completed his naturalization interview in **September 2022**;
- Over **650 days** have elapsed with no final decision;
- Petitioner has exhausted administrative remedies to no avail.

Under the plain language of **§ 1447(b)** and binding precedent, once 120 days pass after examination without a decision, jurisdiction transfers to this Court. See *Khan v. USCIS*, 541 F. Supp. 2d 775 (E.D. Va. 2008).

USCIS cannot defeat judicial review by rushing a retaliatory denial after this lawsuit is filed. Thus, Petitioner has a strong likelihood of prevailing on the merits.

## B. Irreparable Harm

Absent injunctive relief, Petitioner faces severe, irreparable harm, including:

- Retaliatory denial calculated to defeat judicial jurisdiction;
- Potential initiation of removal proceedings based on false foreign agent allegations;
- Prolonged deprivation of the rights and benefits of citizenship;
- Permanent damage to Petitioner's reputation, mental health, and livelihood;
- Undermining of statutory due process protections.

Courts have recognized that immigration-related harm—especially loss of status or bar to naturalization—constitutes irreparable injury. See *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The imminent risk of agency retaliation, coupled with the unique nature of immigration status, satisfies this requirement.

Rego Park, New York

*Atef Sabry Abuelenin*

# SWORN STATEMENT OF ATEF SABRY ABUELENIN REGARDING COUNTERTERRORISM, NATIONAL SECURITY, AND PUBLIC SAFETY CONTRIBUTIONS

I, **Atef Sabry Abuelenin**, Alien Registration Number A201-132-868, respectfully submit this sworn statement under penalty of perjury, pursuant to **28 U.S.C. § 1746**, in further support of my naturalization application and to provide clarity regarding my unwavering commitment to the national security interests of the United States, my professional contributions to public safety, and my consistent opposition to terrorism, radicalization, and extremist ideology:

## Personal History and Opposition to Extremism

1. I am a survivor of political persecution, sectarian violence, and extremist retaliation in the Arab Republic of Egypt. I was systematically targeted, physically assaulted, and subjected to egregious human rights abuses because of my outspoken rejection of radicalization, authoritarianism, and political Islam, and because of my unwavering admiration for the United States and its constitutional principles of freedom, democracy, and secular governance.
2. I have endured abuse at the hands of both state actors and non-state extremist groups due to my vocal opposition to ideologies that promote terrorism, sectarian hatred, and destabilization in Egypt and abroad. My personal history of suffering as a result of my pro-American, anti-extremist stance is thoroughly documented and formed the basis for my grant of asylum in the United States.

## Educational Credentials in National Security and Counterterrorism

3. I hold advanced academic credentials in fields that directly advance the protection of national security and the fight against terrorism, including:

- **Master of Arts in International Terrorism**, Norwich University (Vermont);

- **Master of Arts in International Relations and Global Security**, Norwich University (Vermont);
- **Master of Arts in Data and Intelligence Analysis**, American Military University (West Virginia).

4. My educational journey was not merely academic; it was driven by my life-long mission to contribute meaningfully to the global fight against terrorism, to strengthen the rule of law, and to safeguard vulnerable populations from violence and exploitation.
5. My coursework, research, and practical studies have focused on areas including:

- Counterterrorism policy development;
- Intelligence operations with adherence to human rights and legal frameworks;
- Methods for de-radicalization and preventing extremist recruitment;
- Data-driven threat assessments;
- Protection of civil liberties while ensuring public safety.

## Documented Record of Anti-Extremist Advocacy

6. I have a well-documented, consistent, and public record of opposing extremist organizations, including, but not limited to:

- The **Muslim Brotherhood**, whose ideology and operations have contributed to regional instability, sectarian violence, and radicalization efforts targeting vulnerable communities;
- Other groups and individuals promoting radical, anti-democratic, or violent agendas, regardless of their political or religious affiliations.

7. I have participated in peaceful, lawful demonstrations in the United States opposing extremist movements, speaking out against the global threats posed by violent ideology, and advocating for policies rooted in democracy, human rights, and secular governance.
8. My positions have sometimes made me a target of threats and intimidation, yet I have remained steadfast in supporting U.S. interests and in rejecting all forms of extremism.

## Contributions to Public Safety and National Integrity

9. As a lawful permanent resident of the United States, I have served in professional roles that directly advance public safety, national integrity, and the protection of vulnerable populations, including:

- **Child Welfare Investigations**, where I protected minors from abuse, neglect, trafficking, and exploitation, ensuring that perpetrators were held accountable under the law;
- **Corporate Compliance and Medicaid Fraud Prevention**, where I upheld the integrity of public health care resources, identified fraud schemes, and ensured adherence to federal and state regulatory standards;
- **Cultural and Linguistic Support to Law Enforcement**, providing translation, interpretation, and cultural analysis to U.S. agencies working on national security, immigration, and counterterrorism operations.

10. My professional service reflects not only my commitment to the safety of this nation but also my alignment with American values of justice, accountability, and protection of human dignity.

## Rebuttal of False Foreign Agent Allegations

11. I categorically deny any and all allegations that I have ever engaged in espionage, unlawful intelligence operations, or any activity that undermines the national security of the United States.
12. Claims to the contrary arise from a deeply flawed and coercive 2020 interaction with FBI agents, which I entered under the good faith belief that I was being recruited for legitimate government service, consistent with my academic background in counterterrorism and intelligence.
13. During that interaction, my responses were distorted under psychological distress, manipulation, and the misunderstanding of the encounter's true nature. These statements do not reflect my actual conduct, intentions, or unwavering loyalty to the United States.
14. There exists no lawful evidence to support the conclusion that I have ever served as a foreign agent, nor have I ever been required to register under the **Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq.**, or been subjected to any criminal charges implicating national security concerns.

## Commitment to Upholding U.S. National Security

15. My life experiences as a survivor of extremist violence, coupled with my academic qualifications and professional service, uniquely position me to contribute positively to U.S. counterterrorism efforts through research, policy advocacy, intelligence analysis, and public education—not through unlawful or clandestine means.
16. I have consistently advocated for:

- Respect for human rights in counterterrorism operations;
- The development of ethical intelligence practices that preserve constitutional protections;
- Community-based de-radicalization efforts to prevent extremist recruitment;
- Safeguarding children from ideological indoctrination and human trafficking;
- Strengthening the rule of law and combating corruption that enables terrorism.

17. I remain unequivocally committed to the safety, security, and prosperity of the United States. I have demonstrated through my education, professional service, and advocacy that I am aligned with, and dedicated to, advancing the interests of this nation.
18. My lifelong embrace of American values, my rejection of extremism, and my efforts to serve this country stand in stark opposition to the defamatory and unfounded allegations I have faced during my naturalization process.

## Conclusion

19. I submit this sworn statement to reaffirm my absolute loyalty to the United States, my rejection of extremist ideologies, and my readiness to continue contributing to public safety, national security, and the protection of democratic values.
20. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Executed:** July 7, 2025

**Location:** Rego Park, New York

*Atef Sabry Abuelenin*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

ATEF ABUELENIN,

Plaintiff,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES (USCIS), et al.,

Defendants.

PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER

TO THE HONORABLE JUDGE:

Plaintiff, Atef Abuelenine, respectfully moves this Court to issue a Protective Order barring Defendants, including USCIS and the Department of Homeland Security (DHS), from issuing any adverse decision on Plaintiff's pending Form N-400, Application for Naturalization, after the filing of this Complaint, unless such adjudication occurs under direct supervision of this Court.

I. LEGAL GROUNDS AND URGENCY

1. Under 8 U.S.C. § 1447(b), this Court has exclusive jurisdiction over Plaintiff's delayed naturalization application after USCIS failed to render a determination within 120 days of Plaintiff's examination, which occurred in September 2022.

2. Plaintiff respectfully submits that there exists a substantial and well-founded risk that Defendants may attempt to issue a retaliatory, pretextual, or procedurally defective denial after the filing of this action, solely for the purpose of divesting this Court of jurisdiction, in violation of the spirit and purpose of § 1447(b).

3. Federal courts have recognized that actions designed to circumvent judicial review undermine both administrative fairness and the integrity of the naturalization process. See Ibrahim v. DHS, 538 F. Supp. 3d 327 (D. Mass. 2021); Alqarqaz v. Nielsen, No. 1:17-cv-00393, 2019 WL 157093 (E.D. Va. Jan. 9, 2019).

4. Plaintiff has exhausted all administrative remedies, including:

- Numerous inquiries to USCIS, including the Service Request ID SR11262500867RPA;
- A Congressional inquiry submitted through Senator Kirsten Gillibrand;

- A Freedom of Information Act (FOIA) request currently pending, underscoring Plaintiff's efforts to secure transparency and accountability;

- A formal demand letter served on the USCIS Queens Field Office dated July 1, 2025, requesting lawful adjudication in accordance with 8 U.S.C. § 1427, 8 C.F.R. § 316.10, and due process standards under the Fifth Amendment.

5. The prolonged delay and adverse treatment suffered by Plaintiff over nine (9) years has imposed significant psychological harm, career stagnation, and deprivation of the benefits and rights to which eligible lawful permanent residents are entitled under the Immigration and Nationality Act, including:

- The right to timely adjudication under 8 C.F.R. § 335.3(a);

- Protection from arbitrary action under 5 U.S.C. §§ 555(b) and 706(1) of the Administrative Procedure Act;

- Constitutional due process under the Fifth Amendment.

II. REQUEST FOR COURT SUPERVISION AND PROTECTION

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Issue an Order prohibiting USCIS from issuing a denial or other final decision on Plaintiff's pending N-400 application after the filing of this Complaint, unless:

1. Such adjudication occurs under the express supervision of this Court;

2. Defendants provide this Court and Plaintiff with advance written notice of any proposed decision;

3. The Court grants Plaintiff an opportunity to object, rebut, or present evidence before any final adverse action is taken.

B. Order that jurisdiction over Plaintiff's naturalization application shall remain exclusively with this Court under 8 U.S.C. § 1447(b) until full and fair adjudication occurs.

C. Grant such other relief as this Court deems just, equitable, and necessary to prevent retaliation, abuse of process, or deprivation of Plaintiff's statutory and constitutional rights.

III. CONCLUSION

Plaintiff's fears of retaliatory denial are reasonable, given Defendants' prior history of adverse treatment, misuse of national security pretext, and unexplained administrative delays. The balance of equities, public interest, and statutory framework favor judicial supervision to ensure transparency, fairness, and lawful adjudication.

Respectfully submitted,

Atef Abuelenine, Pro Se

[redacted]

# UNITED STATES DISTRICT COURT

Eastern District of New York

**Atef Sabry Abuelenin,**
Petitioner,

v.

**United States Citizenship and Immigration Services (USCIS),**

**Current or acting director of USCIS**
**Alejandro Mayorkas, former Secretary of Homeland Security,**
**Ur Mendoza Jaddou, former Director of USCIS,**
**Christopher A. Wray, former Director of the FBI,**
**Merrick Garland, Attorney General of the United States,**
Respondents.

**Case No.: to be assigned**

# SUMMONS IN A CIVIL ACTION

TO THE ABOVE-NAMED RESPONDENTS:

You are hereby SUMMONED and required to serve an answer to the Complaint filed in this action, or otherwise move, pursuant to the Federal Rules of Civil Procedure, within **60 days** after service of this Summons and Complaint upon the United States, or within **21 days** for other Defendants, exclusive of the day of service.

If you fail to respond, judgment by default will be entered against you for the relief demanded in the Complaint.

**Note from Petitioner:** Due to a well-founded fear that USCIS may attempt to issue a retaliatory denial of my pending naturalization application immediately upon learning of this lawsuit, I will personally affect service of this Summons and the Complaint upon all required parties in accordance with **Rule 4(i)** of the Federal Rules of Civil Procedure.

I will provide the Court with proof of service (including certified mail receipts and delivery confirmations) within **7 to 10 business days** of filing this Summons.

Respectfully submitted,

**Dated:** July 7, 2025
**Signed:** *Atef Abuelenin*
Atef Sabry Abuelenin
Petitioner, pro se
[redacted]

# LIST OF EXHIBITS

## *I. Identity, Status & Procedural History*

**☑Exhibit 1:**
Copy of:
(a) USCIS's denial letter dated January 25, 2021, regarding Plaintiff's first Form N-400 application;
(b) Receipt Notice for Plaintiff's second N-400 (filed in 2022); and
(c) USCIS Interview Appointment Notice for Plaintiff's September 2022 naturalization examination.

**☑Exhibit 2:**
Screenshots and official printouts from the USCIS Case Status system, along with records of varied USCIS responses and documented attempts by Plaintiff to obtain status updates via Congressional inquiries, service requests, and Ombudsman filings.

**☑Exhibit 3:**
Photocopies of Plaintiff's U.S. Permanent Resident Card (front and back), New York State Identification Card, and any additional government-issued identification establishing legal status and residence.

## *II. Denial & Delay Evidence*

**☑Exhibit 4:**
(a) Plaintiff's sworn narrative rebutting USCIS's denial grounds;
(b) Official letter from New York City Department of Homeless Services confirming Plaintiff's shelter residency history, undermining USCIS's security risk assertions and providing evidence of hardship, transparency, and lack of clandestine conduct.

## *III. Good Moral Character, Rehabilitation & Contributions*

**☑Exhibit 5:**
(a) Diplomas and/or certified transcripts for three graduate degrees:
- M.A. in International Terrorism – Norwich University

- M.A. in International Relations – Norwich University
- M.S. in Data & Intelligence Analysis – American Military University

(b) Selected professional certifications (e.g., LexisNexis compliance training, trauma-informed care, ethics);
(c) Academic research papers authored by Plaintiff and published in peer-reviewed journals;
(d) Any awards, commendations, or recognitions reflecting Plaintiff's public service, ethical standing, and civic engagement.

***IV. Rebuttal Evidence & Legal Defense***

✅**Exhibit 6:**
Plaintiff's signed affidavit or sworn declaration expressly denying allegations of foreign agency affiliation, affirming loyalty to the U.S. Constitution, and explaining the deceptive and coercive nature of the 2020 FBI interview cited in USCIS's denial.

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
26 Federal Plaza
New York, NY 10278

U.S. Citizenship and Immigration Services

January 25, 2021

IOE0901197938

ATEF MUHAMED SABRI MAHMOUD ABUELENIN
[redacted]

A201-132-868

RE: N-400, Application for Naturalization

**DECISION**

Dear ATEF ABUELENIN:

On August 5, 2016 you filed a Form N-400, Application for Naturalization, with U.S. Citizenship and Immigration Services (USCIS) under section 316 of the Immigration and Nationality Act (INA).

After a thorough review of the information provided in your application for naturalization, the documents supporting your application, and your testimony during your naturalization interview, USCIS has determined that you are not eligible for naturalization. Accordingly, USCIS must deny your application for naturalization.

Generally, to qualify for naturalization, under INA 316, an applicant must:

- Be 18 years of age or older at the time of filing Form N-400;
- Be lawfully admitted for permanent residence;
- Be a lawful permanent resident for at least 5 years at the time of filing Form N-400;
- Demonstrate good moral character for at least 5 years prior to the Form N-400 filing date, and during the period leading to administration of the Oath of Allegiance;
- Have resided continuously in the United States for at least 5 years as a lawful permanent resident before filing Form N-400;
- Have resided for at least 3 months in the State or USCIS District where residency is claimed before filing Form N-400;
- Have resided continuously in the United States from the date of filing Form N-400 up to the time of administration of the Oath of Allegiance;
- Be physically present in the United States for at least 2½ years at the time of filing Form N-400;
- Demonstrate a basic knowledge of U.S. history and government;
- Demonstrate the ability to read, write, and speak words in ordinary usage in the English language; and
- Establish an attachment to the principles of the U.S. Constitution and be disposed to the good order and happiness of the United States.

**Statement of Facts and Analysis Including Ground(s) for Denial**

On July 25, 2011, you obtained permanent resident status as an asylee in immigrant classification AS6. USCIS received your Form N-400 on August 5, 2016, and on December 10, 2020, you appeared for an interview to determine your eligibility for naturalization.

During the interview and review of your application with an Immigration Services Officer, you testified that the information on your Form N-400, along with any amendments made during the naturalization interview, and the documents submitted by you were true and correct.

USCIS records indicate that you first entered the U.S. on November 5, 2010 as a tourist. You applied for asylum in the U.S. by filing Form I-589, Application for Asylum and for Withholding of Removal, on November 22, 2010 and March 16, 2011. Your first asylum application was rejected on January 4, 2011 due to incomplete filing. On April 27, 2011, you were interviewed by an asylum officer regarding your second asylum application. On your asylum application and during your interview with the asylum officer on April 27, 2011, you testified that you feared for your life in Egypt because you would be jailed and or imprisoned there for your pro-American views.

Your asylum was granted on May 17, 2011.

On May 21, 2012, you filed Form I-485, Application for to Register Permanent Residence or Adjust Status, seeking to adjust your status to one of a lawful permanent resident. On July 25, 2012, USCIS approved your Form I-485 and you were accorded a status of a lawful permanent resident with the rollback date as July 25, 2011.

On August 5, 2016, you filed the instant Form N-400 and on December 10, 2020 you appeared for your naturalization interview before the immigration services officer and gave testimony under oath.

During the interview, you testified that subsequent to your approval of Form I-485 you traveled to Egypt on the following dates:

- September 8, 2014 to November 4, 2014 (USCIS notes that your actual dates of travel were from October 7, 2014 to December 4, 2014, using Egyptian passport #A00883536)
- December 25, 2016 to February 9, 2017
- February 13, 2018 to May 8, 2018
- August 25, 2018 to January 19, 2019

It was additionally noted that you traveled using your Egyptian passports #A19901874 and A24002162 which were issued to you on January 23, 2017, and December 31, 2018, respectively by the Egyptian authorities subsequent to your grant of asylum in the U.S. .

As the records indicate, on your asylum application and during your asylum interview you testified that you were afraid to return to Egypt due to fear of imprisonment and/or death, however subsequent to the grant of your asylum and obtainment of the status of a lawful permanent resident, not only did you travel to Egypt, the very country of your past persecution, but you also applied for and were issued two passports by the Egyptian authorities. During the interview you were asked to explain these inconsistencies.

You testified under oath that sometime in 2014 you were able to secure an agreement with the "security official" of Egyptian Consulate in New York, under which, you were allowed to travel back to Egypt unharmed.

According to your recollection, you were promised "a leading position" at Egypt's anticipated counterterrorism and counterinsurgency center. You then admitted that you started working with an officer of the Egyptian Consulate in New York as early as 2014 and provided him with information that you found in social media and internet on various topics ranging from the Muslim Brotherhood, terrorism, U.S./Egypt relationships, 2016 U.S. elections, American politicians such as Ted Cruz and Mark Rubio and their views on Egypt and Israel. You claimed that you also did physical surveillance of several Islamic centers in New York and submitted your reports to the same security officer at the Egyptian Consulate in New York.

You further testified that the individual who you worked with was an intelligence officer of the Egyptian Intelligence Service Mukhabarat.

It is evident that not only you collected and passed information to a foreign intelligence service for several years immediately prior to filing your naturalization application, but you were also promised employment and safe passage to Egypt in return for your cooperation. You have not submitted any evidence indicating that you registered under the Foreign Agents Registration Act (FARA) as a foreign agent or that you are otherwise exempted from FARA. See 22 USC 611; 28 CFR Pt. 5. Your violation of FARA constitutes unlawful acts that adversely reflect upon your good moral character. See INA(f); 8 CFR 316.10(b)(3)(iii).

Furthermore, on your Form N-400 and during the interview, you testified that you were arrested three times on the following occasions:

On July 18, 2013, you were arrested in New York and charged with TAR 1050.6 (Panhandling) . On January 17, 2014, the charges against you were dismissed.

On December 5, 2013, while the criminal proceedings against you were still pending, you were arrested again and charged with NYPL 240.30 (Aggravated Harassment in the 2nd degree), NYPL 110-120.00 (Attempted Assault) and NYPL 240.26 (Harassment in the 2nd Degree). On April 22, 2014, you were convicted of NYPL 240.20 (Disorderly Conduct), placed under conditional discharge for 1 year and ordered community service for 2 days.

On May 14, 2018, you were arrested in New York and charged with NYPL 155.25 (Petit Larceny) and NYPL 165.40 (Criminal Possession of Stolen Property in the 5th degree). On January 17, 2019, the charges against you were dismissed.

However, USCIS records indicate that you were also fingerprinted for law enforcement purposes on May 22, 2014. During the interview, you adamantly denied that you were arrested, however under further questioning admitted that you were confronted by undercover police officers when you were attempting to gain entry to NYC subway by asking other riders for a "swipe " and blocking the entrance to turnstile.

To be eligible for naturalization, you must demonstrate that you are a person of good moral character. USCIS finds that your criminal history as well as the intelligence collection efforts for the benefit of a foreign intelligence service, including collecting information on U.S. politicians, without registering under FARA, adversely reflect upon your moral character. You have not established any extenuating circumstances that would warrant a departure from this finding. See INA 101(f) and 316(a)(3) and Title 8, Code of Federal Regulations (8 CFR), section 316.10 (b)(3)(iii).

Finally, USCIS finds that based on your testimony of serving as a foreign agent, you are not able to fulfill the obligations of the Oath of Allegiance as required. See INA 337(a); 8 CFR 337.1(c) (requiring in the oath that you "renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a

subject or citizen.").

As a result, you are statutorily precluded from establishing eligibility for naturalization. See INA 316(a); INA 337(a). Therefore, your application is denied.

If you believe that you can overcome the grounds for this denial, you may submit a request for a hearing on Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, within 30 calendar days of service of this decision (33 days if this decision was mailed). See attached 8 CFR 336.2 (a) and 103.8(b). Without a properly filed Form N-336, this decision will become final. See INA 336.

For questions about your application, you can use our many online tools (uscis.gov/tools) including our virtual assistant, Emma. If you are not able to find the information you need online, you can reach out to the USCIS Contact Center by visiting uscis.gov/contactcenter.

Sincerely,

Brian J. Meier

Brian J. Meier
Director

cc:

IOE0901197938

A201-132-868

**Attachment**
**(Applicable Law/Regulations)**

To better assist you, the sections of the law referenced in your decision are provided below:

**INA 316**
(a) No person, except as otherwise provided in this title, shall be naturalized, unless such applicant,

(3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

**INA 101**
(f) For the purposes of this Act—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

(1) a habitual drunkard;

(2) Repealed. Pub. L. 97-116, § 2(c)(1), Dec. 29, 1981, 95 Stat. 1611.

(3) a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D), (6)(E), and (10)(A) of section 1182(a) of this title; or subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marijuana), if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

(4) one whose income is derived principally from illegal gambling activities;

(5) one who has been convicted of two or more gambling offenses committed during such period;

(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter;

(7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;

(8) one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43) of this section); or

(9) one who at any time has engaged in conduct described in section 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 1182(a)(2)(G) of this title (relating to severe violations of religious freedom).

The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character. In the case of an alien who makes a false statement or claim of citizenship, or who registers to vote or votes in a Federal, State, or local

election (including an initiative, recall, or referendum) in violation of a lawful restriction of such registration or voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such statement, claim, or violation that he or she was a citizen, no finding that the alien is, or was, not of good moral character may be made based on it.

**8 CFR 316.10**
(b)Finding of a lack of good moral character.

(3) Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant:

(iii) Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts although the acts do not fall within the purview of §316.10(b) (1) or (2).

**INA 336**
(a) If, after an examination under section 335, an application for naturalization is denied, the applicant may request a hearing before an immigration officer.

(b) If there is a failure to make a determination under section 335 before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

(c) The Attorney General shall have the right to appear before any immigration officer in any naturalization proceedings for the purpose of cross-examining the applicant and the witnesses produced in support of the application concerning any matter touching or in any way affecting the applicant's right to admission to citizenship, and shall have the right to call witnesses, including the applicant, produce evidence, and be heard in opposition to, or in favor of, the granting of any application in naturalization proceedings.

(d) The immigration officer shall, if the applicant requests it at the time of filing the request for the hearing, issue a subpoena for the witnesses named by such applicant to appear upon the day set for the hearing, but in case such witnesses cannot be produced upon the hearing other witnesses may be summoned upon notice to the Attorney General, in such manner and at such time as the Attorney General may by regulation prescribe. Such subpoenas may be enforced in the same manner as subpoenas under section 335(b) may be enforced.

(e) It shall be lawful at the time and as a part of the administration by a court of the oath of allegiance under section 337(a), for the court, in its discretion, upon the bona fide prayer of the applicant included in an appropriate petition to the court, to make a decree changing the name of said person, and the certificate of naturalization shall be issued in accordance therewith.

**8 CFR 336.2**
(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

**8 CFR 103.8**

This section states authorized means of service by the Service on parties and on attorneys and other interested persons of notices, decisions, and other papers (except warrants and subpoenas)in administrative proceedings before Service officers as provided in this chapter.

(b) Effect of service by mail. Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice upon him and the notice is served by mail, 3 days shall be added to the prescribed period. Service by mail is complete upon mailing.

| Receipt Number | USCIS Online Account Number | Case Type |
|---|---|---|
| IOE9753943125 | 028356788975 | N400 - APPLICATION FOR NATURALIZATION |
| **Received Date**<br>02/21/2022 | **Priority Date** | **Applicant**<br>[redacted]<br>ABUELENIN, ATEF SABRY |
| **Notice Date**<br>08/22/2022 | **Page**<br>1 of 1 | |

ATEF SABRY ABUELENIN
c/o ATEF ABUELENIN
[redacted]

**Please come to:**

26 FEDERAL PLAZA 9TH FL RM 9-901
JACOB K. JAVITS FEDERAL BUILDING
NEW YORK, NY 10278
USA

**On (Date):** Tuesday, September 27, 2022
**At (Time):** 08:35AM

You are notified to appear before a USCIS officer regarding the application identified above at the date, time, and place indicated above. *Failure to appear for the scheduled appointment without prior notification and without good cause may result in the denial of your application.* (8 CFR 103.2)

> ***To ensure visitor and employee health and safety, please pay special attention to the sections entitled, "COVID-19 Safety Precautions" and "Who should come with you?"***

*YOU MUST APPEAR FOR THIS APPOINTMENT* - However, if you are under self-isolation or quarantine, are ill, have any symptoms of illness or are at heightened risk due to age or an underlying health condition and would like to reschedule your appointment, call the U.S. Citizenship and Immigration Services (USCIS) Contact Center at 1-800-375-5283 (TTY 1-800-767-1833) as soon as possible to reschedule your appointment. There is no penalty for requesting that your appointment be rescheduled.

*COVID-19 Safety Precautions* - To ensure the health and safety of all who enter USCIS facilities, you must take the following safety precautions when arriving for your appointment:
- DO NOT arrive more than 15 minutes prior to your appointment time. You will not be permitted entry into the office until 15 minutes before your appointment.
- Check www.cdc.gov for the county COVID-19 Community Level where you will appear for your appointment to understand the prevention steps for that location.
- Follow local USCIS guidance while inside USCIS facilities.
- You may have to answer health screening questions before entering.
- Bring a black or blue ink pen with you to your appointment.

*Who should come with you?* - You may be limited in who may attend your appointment with you in person.
- **If you do not speak English fluently and are eligible to take the appointment in a language other than English, you should arrange to have an interpreter come with you to the appointment or be available via phone.** If you need a Sign Language Interpreter or Certified Deaf Interpreter, call the USCIS Contact Center at 1-800-375-5283 as soon as possible.
- Your attorney or authorized representative may come with you to the appointment or be available via phone.
- If you have a disability and have an individual who assists you, that individual may come with you.

If you are applying for citizenship for yourself, you will be tested on your knowledge of the government and history of the United States. You will also be tested on reading, writing, and speaking English, unless on the day you filed your application, you have been living in the United States for a total of at least 20 years as a lawful permanent resident and are over 50 years old, or you have been living in the United States for a total of 15 years as a lawful permanent resident and are over 55 years old, or unless you have a medically determinable disability.

If you filed your Form N-400, Application for Naturalization, on or after Dec. 1, 2020, and are required to take the 2020 version of the civics test, you may now have the option to take the 2008 version of the civics test. To learn if this option is available to you, visit the USCIS Citizenship Resource Center at uscis.gov/citizenship/2020test.

**You MUST BRING the following with you to the interview:**
- This letter.
- Your Alien Registration Card ("green card").
- Any evidence of Selective Service Registration.
- Your passport and/or any other documents you used in connection with any entries into the United States.
- Those items noted below which are applicable to you:

If applying for NATURALIZATION AS THE SPOUSE of a United States Citizen;
- Your marriage certificate.
- Proof of death or divorce for each prior marriage of yourself or spouse.
- Your spouse's birth or naturalization certificate or certificate of citizenship.

If applying for NATURALIZATION as a member of the United States Armed Forces;
- Your discharge certificate, or form DD214.

If copies of a document were submitted as evidence with your N400 application, the originals of those documents should be brought to the interview.

**PLEASE keep this appointment, even if you do not have all the items indicated above.**

To request a disability accommodation, go to **www.uscis.gov/accommodations** or call the USCIS Contact Center at **1-800-375-5283** (TTY: **1-800-767-1833**) as soon as possible, **even if you indicated on your application that you require an accommodation.**

If you have any questions or comments regarding this notice or the status of your case, please contact the USCIS Contact Center toll free at 1-800-375-5283. If you are hearing impaired, please call the USCIS Contact Center TTY at 1-800-767-1833.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

QUEENS FIELD OFFICE
U.S. CITIZENSHIP & IMMIGRATION SVC
26 FEDERAL PLAZA, 8th FLOOR
JACOB K. JAVITS FEDERAL BLDG
NEW YORK NY 10278

A Number

Receipt Number

**USCIS Contact Center: www.uscis.gov/contactcenter**

← Back

# Control Number: NRC2025303776

FOIA/PA STATUS CHECK    DOCUMENT LIBRARY

## Request Details

| | |
|---|---|
| Request Description | |
| Date Submitted | 06/25/2025 |
| Request Type | FOIA Request |

## Request Status

| | |
|---|---|
| Place in Queue | 4854 of 12150 pending requests |
| Status | Files Requested |
| Estimated Completion Date | 07/31/2025 |

**Note: This is an estimated date based on average processing times. Availability of records and complexity of request may effect completion date.**

**For more information about making a FOIA/PA request or submitting an Administrative Appeal, please see the link How to Request Records through the Freedom of Information Act or Privacy Act (uscis.gov) .**

✓ Received
The request was received by USCIS.

✓ In Process
USCIS is performing activities such as reviewing the request, searching for records, and preparing records for release.

3 Completed
USCIS completed processing the request, and a letter was sent to the requester explaining the actions taken

## USCIS FOIA/PA Headquarters Office

USCIS Contact Center
1-800-375-5283 or TTY 800-767-1833
FOIAPAQuestions@uscis.dhs.gov

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*National Records Center*
P.O. Box 648010
Lee's Summit, MO 64064-8010

**U.S. Citizenship and Immigration Services**

August 11, 2025

**Control Number: NRC2025303776**

ATEF ABUELENIN
[redacted]

Dear ATEF ABUELENIN:

This letter is in response to your request for records under the Freedom of Information Act (FOIA) Privacy Act (PA), which was received in this office on June 25, 2025, regarding your N-400.

We have considered the foreseeable harm standard when reviewing the record set and have applied the FOIA exemptions as required by the statute and the Attorney General's guidance. We have completed th review of all documents and have identified 46 pages that are responsive to your request. Enclosed ar pages released in their entirety and 6 pages released in part. We have reviewed and have determined t release all information except those portions that are exempt pursuant to 5 U.S.C. § 552 (b)(6) of th FOIA.

The following exemptions are applicable:

Exemption (b)(6) permits the government to withhold all information about individuals in personnel, medical and similar files where the disclosure of such information would constitute a clearly unwarra invasion of personal privacy. The types of documents and/or information that we have withheld may consist of birth certificates, naturalization certificates, drivers' licenses, social security number addresses, dates of birth, or various other documents and/or information belonging to a third party t considered personal.

There may be additional documents that contain discretionary releases of exempt information. If made, these releases are specifically identified in the responsive record. These discretionary releases do waive our ability to invoke applicable FOIA exemptions for similar or related information in the futu

The enclosed record consists of the best reproducible copies available. Certain pages contain marks t appear to be blacked-out information. The black marks were made prior to our receipt of the file and not information we have withheld under the provisions of the FOIA or PA.

You have the right to file an administrative appeal within 90 days of the date of this letter. By fil appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider yo request and the agency's decision. You may file an administrative FOIA appeal electronically to USCI through your online portal by selecting Appeal in the Actions drop down window. You may also file an administrative FOIA appeal to USCIS at: USCIS FOIA/PA Appeals Office, 150 Space Center Loop, Suite 500, Lee's Summit, MO 64064-2139. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

If you would like to discuss our response before filing an appeal to attempt to resolve your dispute without going through the appeals process, you may contact our USCIS FOIA Public Liaison at U.S. Citizenship and Immigration Services, National Records Center, FOIA/PA Office, P.O. Box 648010, Lee's Summit, MO 64064-8010, or by email at FOIAPAQuestions@uscis.dhs.gov.

A USCIS FOIA Public Liaison is an agency official to whom FOIA requesters can raise concerns about

the service the requester has received from the agency's FOIA Office. USCIS FOIA Public Liaisons are responsible for assisting in reducing delays, increasing transparency, and understanding of the statu requests, and assisting in the resolution of disputes.

If you are unable to resolve your FOIA dispute through our USCIS FOIA Public Liaison, you may contac the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001; email ogis@nara.gov; telephone 202-741-5770; toll free 877-684-6448; or facsimile 202-741-5769.

The National Records Center does not process petitions, applications, or any other type of benefit un the Immigration and Nationality Act. If you have questions or wish to submit documentation relating t matter pending with USCIS, please visit the Contact Us page at www.uscis.gov or call the USCIS Contac Center at 800-375-5283 (TTY 800-767-1833).

How to submit Questions or Changes

Questions concerning this FOIA/PA request may be mailed to U.S. Citizenship and Immigration Services, National Records Center, FOIA/PA Office, P.O. Box 648010, Lee's Summit, MO 64064-8010 or emailed to FOIAPAQuestions@uscis.dhs.gov. All FOIA/PA related requests, including address changes must be submitted in writing, and signed by the requester. Please include the control number listed above on correspondence. For more information regarding the USCIS FOIA Program, please visit the USCIS website at www.uscis.gov/FOIA.

Sincerely,

Jarrod T Panter
Acting Chief FOIA Officer
Freedom of Information Act & Privacy Act Unit

Enclosure(s)

Case 1:25-cv-04601-RPK Document 21 Filed 08/12/25

Gmail Atef Abuelenin <eleynin@gmail.com>

## Reply from Senator Gillibrand

Senator Kirsten Gillibrand <casework@gillibrand.senate.gov> Tue, Jul 29, 20:
To: eleynin@gmail.com

**KIRSTEN GILLIBRAND**
NEW YORK
SENATOR
RUSSELL SENATE OFFICE BUILDING
SUITE 478
WASHINGTON, DC 20510-3205
202-224-4451

**United States Senate**
**WASHINGTON, DC 20510-3205**

COMMITTEES:
ARMED SERVICES
SELECT COMMITTEE ON INTELLIG
SPECIAL COMMITTEE ON AGI
APPROPRIATIONS

Case Number: 711744

Dear Mr. Abuelenin,

Thank you for contacting my office regarding your matter. I have contacted US Citizenship & Immigration Services on your behalf. According to the agency:

"Thank you for your inquiry regarding the status of your constituent's pending Form I-130, Petition for Alien Relative, IOE9253447530.

According to U.S. Citizenship and Immigration Services (USCIS) records, your constituent's Form I-130 was received on February 13, 2022, and is currently under the jurisdiction of the USC Field Office. Your constituent's petition is within our current field office processing times and remains pending with USCIS. Please see our Web site at www.uscis.gov for processing times.

Therefore, we have forwarded your inquiry to the Queens Field Office for review and a direct response.

Case status may be monitored online at https://egov/casestatus/landing.do.

If your constituent needs to update their address at any time, please advise them to update his/her address with USCIS at www.uscis.gov/addresschange, contact the USCIS Contact Center 375-5283 or TTY (800) 767-1833 (for people who are deaf, hard of hearing, or have a speech disability) or through their existing USCIS online account if the form was filed online.

Respectfully,

Congressional Liaison
U.S. Citizenship and Immigration Services
Department of Homeland Security"

I regret that I do not have a more positive agency response to share. Please do not hesitate to contact my office again via email at casework@gillibrand.senate.gov.

Sincerely,

Kirsten Gillibrand

Kirsten Gillibrand
United States Senator

KEG/ba

Gmail

Atef Abuelenin <eleynin@gmail.com>

---

**Thank you for contacting USCIS**

---

**USCIS No Reply** <no-reply@uscis.dhs.gov>
To: "eleynin@gmail.com" <eleynin@gmail.com>

Tue, Jul 1, 2025 at 7:39 PM

U.S. Citizenship and Immigration Services

Dear ATEF,

Thank you for contacting us. An immigration officer will call or email you to answer your question(s), or schedule an appointment for you, if that is needed. You will receive a text message and/or email one to two business days before we contact you. Officers will begin calls starting at 7am local time.

| **If you have…** | **We will respond to you** |
|---|---|
| an urgent situation | within 72 hours, Monday thru Friday |
| a question that is not urgent | within 30 calendar days |
| a technical issue like a password reset | within 2-3 business days |

If by phone, callbacks will begin at 7am local, Monday thru Friday (on occasion, we may also respond to inquiries by phone on Saturday). To verify the return call is coming from USCIS, the number on your caller id will be **202-838-2104**. Please write down the following service item number and have it available for verification when we call you. If you do not have Caller ID, the USCIS officer will confirm the service item number you were given when you first contacted us. If by email, the sender will be no-reply@uscis.dhs.gov. Please add this address to your contacts to ensure any messages are not sent to a spam folder.

If you missed our first call, please be patient. We will try to call you twice. Please do not call us back unless you miss both of our return calls. The USCIS Contact Center hours of operation are Monday through Friday from 8 a.m. to 6 p.m. Eastern.

Gmail **Atef Abuelenin <eleynin@gmail.com>**

---

## USCIS Contact Center-DC Response

---

**CRU** <cru@uscis.dhs.gov> Wed, Jul 30, 2025 at 10:00 AM
To: "eleynin@gmail.com" <eleynin@gmail.com>

U.S. Citizenship and Immigration Services (USCIS) has received your inquiry, and our USCIS Contact Center is currently researching your issue. Your letter has been assigned case #[[INSERT NUMBER HERE: 39949978]].

USCIS is committed to helping the public resolve any problems they might have encountered when applying for immigration services and benefits. We understand your concerns and are dedicated to providing you with accurate information and guidance. Please allow 60 business days from the date of this letter for us to respond to your inquiry.

If you need additional help or filing instructions, go to our Tools web page at www.uscis.gov/tools.

We hope this information is helpful.

Sincerely,

Kimberley Coleman Bearden, Chief
USCIS Contact Center
\[[MS Initials in Lower Case]]

-----------

**Please do not reply directly to this email. This email was sent from a notification-only address that cannot accept incoming email.**

Gmail

Atef Abuelenin <eleynin@gmail.com>

**Response to your message (Intranet Quorum IMA00)**

**The White House(imailagent)** <noreply@contact.whitehouse.gov> Wed, Jul 2, 2025 at 7:05 PM
To: eleynin@gmail.com

THE WHITE HOUSE

WASHINGTON

July 2, 2025

Thank you for taking the time to write and share your story with President Donald J. Trump. After careful review, we have provided the appropriate federal government agency with a copy of your letter for possible assistance or further action.

For additional information about Federal government services, please visit www.USA.gov or call 1-800-FED-INFO.

Sincerely,

Office of Presidential Correspondence

# N-400, Application for Naturalization

**Submitted on** February 21, 2022 | **Receipt #** IOE9753943125

Download PDF

Case Status | myProgress | Case History | Documents

Estimated time until your case decision:

7 Months

This is an estimate and will be periodically updated as we process your case.

In some cases, a biometrics appointment and/or an interview will not be necessary. For more information regarding biometrics, visit the USCIS biometrics page.

Step 1 of 5 (completed): Case received

Step 2 of 5 (completed): Attend biometrics appointment (if necessary)

**Step 3 of 5 (current step): Interview scheduled**

Step 4 of 5 (not started): Case decision

Step 5 of 5 (not started): Attend oath ceremony (if approved)

Current as of today at 11:26 a.m. EDT

# Your Cases

## N-400, Application for Naturalization

**Submitted on** February 21, 2022 | **Receipt #** IOE9753943125

**Download PDF** ▼

**Case Status** | **myProgress** | **Case History** | **Documents**

**June 5, 2024**

### Case Is Being Actively Reviewed By USCIS

As of June 5, 2024, we are actively reviewing your Form N-400, Application for Naturalization, Receipt Number IOE9753943125. Our records show nothing is outstanding at this time. We will let you know if we need anything from you. If you move, go to www.uscis.gov/addresschange to give us your new mailing address.

Current as of today at 11:26 a.m.

# Your Cases

## N-400, Application for Naturalization

**Submitted on** February 21, 2022 | **Receipt #** IOE9753943125

**Download PDF**

**Case Status** **myProgress** **Case History** **Documents**

### Case history

| Status | Date |
|---|---|
| Case Is Being Actively Reviewed By USCIS | June 5, 2024 |
| We scheduled an interview for your Form N-400, Application for Naturalization. | August 22, 2022 |
| We are actively reviewing your Form N-400, Application for Naturalization. Our records showed nothing is outstanding at this time. | February 21, 2022 |
| We received your Form N-400, Application for Naturalization, and sent you a receipt notice. | February 21, 2022 |

**Atef Abuelenin**
[redacted]

**Date:** July 1, 2025

**U.S. Citizenship and Immigration Services**
Queens Field Office
31-00 47th Ave, Suite 5001
Long Island City, NY 11101

**Attn:** Queens District Director

## Subject: Request for Prompt Adjudication of Naturalization Application

**Receipt Number:** IOE9753943125 | **Alien Number:** A201132868

Dear Queens County District Director and Esteemed Officers of USCIS,

I write with the utmost respect and sincerity as a lawful permanent resident of the United States and as an applicant for naturalization under Form N-400, receipt number IOE9753943125. I am profoundly committed to the foundational values of this nation and to the lawful processes that preserve the integrity of its immigration system.

I submitted my application in **February 2022** and successfully completed my naturalization interview in **September 2022**, fully satisfying the statutory requirements of **8 U.S.C. § 1423** regarding English proficiency and civics knowledge. Despite fulfilling all eligibility criteria, my application remains pending nearly three years later, and I now respectfully request its **prompt adjudication.**

I have unequivocally demonstrated **sustained rehabilitation and good moral character for more than seven years since 2018, as required under 8 U.S.C. § 1427(a)**, which mandates that naturalization applicants demonstrate good moral character during the statutory period preceding their application. The **Immigration and Nationality Act (INA) § 101(f)** also emphasizes that an applicant's conduct should be assessed within the relevant statutory timeframe, recognizing the individual's capacity for change and rehabilitation. In the American legal tradition, the principle of **rehabilitation and second chances is deeply embedded in the justice system**, including doctrines reflected in **18 U.S.C. § 3553(a)**, which encourages courts to impose sentences that promote rehabilitation and reintegration into society.

Additionally, the **United States Constitution and the Universal Declaration of Human Rights (UDHR), Article 8**, establish that everyone has the right to an effective remedy by competent national authorities for acts that violate fundamental rights. **Article 10 of the UDHR** further

guarantees the right to a fair and public hearing by an impartial tribunal, which includes the fair and timely resolution of administrative matters. U.S. immigration law, through **8 C.F.R. § 316.10(a)(2)**, recognizes that the assessment of moral character should be made based on the totality of circumstances, including evidence of rehabilitation, contributions to society, and sustained lawful behavior.

The **American Bar Association (ABA) Standards on Treatment of Prisoners, Standard 23-8.1**, and broader human rights frameworks affirm that individuals are entitled to meaningful opportunities for redemption and community reintegration. These guiding principles reflect the core values of the United States: that individuals are not defined by their past, but by their consistent efforts to contribute positively to society over time.

Notably, I have served in **child welfare services, specializing in high-risk investigations involving cases of child abuse, neglect, and sex trafficking.** I worked on the front lines to protect vulnerable children, manage complex family dynamics, and collaborate with law enforcement and legal entities to safeguard at-risk minors. This work demanded a high level of ethical responsibility, integrity, and resilience under pressure.

Further, I have developed extensive **professional expertise in corporate compliance and ethics,** contributing to the protection of organizations and communities by upholding federal, state, and institutional regulations. My combined experience reflects a career devoted to advancing child safety, regulatory compliance, and ethical practice—values that deeply align with the mission and spirit of the United States. In addition to my service record, I hold **multiple master's degrees from U.S. military graduate schools,** where I acquired advanced knowledge in data analysis, international relations, and counterterrorism, all of which reflect my dedication to intellectual growth and national security principles. I have continuously committed myself to the betterment of society and the advancement of this nation's core interests.

U.S. immigration law and USCIS policy explicitly recognize that individuals are capable of growth, rehabilitation, and genuine reform. According to **8 U.S.C. § 1427(a)** and **8 C.F.R. § 316.10(a)(2),** the determination of good moral character is based on the applicant's conduct during the statutory period, typically the five years preceding the naturalization application. Past infractions or mistakes that occurred outside this statutory period are not automatically disqualifying, particularly when applicants present credible evidence of sustained rehabilitation, lawful behavior, and community contribution. USCIS officers are required to evaluate an applicant's life as a whole, considering positive factors, service to the community, and post-offense conduct that clearly demonstrates reformation. The **USCIS Policy Manual (Volume 12, Part F, Chapter 5)** further instructs officers to give weight to an applicant's efforts to rehabilitate and reintegrate, reaffirming the principle that the immigration system is not inherently punitive but is designed to allow for fair adjudication based on the totality of circumstances.

Additionally, the **Board of Immigration Appeals (BIA)** has long held, as in **Matter of Marin, 16 I&N Dec. 581 (BIA 1978)**, that the discretionary relief process must balance past negative factors with present positive equities, including rehabilitation, service, and demonstrated moral

growth. The **Immigration and Nationality Act § 101(f)** reinforces that unless an applicant has committed a permanently disqualifying offense, they retain the right to be fairly considered for immigration benefits. The spirit of U.S. immigration law aligns with broader humanitarian and constitutional protections, including the **Universal Declaration of Human Rights (UDHR), Article 8 and Article 10,** which guarantee the right to an effective remedy and a fair process. These combined legal and ethical frameworks uphold the belief that individuals should not be perpetually defined by their past but should be afforded meaningful opportunities to earn second chances and contribute positively to the society they now call home.

The prolonged delay in adjudicating my application has inflicted **clinically significant emotional and psychological harm.** According to behavioral health standards and the **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5),** sustained exposure to uncertainty of this nature can contribute to chronic stress responses, generalized anxiety, depressive episodes, and functional impairments in occupational and social domains.

Over this extended period, I have experienced **persistent depressive symptoms, including profound hopelessness, diminished concentration, and disruptions in sleep patterns.** These adverse mental health outcomes are directly attributable to the unresolved status of my application, which remains a central determinant of my stability, identity, and long-term security.

The **USCIS Policy Manual (Volume 12, Part F, Chapter 5)** further emphasizes that applicants should be judged by the totality of their lives, not solely by isolated past mistakes. Additionally, the principles of fairness and the right to timely administrative resolution are supported by **the Universal Declaration of Human Rights (UDHR), Articles 8 and 10**, which guarantee access to an effective remedy and a fair process. U.S. immigration jurisprudence, including **Matter of Marin, 16 I&N Dec. 581 (BIA 1978)**, encourages the balancing of positive contributions and rehabilitation against any negative history.

Under **the Administrative Procedure Act (APA), 5 U.S.C. §§ 555(b) and 706(1),** USCIS is obligated to resolve matters within a reasonable time. The U.S. Supreme Court in **Brock v. Roadway Express, Inc., 481 U.S. 252 (1987)**, reinforced that extended administrative delays can inflict real-world harm and undermine the principles of due process. Additionally, **8 C.F.R. § 335.3(a)** emphasizes timely adjudication following the naturalization interview, and **the Fifth Amendment's Due Process Clause** guarantees fair and prompt consideration for lawful permanent residents.

My respectful request is not for mere updates but for the **final adjudication of my naturalization application** in accordance with statutory, regulatory, and constitutional standards. I trust that USCIS will consider the holistic impact of this delay, including the psychological burden and the societal contributions I have consistently made through public service and professional integrity.

I remain fully committed to the lawful processes of this country and appreciate the complexity and magnitude of your office's responsibilities. I place my full trust in USCIS to resolve this matter fairly and in alignment with its longstanding commitment to justice and human dignity.

Thank you for your time, attention, and dedicated service.

Respectfully,

**Atef Abuelenin**
Alien Number: [redacted]
Receipt Number: [redacted]
DOB: 10/20/1980


UNITED STATES OF AMERICA
PERMANENT RESIDENT
Surname
ABUELENIN
Given Name
ATEF S
USCIS#
Category
[redacted]
Country of Birth
Egypt
USA
Date of Birth
Sex
20 OCT 1980
M
Card Expires:
08/04/30
Resident Since:
07/25/11


FORM I-551
Rev (02-2016)
[redacted]
63
If found, drop in any US Mailbox. USPS: Mail to USCIS, 7 Product Way, Lees Summit, MO 64002
[redacted]

W-2-620
Rev. 09/22

**NYC**
**Department of Social Services**
Human Resources Administration
Department of Homeless Services

**Office of Legal Affairs**

**Legal Process Unit**

**Gary P. Jenkins**
Commissioner

**Ann Marie Scalia**
General Counsel

**Paul Ligresti**
Deputy General Counsel

**150 Greenwich Street**
**New York, NY 10007**

January 31, 2023

Via Email
Atef Abuelenin
Email: eleynin@gmail.com

Dear: Atef Abuelenin

According to the New York City Department of Homeless Services' (DHS) Client Assistance & Rehousing Enterprise System (CARES) **Atef Abuelenin (DOB: 11/20/1980)** resided in the DHS shelter system on the following dates at the listed shelter facilities:

| Shelter Name | Start Date | Exit Date |
|---|---|---|
| Red Lion | 2020-06-24 | 2020-07-06 |
| Red Lion | 2019-12-31 | 2020-06-24 |
| Red Lion | 2019-12-04 | 2019-12-31 |
| BRC McGuinness Men's Assessment Shelter | 2019-11-24 | 2019-12-03 |
| 30th St. Men's Shelter | 2018-05-27 | 2018-08-27 |
| 30th St. Men's Shelter | 2018-05-10 | 2018-05-24 |
| 30th St. Men's Shelter | 2018-05-09 | 2018-05-10 |
| 30th St. Men's Shelter | 2017-06-24 | 2017-10-31 |
| 30th St. Men's Shelter | 2017-04-11 | 2017-06-24 |
| 30th St. Men's Shelter | 2017-02-22 | 2017-04-07 |
| 30th St. Men's Shelter | 2016-02-02 | 2016-07-10 |

| | | |
|---|---|---|
| 30th St. Men's Assessment | 2016-01-21 | 2016-02-02 |
| 30th St. FastTrack | 2016-01-20 | 2016-01-21 |
| Willow Men's Shelter | 2014-09-13 | 2014-09-13 |
| Willow Men's Shelter | 2014-06-20 | 2014-09-13 |
| Willow Men's Shelter | 2014-04-30 | 2014-06-20 |
| Willow Men's Shelter | 2013-12-11 | 2013-12-24 |
| 126th Street Shelter | 2013-08-04 | 2013-10-12 |
| 126th Street Shelter | 2013-07-21 | 2013-07-28 |
| 126th Street Shelter | 2013-07-20 | 2013-07-20 |
| 126th Street Shelter | 2013-06-17 | 2013-07-18 |
| 126th Street Shelter | 2013-06-04 | 2013-06-16 |
| 126th Street Shelter | 2013-02-25 | 2013-02-25 |
| 126th Street Shelter | 2012-12-05 | 2013-02-23 |
| Eddie Harris Men's Shelter | 2012-08-11 | 2012-10-03 |
| Eddie Harris Men's Shelter | 2012-08-02 | 2012-08-11 |
| Eddie Harris Men's Shelter | 2012-03-28 | 2012-04-20 |
| Eddie Harris Men's Shelter | 2012-03-04 | 2012-03-27 |
| Eddie Harris Men's Shelter | 2012-02-28 | 2012-02-29 |
| Eddie Harris Men's Shelter | 2011-12-23 | 2012-02-27 |
| Eddie Harris Men's Shelter | 2011-11- | 2011-12- |

| | | |
|---|---|---|
| | 13 | 16 |
| Eddie Harris Men's Shelter | 2011-10-31 | 2011-11-07 |
| Eddie Harris Men's Shelter | 2011-07-17 | 2011-09-22 |
| Eddie Harris Men's Shelter | 2010-12-09 | 2011-07-16 |
| 30th St. FastTrack | 2010-11-16 | 2010-11-16 |
| 30th St. Men's Shelter | 2010-11-16 | 2010-12-09 |

This letter contains CONFIDENTIAL INFORMATION that is needed per your written request.

Sincerely,

Anna Montebello
Office of Legal Affairs/Legal Process and Record Access Unit
New York City Department of Social Service
4 WTC – 150 Greenwich Street, 38th Floor, New York, NY 10007


WAITING
AB
5
Promised: 10/8/22 6:22 PM
[redacted]
Abuelenin, Atef S
Counsel New Drug
Prescription Information
[redacted]
MORNING
1 TABLET
MIDDAY
EVENING
BEDTIME
PHARMACY ADVICE
See back for more informatio
[redacted]
Get important updates to help you stay on track with your health.
See back for details.
OPEN HERE
CVS pharmacy



20161199975580 2002197 015300 64 d331750 050315 03:07 050515 ca(1400_E125-050050

**Elmhurst Hospital Center**
**New York Health and Hospital Corporation**

# Progress Record

**Do not use Abbreviations List:**
**U; IU; Q.D.; Q.O.D.; (X.0 mg); (.X mg); MS; MSO₄; MgSO₄; AU; AS; AD; µg; T.I.W.**
**Write Legibly**
**Use stamp after signing**

Abas El-Emin-Ahmed
2922291

| Date & Time | Title/ Discipline | Problems/ Issues | Progress Notes - Include Opinions of Health Care team members. - Relate Documentation to the current problem. - New problems require a priority, goal and outcome - to be documented in the body of the progress note |
|---|---|---|---|
| 4/5/11 | CSW | Supervisor Note | SW Intern consulted with SW Supervisor about this intake. This is a 30 year old Egyptian male referred [redacted] He has a history of political and academic persecution. He denies substance abuse history. Medical history is significant for [redacted]. Patient has poor social supports and is undocumented in the US. He is seeking political asylum. Patient will be evaluated for medication and will be referred for therapy. [signature] Tamar Green, LCSW |

ELM 100

Continue notes on other side

### C. Balance of Equities

The balance of equities overwhelmingly favors Petitioner:

- USCIS has already delayed adjudication far beyond statutory limits;
- Enjoining premature action imposes no material hardship on the agency;
- Petitioner faces life-altering harm absent judicial protection;
- Allowing rushed agency action would reward procedural gamesmanship.

Preserving the status quo pending judicial review imposes minimal burden on Respondents while protecting Petitioner's constitutional and statutory rights.

### D. Public Interest

The public interest is served by:

- Upholding congressional intent behind **8 U.S.C. § 1447(b)**;
- Deterring agency manipulation of jurisdictional statutes;
- Ensuring fairness and due process in naturalization adjudications;
- Preserving trust in the integrity of the judicial system.

Allowing retaliatory denials to defeat judicial oversight undermines public confidence in lawful governance. An injunction reinforces respect for statutory processes and constitutional protections.

## IV. CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Court:

- Enjoin Respondents from issuing any final adjudication on Petitioner's Form N-400, Application for Naturalization, absent supervision by this Court;
- Alternatively, order that any such decision remains subject to this Court's full review and authority;
- Grant such further relief as justice requires.

A proposed order is attached.

**Dated:** July 7, 2025

**Respectfully submitted,**

Atef Sabry Abuelenin

[redacted]

Email: eleynin@gmail.com

Phone: (626) 437-3332

# ORDER GRANTING PRELIMINARY INJUNCTION

Upon consideration of Petitioner's Motion for Preliminary Injunction, and for good cause shown, the Court hereby ORDERS:

1. Respondents are ENJOINED from issuing any final decision on Petitioner's pending Form N-400 Application for Naturalization while this matter is under judicial review, unless such decision is made under this Court's supervision;
2. Respondents shall not take any adverse adjudicative action intended to divest this Court of jurisdiction under **8 U.S.C. § 1447(b)**;
3. This Order remains in effect until the Court issues a final ruling on the merits or until further order of the Court.

**SO ORDERED.**

Dated: ___________

United States District Judge

# DECLARATION OF ATEF ABUELENIN

I, **Atef Sabry Abuelenin**, pursuant to **28 U.S.C. § 1746**, declare:

1. I am the Petitioner in this action, seeking naturalization under USCIS Receipt Number IOE9753943125;
2. I filed my N-400 application in **February 2022** and completed my naturalization interview in **September 2022**;
3. Over **650 days** have passed with no final decision issued;
4. Recently, USCIS issued vague notices indicating an "additional delay," leading me to believe the agency may retaliate by issuing a rushed denial intended to avoid judicial oversight under **8 U.S.C. § 1447(b)**;
5. I have made exhaustive good-faith efforts to resolve this delay, including FOIA requests, Congressional outreach, and direct communications with USCIS;
6. I have faced retaliation, psychological distress, and reputational harm resulting from false foreign agent allegations and prolonged adjudication;
7. I fear imminent harm if USCIS issues a bad-faith denial outside Court supervision, undermining my rights and this Court's jurisdiction;
8. I respectfully request that the Court protect its jurisdiction, prevent retaliatory adjudication, and supervise further proceedings to ensure fairness.

I declare under penalty of perjury that the foregoing is true and correct.

**Executed:** July 7, 2025

2011... 2003... 03:07 ...

**PATIENT NAME:** Abu El-Enin, Atef
**MEDICAL RECORD NUMBER:** [redacted]
**Date of Initial Treatment Plan** 4/7/11

| MEDICATIONS PRESCRIBED (NAME, DOSE, ROUTE, FREQUENCY): | |
|---|---|
| [redacted] | ...... |
| ...... | ...... |
| ...... | ...... |

**STATEMENT OF PATIENT PARTICIPATION IN TREATMENT PLAN**

[redacted]

**PATIENT STATEMENT:**

I have received a copy of the Patient Bill of Rights, Advanced Directives and Informed Consent.

I have had the opportunity to participate in the formation of this treatment plan and would like to make comments as follows:

I would like the following to be involved in my treatment:

| Name | Title/Relationship to patient |
|---|---|
| | |
| | |
| | |

| | |
|---|---|
| **Patient Signature:** | **Date:** |
| **Staff Signature:** [signature] **Legible name and credential:** Lauren Clifford, SW intern | **Date:** 4/7/11 |
| **Attending MD Note (If Resident Case):** ☐ Case was presented, discussed and reviewed. ☐ I agree with the plan. | |
| **Attending MD Signature:** [signature] **Legible name and credential:** Richard Young, MD Lic# 201189 Hospital ID# 802421 | **Date:** 4/7/11 |

**Patient Name: Abu El-Enin, Atef** **MR#: 2927291** **Date: 4/5/11**

***Psychiatrist in Egypt 2001*** ***Suicide attempt*** ***Only attended one session***

[redacted]

Bellevue Hospital Center
Chart Review Print

| Location | Patient Name | | Age | Sex |
|---|---|---|---|---|
| DIS-16N-44-B | Abuelenin,Atef | [redacted] | 35Y | M |

| Attending Physician | D.O.B. |
|---|---|
| Leibert,Eric | 10/20/1980 |

---

Unscheduled ED RN Progress/Reassessment
Event Time: Tue, 26 Jan 16 2335 Status: complete

Tue, 26 Jan 16 2336 Documented by Folasade K Idowu, LPN

[redacted]
Suspected Sepsis : no

---

Unscheduled Vital Signs ED
Event Time: Tue, 26 Jan 16 2337 Status: complete

Tue, 26 Jan 16 2337 Documented by Richard Williams, RN

Temperature : 102.2 F (39.0 C)
Temperature Method: Oral
Pain Screen : no change from last pain screen

---

Unscheduled Vital Signs ED
Event Time: Wed, 27 Jan 16 0053 Status: complete

Wed, 27 Jan 16 0054 Documented by Richard Williams, RN

Pulse : 116 bpm
O2 Saturation : 97 %
Pain Screen : patient denies pain issues at this time

---

Unscheduled Vital Signs ED
Event Time: Wed, 27 Jan 16 0257 Status: complete

Wed, 27 Jan 16 0257 Documented by Renee M Padmore, PCT

Blood Pressure : 161/86 mmHg
Pulse : 98 bpm
Respirations : 18
Temperature : 98.7 F (37.1 C)
Temperature Method: Oral
O2 Saturation : 99 %
Pain Screen : patient denies pain issues at this time

---

5590 2902192 015320 64 d311750 050515 03:07 020515 Rej#400_ELIS-040060

**PATIENT NAME:** Abu El-Enin, Atef
**MEDICAL RECORD NUMBER:** 2927291
**Date of Initial Treatment Plan** 4/7/11

**ELMHURST HOSPITAL CENTER**
**DEPARMENT OF PSYCHIATRY**
**AMBULATORY BEHAVIORAL HEALTH SERVICES**

## INITIAL COMPREHENSIVE TREATMENT PLAN

| | |
|---|---|
| **Next Review Due:** 7/7/11 | |
| [redacted] | |
| **Axis V: Current GAF: 60** | **Past Year GAF:** |
| **STRENGTHS:** *Educated, multilingual, skilled* | |
| **WEAKNESSES:** *Undocumented, uninsured, unemployed, social isolation* | |
| **DISCHARGE PLANNING:** Anticipated length of stay from date of admission: *6-12 months* | |
| **KEY DISCHARGE PLANNING PROBLEMS:** None at present. | |
| **DISCHARGE CRITERIA:** Patient will be discharged when symptoms are in full remission without treatment for at least 3-6 months or if patient decides to stop treatment or transfer care to another provider outside of our clinic. | |
| [redacted] | |
| **Categories:** A. Psychiatric/psychological; B. Personality/ Developmental; C. Medical/ Physical/Self-care; D. Family; E. Educational; F. Vocational; G. Social; H. Leisure; I. Housing; J. Financial; K. Disposition; L. Other | |
| **Reason Not Addressed Codes:** 1. Not currently active problem. 2. Patient currently refusing to address. 3. Acute symptoms too active to address this problem and will be addressed when patient stabilizes. 4. Other: Describe reason | |

5590 2902192 015320 64 d331750 030310 03:07 080516 RoJN400_ELIS-660030



Background:

Mr Abu El-Enin is from a small village about 130 miles outside of Cairo, Egypt. He was raised in a conservative Muslim household. His parents divorced after 30 days when he was a young child. At the age of 15, his father died, and he was left alone with his mother. He describes his father as being from "a different race" than other Egyptians, and so he always felt like an outcast. He is fairer than other Egyptians.

He went to an Arabic school as a child. At age 15 he was molested at school, shortly after the death of his father. [redacted] He was frightened and young, and so did not tell his mother. He feared telling her also because she was an uneducated, divorced, single-mother. He also did not go to the authorities.

Mr Abu El-Enin began University in Cairo in 1999. In November of 1999, while running to catch a bus, Mr El-Enin was struck by a car. He was hospitalized for four weeks at the University hospital in Cairo. He describes being left on the floor of his room, with no bedding, and covered in blood. He left this hospital and went to a private hospital for the rest of his care. He states he required two surgeries to repair the damage to his leg. An internal titanium fixture was placed to stabilize the fracture. Due to a complication concerning blood clots, he was placed in an intensive care unit (ICU) for 4-5 days. After being discharged, Mr El-Enin returned home where he stayed for about a year while he recovered. He returned to University in 2000.

At University, Mr El-Enin studied languages and translation. His professors were all Egyptian, and Mr El-Enins different appearance again set him apart. While at University, he also described himself as a liberal Muslim. He refused to pray the 5-times a day that his classmates and professors would do. He was criticized and persecuted for not praying. He was also struck in the head with a stone on one occasion for not participating in the daily prayers.

Mr El-Enin describes being harassed and persecuted on several occasions for his thoughts and the writing that he produced while a student. He wrote a paper on Animal Farm as a first year student comparing the short story with the political climate in Egypt. He states that his professor was offended by this essay, and began informing other professors that Mr El-Enin was "dangerous". After this, students from other regions would harass and threaten him for his thoughts. Mr El-Enin felt that he was being treated unfairly by his professors, who would give him low grades, and falsify his exam results, and accuse him of plagiarism. He also describes an event where the Dean of the University approached him and warned him to "walk behind the walls".

Mr El-Enin describes the universities in Egypt as being very strictly controlled by the government, and he expresses the notion that free thought is not encouraged or appreciated. He gives an example of a professor who became Dean not on his qualifications, but because he supported the government. He states that these positions

Copyright July 2010

2016131971510 2902192 015320 04 0331710 033015 03:07 020118 ca/pH03_013-460080

Elmhurst Hospital Center
New York Health and Hospital Corporation

# Progress Record

**Do not use Abbreviations List:**
U; IU; Q.D.; Q.O.D.; (X.0 mg); (.X mg); MS; MSO4; MgSO4; AU; AS; AD; µg; T.I.W.
**Write Legibly**
**Use stamp after signing**

Abou El-Enin-Alef
[redacted]

| Date & Time | Title/ Discipline | Problems/ Issues | **Progress Notes** - Include Opinions of Health Care team members. - Relate Documentation to the current problem. - New problems require a priority, goal and outcome - to be documented in the body of the progress note |
|---|---|---|---|
| 9/7/11 | LCSW | Supervisors Note | SW Intern consulted with SW Supervisor about the treatment plan. Supervisor agrees with goals and [redacted] |
| | | | Tamar Green, LCSW |

ELM 100

Continue notes on other side

90 2902192 015320 64 d331790 030515 03:07 030516 Rej0400_ELIS-060050

PATIENT NAME: Abu El-Enin, Atef
MEDICAL RECORD NUMBER: 2927291
Date of Initial Treatment Plan 4/7/11

## PROBLEM # 3

| | | |
|---|---|---|
| **DESCRIPTION OF PROBLEM** (include statement as manifested by): | | |
| Social isolation | | |
| **DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved): | | |
| Patient will participate in social groups or activities with others. | | |
| CHECK ONE: | Short Term Goal ☐ | Long Term Goal ☒ |

[redacted]

Modalities:
1. Individual Psychotherapy 2. Family Therapy 3. Group Psychotherapy
4. Psychoeducation 5. Social Services 6. Medication Treatment
7. Vocational Services 8. Case Management 9. Other

## PROBLEM # 4

| | | |
|---|---|---|
| **DESCRIPTION OF PROBLEM** (include statement as manifested by): | | |
| | | |
| **DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved): | | |
| | | |
| CHECK ONE: | Short Term Goal ☐ | Long Term Goal ☐ |
| OBJECTIVES (PATIENT WILL...) (Steps to address the problem stated in measurable terms): | | |
| | | |
| ESTIMATED DATE ACHIEVED: | | |
| MODALITY OF TREATMENT | FREQUENCY | RESPONSIBLE CLINICIAN |
| N/A | Monthly | |
| N/A | N/A | |
| N/A | N/A | |
| N/A | N/A | |

Modalities:
1. Individual Psychotherapy 2. Family Therapy 3. Group Psychotherapy
4. Psychoeducation 5. Social Services 6. Medication Treatment
7. Vocational Services 8. Case Management 9. Other

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amphetamines | ☐ | | | | | | |
| *Other: Specify* | ☐ | | | | | | |

**Impact of Substance Abuse** (patient's report of negative consequences or losses that have been experienced as a result of substance use) on:

Family Relationships:
Social Relationships:
Work/School Performance:
Living Situation:
Legal Status:
Mood/Emotional Reactions:
Health/Medical Problems:

PATIENT'S MOTIVATION TO ADDRESS SUBSTANCE USE:

☐ Denies having problem with substances
☐ **Admits problem but refusing treatment**
☐ **Acknowledges problem and accepts treatment**

[redacted]

Medication compliance: ☐ Consistent ☐ Inconsistent ☐Poor
Use of herbal products: ☒ No ☐ Yes, explain:

Allergies: ☒ NKDA ☐ Yes, explain:

Problems with Psychotropic Medications: ☐ No ☐ Yes, explain:

**PAIN ASSESSMENT:** ☒ No pain reported by patient (Skip to Family History)
☐ Pain reported by patient (Complete questions 1-7.)



| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

2016139975590 2902102 015320 64 d331750 080816 03:08 080516 Rejn400_ELIS-080080

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

☐ Significant alcohol and drug abuse within the last two years and an additional risk factor from the list above.

**DISPOSITION**

Presented at disposition conference on: ____________________

☐ **Not accepted for treatment because:** (Check reasons below)

☐ Patient's symptoms have resolved without treatment.
☐ Patient is not a danger to self or others.
☐ Patient missed follow-up appointments.
☐ Missed appointment letter was sent but patient did not respond to reschedule.
☐ Patient moved to
☐ Patient refused further treatment.
☐ Patient connected with another provider.
☐ Confirmed that patient connected to new provider:

New Provider: Tel #

Address/Fax #

If not confirmed, explain:

[**If high risk patient, not accepted because:**]

☐ Mobile crisis unit was unable to re-engage patient.
☐ Patient was readmitted to the hospital. Where?
☐ Other (*explain*):

☐ **Accepted for treatment.**

**Type(s) of Treatment** Clinician (s) assigned:

☐ Medication Management REZK
☐ Individual Therapy
☐ Group Therapy
☐ Other:
☐ Other:

| | Signature | Stamp | Date |
|---|---|---|---|
| **Intake Clinician(s):** | [signature] | *Lauren Clifford, SW intern* | *4/5/11* |
| **Supervising Psychiatrist:** | [signature] | Richard Young, MD Lic:# 201199 Hospital ID# 802421 | 4/21/11 |

Patient logged into system.

| | |
|---|---|
| Clerk's Initials: TP | Date: 6/16/11 |

Med Eval:

Rafael Mustafa, MD
Psychiatry
18366
4/5/11

2016139975590 2902192 015320 64 d031750 080616 03:07 080536 hejh400_EL15-680060



Queens Health Network
Elmhurst Hospital CenterElmhurst Hospital CenterElmhurst Hospital Center
Chart Review Print

| Location | Patient Name | Patient Number | Visit Number | DOB | Sex |
|---|---|---|---|---|---|
| DIS-CP | Abuelenin,Atef | 2927291 | 2927291-1 | 10/20/80 | M |

Attending Physician

---

Unscheduled Adult Comprehensive/Initial History
Event Time: Thu, 10 Feb 11 1408 Status: complete

Thu, 10 Feb 11 1416 Documented by Chang Yoo, MD

Chief Complaint : [redacted]

Hx of PI : [redacted]

Signif Hx/Dx/Proc(s) : [redacted]

Med Allergy/Adverse Effect: no known medication allergies
Other Allergies : no known other allergies
HIV Status : Tested: yes Knows Status: yes Test Date: Dec 2010 Result: negative

Last Smoking Status : [redacted]
Pain : [redacted]

General : Negati[redacted]
HEENT : Negative
Gastrointestinal : Negative
GU/Reproductive : Negative
Hematologic/Lymph : Negative

---

2018199875190 2902192 015320 04 d381750 050516 03:07 080516 Aaj8400_EL18-060050

PATIENT NAME: Abu El-Enin, Atef
MEDICAL RECORD NUMBER: 2927291
Date of Initial Treatment Plan 4/7/11

**PROBLEM # 1**

**DESCRIPTION OF PROBLEM** (include statement as manifested by):
Depression as manifested by sad mood, compulsive over eating, over sleeping, fatigue, poor concentration, anhedonia, and feelings of helplessness.

**DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved):
Patient's depression will be reduced or resolved.

CHECK ONE: Short Term Goal ☐ Long Term Goal ☒

[redacted]

| | | |
|---|---|---|
| N/A | N/A | |
| N/A | N/A | |

Modalities:
1. Individual Psychotherapy 2. Family Therapy 3. Group Psychotherapy
4. Psychoeducation 5. Social Services 6. Medication Treatment
7. Vocational Services 8. Case Management 9. Other

**PROBLEM # 2**

**DESCRIPTION OF PROBLEM** (include statement as manifested by):
PTSD symptoms manifested by nightmares and flashbacks.

**DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved):
Symptoms of PTSD will be reduced or resolved.

CHECK ONE: Short Term Goal ☐ Long Term Goal ☒

**OBJECTIVES (PATIENT WILL…)** (Steps to address the problem stated in measurable terms):
Patient will report decreased nightmares and flashbacks at each session.

ESTIMATED DATE ACHIEVED: 7/7/11

MODALITY OF TREATMENT AND RESPONSIBLE CLINICIAN:

| MODALITY | FREQUENCY | RESPONSIBLE CLINICIAN |
|---|---|---|
| 6 | Monthly | R. Mustafa, MD |
| N/A | N/A | |
| N/A | N/A | |

Modalities:
1. Individual Psychotherapy 2. Family Therapy 3. Group Psychotherapy
4. Psychoeducation 5. Social Services 6. Medication Treatment
7. Vocational Services 8. Case Management 9. Other

20161230075590 2902192 015320 64 d331750 080816 03:07 080516 #ej#400_0131-600000

Libertas Center for Human Rights Intake Form

Current situation:
Mr El-Enin is currently living in New York City, where he hopes to file for asylum. He initially filed by himself (without a lawyer) on November 19, 2010, but provided the wrong address. He then reapplied with the proper address of his residence, a men's shelter in Brooklyn, but the application was returned to him because of an inaccuracy. He would like to apply again, but has met with Bitta, who told him that he is better off applying with the help of an attorney.

Medical information current/past:

[redacted]

Mental health current/past:

[redacted]

Social support/relationship/strengths:

Mother remains in Egypt. Uncle in LA. Otherwise, unknown.

Treatment Plan:

1. Refer to ABHC
2. Refer to Diagnostic

Reason for acceptance into Libertas:

Copyright July 2010

16139975990 2902192 015320 44 d311750 050318 03:07 030518

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

**Elmhurst Hospital Center, Department of Psychiatry**
**AMBULATORY BEHAVIORAL HEALTH SERVICES**
**INITIAL EVALUATION**

Length of Visit: *1 hour*

☒ Normal Risk

☐ HIGH RISK

**IDENTIFICATION:** (Check accuracy of information on face sheet)

Address: Eddie Harris Shelter, 629 Chauncey St., Brooklyn, NY 11207
Telephone: *303-319-4905.* / 347-227-0123
Next of Kin: *Mida Gaurdel (aunt)* [contact phone number]: *818-422-1446*
DOB: *10/20/80* Age: *30* ☒ Male ☐ Female
Patient's Spoken Languages: *English, Arabic* [Interview Conducted in]: *English*
Patient consenting to translator? ☐ Yes : (name of translator) ☐ No

Referral Source: *Libertas*

List of Records Requested & Reviewed:

Means of Payment: ☐ Medicaid ☐ Medicare ☒ Self-Pay ☐ Managed Care ☐ADAP

**CHIEF COMPLAINT** (In patient's, parent's, guardian's, school's words.):
*"I need hope for relief"*

[redacted]

**INPATIENT TREATMENT :** ☒ No ☐ Yes, see below

| Provider | Dates | Reason | Outcome |
| --- | --- | --- | --- |

**OUTPATIENT TREATMENT :** ☐ No ☒ Yes, see below

| Provider | Dates | Reason | Outcome |
| --- | --- | --- | --- |

139975590 2902192 015320 64 d331750 030516 03:07 030516 RajM400_ELI5-660060

**Patient Name:** Abu El-Enin, Atef **MR#:** 2927291 **Date:** 4/5/11

[redacted]

**Each affirmative response earns one point.** **SCORE:** ***0/4***

**2/4 or greater = positive screening and further evaluation is indicated.**

☒**NO SUBSTANCE ABUSE** (Go to Medical History)

**ALCOHOL AND SUBSTANCE ABUSE:** (Check applicable Yes ☒ and fill out below)

| Substance | Yes | Route | Age of Onset | Frequency & Quantity of Use | Amount past five days | Date of last use |
|---|---|---|---|---|---|---|
| Alcohol | ☐ | | | | | |
| Tobacco | ☐ | | | | | |
| Marijuana | ☐ | | | | | |
| Cocaine | ☐ | | | | | |
| Opiates | ☐ | | | | | |
| Heroin | ☐ | | | | | |
| PCP | ☐ | | | | | |
| BZD's | ☐ | | | | | |
| Hallucinogens | ☐ | | | | | |

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

| No pain | | | | Moderate | | | | | | Worst Pain |
|---|---|---|---|---|---|---|---|---|---|---|

1. LOCATION: Where is your pain located? Mark drawing:



Or state:

2. QUALITY: Have patient describe pain in their own words, e.g.
☐ Ache ☐ Burn ☐ Throb ☐ Pull ☐ Sharp

Please explain:

3. ONSET: Include duration, variations, rhythms:

4. PRESENT PAIN MANAGEMENT REGIMEN & ITS EFFECTIVENESS:

5. WHAT CAUSES OR INCREASES THE PAIN?

6. WHAT RELIEVES THE PAIN?

**7. PLAN FOR PAIN MANAGEMENT:**

**FAMILY HISTORY** of Psychiatric Illness, Substance Abuse, Suicide & Violence:
☐ No ☒ Yes, describe: *Patient's uncle struggles with alcoholism.*

**PSYCHOSOCIAL HISTORY:**

Family of Origin (Describe members, ages, religious/ethnic background, occupation, family dynamics): *Patient was born and raised in Cairo, Egypt by his mother and grandmother. Patient reports that his parents divorced after 30 days of marriage, and patient never met his father who died when patient was 15. Patient reports a strained relationship with his mother and grandmother because he did not support the government or strict Islamic beliefs. Patient reports that his mother worked a lot so they rarely spent time together. Patient states that he and his mother are working to repair their relationship over the phone. Patient reports that his grandmother mostly cared for him as a child but he and his grandma constantly fought*

[redacted]

Development (Include information about prenatal course, delivery, developmental milestones in the first year of life, motor development, language, feeding, toilet training, sleeping, sexual development): *Patient reports normal development.*

Was childhood development within normal limits? ☒ Yes ☐ No, explain:

Education (Highest grade completed; Special education? Ability to read and write): *Patient completed 4 years of college, split between two Universities in Egypt. Patient tried to pursue a Graduate degree but was denied because the schools did not agree with patient's interests.*

Work History: ☐ No ☒ Yes, describe: *Patient worked at Berlitz Language Center in Cairo where he taught English for 9 months. Patient then began working for a small training company where he became Director of Marketing and Training, while again teaching English to students. Patient was fired after 1 year for using American films in his classes. Patient next*

[redacted]

Rev 09/01/2009

2016139971550 2902192 015320 64 d331750 080816 03:08 080516 RejN400_ELIS-680060



Bellevue Hospital Center
Chart Review Print

| Location | Patient Name | | Age | Sex |
|---|---|---|---|---|
| DIS-16N-44-B | Abuelenin,Atef | [redacted] | 35Y | M |

| Attending Physician | D.O.B. |
|---|---|
| Leibert,Eric | 10/20/1980 |

---

Unscheduled ED MD Disposition Note/Order (ED MD Disposition Note)
Event Time: Wed, 27 Jan 16 0316 Status: complete

Wed, 27 Jan 16 0316 Documented by Farzon Nahvi, MD

ED Attending : Soma Pathak, MD
Provider : Farzon Nahvi, MD
Disposition : Admitted as an Inpatient
Disposition Date/Time : Wed, 27 Jan 2016 0316
Primary Dx : [redacted]
Secondary Dx(s) :
Special Bed Needs :
Select Dx(es) at Adm :
Admit To :
Service (Medicine) :
(Service) :
Team (Medicine) :
(Team) :
Condition :
Summary :
HIV Test Results :
Med Decision Making :

Tests Reviewed :

---

Unscheduled ED RN Progress/Reassessment
Event Time: Wed, 27 Jan 16 0623 Status: complete

Wed, 27 Jan 16 0624 Documented by Richard Williams, RN

Progress Note : Patient with middle lobe pneumonia treated with antibiotics, now remain afebrile, spont breath, awake and alert, await sbed assignment
ED Alerts : None;
Suspected Sepsis : no

---

Bellevue Hospital Center
Chart Review Print

```
Location      Patient Name          [redacted]                  Age   Sex
DIS-16N-44-B  Abuelenin,Atef                                    35Y   M

                                    Attending Physician   D.O.B.
                                    Leibert,Eric          10/20/1980
-------------------------------------------------------------------------------
Unscheduled ED RN Initial Assessment
Event Time: Tue, 26 Jan 16  2251                      Status: complete

Tue, 26 Jan 16  2258   Documented by Desmond Smith, RN

Vital Signs                         : [redacted]
Pain Screen                         :
ESI Level                           :
Chief Complaint                     :
Focused Assessment                  :

Past Medical/Surgical Hx            :
Medications on Arrival              :
Allergies - Medications             :
Allergies - Other                   :
Med Allergy(ies) Documented/Revw'd?:
Domestic Violence                   :
Psych Risk Assessment               :
ED Alerts                           :
HIV Test Offering                   :
Preferred Language                  :
Communication Ability               :
Language Used                       :
Suspected Sepsis                    :
-----------------------------------
ED Full Registration
Event Time: Tue, 26 Jan 16  2315                      Status: complete

Tue, 26 Jan 16  2315   Documented by Gary Bryan

Full Reg Completed?: Yes
-------------------------------------------------------------------------------
```

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

ed 10/04

Patient Name: Abu El-Enin, Atef    MR#: 2927291    Date: 4/5/11

**Elmhurst Hospital Center, Department of Psychiatry**
**AMBULATORY BEHAVIORAL HEALTH SERVICES**
**INITIAL EVALUATION**

Length of Visit: *1 hour*

☒ Normal Risk
☐ HIGH RISK

**IDENTIFICATION:** (Check accuracy of information on face sheet)

Address: Eddie Harris Shelter, 629 Chauncey St., Brooklyn, NY 11207
Telephone: *303-319-4905.* / 347-227-0123
Next of Kin: *Mida Gaurdel (aunt)* [contact phone number]: *818-422-1446*
DOB: *10/20/80*    Age: *30*    ☒ Male ☐ Female
Patient's Spoken Languages: *English, Arabic*    [Interview Conducted in]: *English*
Patient consenting to translator? ☐ Yes : (name of translator) ☐ No

Referral Source: *Libertas*

List of Records Requested & Reviewed:

Means of Payment: ☐ Medicaid ☐ Medicare ☒ Self-Pay ☐ Managed Care ☐ ADAP

**CHIEF COMPLAINT** (In patient's, parent's, guardian's, school's words.):
*"I need hope for relief"*

**HISTORY OF PRESENT ILLNESS:**

[redacted]

*floor bloodied for a week before his mother transferred him to a private hospital. Patient developed a blood clot, and after recently developing a blood clot in his finger, he has again been having nightmares about the incident. Patient began meeting with Libertas on 1/19/11 and asked for a referral to ABHS due to anxiety and sad mood. Patient underwent political and academic persecution in Egypt due to his light skin and liberal beliefs. Due to the*

[redacted]

**PAST PSYCHIATRIC HISTORY:** (Describe initial presentation [include age], past episodes of mental illness, previous treatment and diagnoses):

[redacted]

**INPATIENT TREATMENT :** ☒ No ☐ Yes, see below

| Provider | Dates | Reason | Outcome |
|---|---|---|---|

**OUTPATIENT TREATMENT :** ☐ No ☒ Yes, see below

| Provider | Dates | Reason | Outcome |
|---|---|---|---|



[redacted]

# AFTER VISIT SUMMARY

NYU Langone Health

**Atef S. Abuelenin** Date of Birth: 10/20/1980

2/20/2021 Tisch Hospital - Perelman Emergency Department 212-263-5550

Emergency Department Follow-Up & Care Transition Center 212-263-6695

## Instructions

Your personalized instructions can be found at the end of this document.

**AMB REFERRAL TO ORTHOPEDIC SURGERY**
Expires: 2/20/2022 (requested)

**Follow up with the orthopedist**

## Today's Visit

**Diagnosis**
Suprapatellar effusion of knee

[redacted]

Blood Pressure
158/100

BMI
33.91

Weight
250 lb

Height
6'

Temperature (Oral)
98.2 °F

Pulse
73

Respiration
16

Oxygen Saturation
99%

## What's Next

You currently have no upcoming appointments scheduled.

## Patient Demographics

[redacted]

## Emergency Department Treatment Team

1. Tina Wu, MD
2. Lauren Nash, PA

## Follow Up Call

You will get a call from our Emergency Department (ED) Follow-Up & Care Transition Center. They will talk with you about your visit to the ED. If you have any questions about your discharge instructions, please call us between 9 am and 7 pm at **212-263-6696** or **212-263-6695.**

## Your Medication List

You have not been prescribed any medications.

---

## MyChart at NYU Langone

- Sign up for NYU Langone Health MyChart to stay connected to your care anytime and anywhere.
- You can schedule appointments, view test results, request prescription refills, send secure messages to your providers, and more.
- To enroll, download the NYU Langone Health app and select "Activate MyChart Account" on the login screen. Or you can visit https://mychart.nyulmc.org and select "Sign Up Now."
- For technical support, please call 1-866-262-6458.

---

it to apply the ice pack, or heat, directly to the knee. Never put ice directly on the skin. Always wrap the ice in a t[...] or other type of cloth.

- You may use over-the-counter pain medicine to control pain, unless another pain medicine was prescribed. If you have chronic liver or kidney disease or have ever had a stomach ulcer or GI bleeding, talk with your healthcare provider before using these medicines.
- If crutches or a walker have been recommended, do not put weight on the injured leg until you can do so without pain. Check with your healthcare provider before returning to sports or full work duties.
- If you have a hook-and-loop knee brace, you can remove it to bathe and sleep, unless told otherwise.

## Follow-up care

Follow up with your healthcare provider as advised.

If you are overweight, talk to your healthcare provider about a weight loss program. The excess weight puts extra strain on your knees.

## When to seek medical advice

Call your healthcare provider right away if any of these occur:

- Increasing pain, redness, or swelling of the knee
- Fever of 100.4°F (38°C) or above lasting for 24 to 48 hours

**Date Last Reviewed:** 11/23/2015

© 2000-2017 The StayWell Company, LLC. 800 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

# Allergies as of 2/20/2021

No Known Allergies

[redacted]

## Water on the Knee




Water on the knee is also known as knee effusion. The knee joint normally has less than 1 ounce of fluid. Injury or inflammation of the knee joint causes extra fluid to collect there. When this happens, the knee joint looks swollen and is usually painful. It may be hard to fully bend the knee.

The most common cause of water on the knee is osteoarthritis due to wear and tear on the joint cartilage. Other causes include injury to the cartilage, inflammatory arthritis such as gout or rheumatoid arthritis, and infection of the joint.

You may need a needle aspiration, if the cause of your water on the knee is not certain. This procedure removes a sample of joint fluid from the knee for testing. This is done with a local anesthetic. Removing excess fluid may also relieve swelling and pain.

## Home care

- Limit your activities. Stay off the injured leg as much as possible until pain improves.
- Keep your leg elevated to reduce pain and swelling. When sleeping, place a pillow under the injured leg. When sitting, support the injured leg so it is level with your waist. This is very important during the first 48 hours.
- Apply an ice pack over the injured area for 15 to 20 minutes every 3 to 6 hours. You should do this for the first 24 to 48 hours. You can make an ice pack by filling a plastic bag that seals at the top with ice cubes and then wrapping it with a thin towel. Continue to use ice packs for relief of pain and swelling as needed. As the ice melts, be careful to avoid getting your wrap, splint, or cast wet. After 48 hours, apply heat(warm shower or warm bath) for 15 to 20 minutes several times a day, or alternate ice and heat. If you have to wear a hook-and-loop knee brace, you can open

History: Pain

Technique: XR KNEE 4 OR MORE VIEWS RIGHT

Comparison: No prior imaging

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Mikell Yuhasz MD 2/20/2021 2:53 PM

IMPRESSION:

No acute fracture or dislocation. Tricompartmental osteoarthrosis. Chronic proximal fibular diaphyseal fracture. Circumferential soft tissue swelling and small suprapatellar effusion.

**If you feel that any of the information in this summary is inaccurate, please talk with your healthcare provider.**

## Information About Medication Safety

It is important to keep an updated record of the medications you are taking, and to bring this updated list of medications every time you visit your Health Care Provider and when you come to the hospital. We want to help you in managing your medications safely after your visit or discharge. This includes the potential side effects of your medications. If you have any questions regarding the medications you are taking, please speak to your Health Care Provider or Pharmacist.

## Finding a Physician Within NYU Langone Health

As one of the nation's premier academic medical centers, NYU Langone Health is devoted to excellence in patient care, education, and research. We are proud that our care team includes leading specialists for every condition.

Should you need assistance finding a physician or service, please visit us on our website at https://nyulangone.org/doctors.

To reach us by phone:
NYU Langone Physician Referral Services – (855) 314-2978
NYU Langone Orthopedic Hospital – (888) 453-3627
Family Health Centers at NYU Langone – (718) 630-7942

Additional resources include:

National Suicide Prevention Hotline – **(800) 273-8255**
NYC Suicide Hotline – **(888) 692-9355**

## Have questions about your bills?

Our physician and hospital customer service representatives are available to answer any billing questions: https://nyulangone.org/insurance-billing-financial-assistance

# Norwich University

The Trustees of Norwich University by authority of the laws of the State of Vermont and on the recommendation of the Faculty of the University hereby confer upon

**Atef Abuelenin**

the Degree of

## Master of Arts in International Relations

together with all the rights, privileges, and honors which pertain there to. In testimony thereof and as evidence of satisfactorily fulfilling all the requirements for the Degree as stated by the Faculty, we affix to this diploma the Seal of the University and the signatures of the President and Secretary.

June 22, 2018

NORWICH UNIVERSITY 1819

Secretary

Richard W. Schneider
President

A PHOTOCOPY OF THIS TRANSCRIPT IS NOT OFFICIAL

Student No: A00805275 Date of Birth: 20-OCT-1980 Date Issued: 26-JUN-2018

Page: 1

Record of: Atef Sabry Abuelenin
Current Name: Atef Sabry Abuelenin
PO Box 114
New York, NY 10021-0005

Issued To: STUDENT

Course Level: Graduate Studies
First Admit: Spring 2014 (Graduate)
Last Admit: Summer 2016 (Graduate)

Degrees Awarded Master of Arts 15-SEP-2015
Ehrs: 36.00 GPA-Hrs: 36.00 QPts: 122.40 GPA: 3.40
Primary Degree
College : College Graduate Con Studies
Major : Diplomacy
Maj/Concentration : MDY Conc. Intl Terrorism

Degrees Awarded Master of Arts 22-JUN-2018
Ehrs: 21.00 GPA-Hrs: 12.00 QPts: 37.80 GPA: 3.15
Primary Degree
College : College Graduate Con Studies
Major : MA International Relations
Maj/Concentration : MIR Conc InternationalSecurity

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|
| INSTITUTION CREDIT: | | | | | | |
| Spring 2014 (Graduate) | | | | | | |
| Diplomacy | | | | | | |
| GD | 511 | Hist Diplomacy in Intnatl Syst | 6.00 | C | 12.00 | |
| GD | 520 | Law & International System | 6.00 | A- | 22.20 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 34.20 | GPA: | 2.85 | |
| Probation 1 | | | | | | |
| Fall 2014 (Graduate) | | | | | | |
| Diplomacy | | | | | | |
| GD | 530 | Econ & International System | 6.00 | A | 24.00 | |
| GD | 542 | Terrorism; Intro & State Spons | 6.00 | A | 24.00 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 48.00 | GPA: | 4.00 | |
| Academic Warning | | | | | | |
| Spring 2015 (Graduate) | | | | | | |
| Diplomacy | | | | | | |
| GD | 552 | Int'l Terrorism Non-State Actr | 6.00 | A- | 22.20 | |
| GD | 555 | Comprehensive Exam | 0.00 | S | 0.00 | |

******************** CONTINUED ON NEXT COLUMN ********************

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|
| Institution Information continued: | | | | | | |
| GD | 562 | Int'l Resp Trnsntl Terrorism | 6.00 | B | 18.00 | |
| GD | 575 | Exit Portfolio | 0.00 | S | 0.00 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 40.20 | GPA: | 3.35 | |
| Academic Warning | | | | | | |
| Residency 2015 | | | | | | |
| Diplomacy | | | | | | |
| GD | 595 | Residency | 0.00 | S | 0.00 | |
| | | Ehrs: 0.00 GPA-Hrs: 0.00 QPts: | 0.00 | GPA: | 0.00 | |
| Academic Warning | | | | | | |
| Summer 2016 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 520 | American Foreign Policy | 6.00 | B+ | 19.80 | |
| IR | 530 | International Security | 6.00 | B | 18.00 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 37.80 | GPA: | 3.15 | |
| Good Standing | | | | | | |
| Winter 2016 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 590 | Masters Research Paper | 9.00 | F | 0.00 | E |
| | | Ehrs: 0.00 GPA-Hrs: 0.00 QPts: | 0.00 | GPA: | 0.00 | |
| Probation 2 | | | | | | |
| Summer 2017 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 555 | Field Exam | 0.00 | S | 0.00 | |
| | | Ehrs: 0.00 GPA-Hrs: 0.00 QPts: | 0.00 | GPA: | 0.00 | |
| Good Standing | | | | | | |
| Winter 2017 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 590 | Masters Research Paper | 9.00 | S | 0.00 | I |

******************** CONTINUED ON PAGE 2 ********************

THE OFFICIAL SIGNATURE IS WHITE AND IS IMPOSED UPON THE INSTITUTIONAL SEAL

GRADING LEGEND IS PRINTED ON REVERSE

THE UNIVERSITY NAME APPEARS IN WHITE PRINT ACROSS THE FACE OF THIS RECORD

This official document is printed on maroon security paper and does not require a raised seal. A hidden security warning appears only when photocopied. When photocopied, the name of the institution appears on one line and the words "COPY" appears on the next. An official signature is white with a maroon background. Reject document as official if the signature is distorted or has been photocopied.

Interim Registrar

In accordance with USC 438 (6) (4) (8) (The Family Educational Rights and Privacy Act of 1974) you are hereby notified that this information is provided upon the condition that you, your agent or employees, will not permit any other party access to this record without consent of the student. Alterations of this transcript may be a criminal offense.

A HIDDEN SECURITY COPY WARNING APPEARS ONLY WHEN PHOTOCOPIED

A PHOTOCOPY OF THIS TRANSCRIPT IS NOT OFFICIAL

Student No: A00805275 Date of Birth: 20-OCT-1980 Date Issued: 26-JUN-2018

Record of: Atef Sabry Abuelenin Page: 2
Level: Graduate Studies

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|

Institution Information continued:
Ehrs: 9.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00
Good Standing

Residency 2017
MA International Relations

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|
| IR | 595 | MIR Residency | 0.00 | S | 0.00 | |

Ehrs: 0.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00

********************** TRANSCRIPT TOTALS **********************

| | Earned Hrs | GPA Hrs | Points | GPA |
|---|---|---|---|---|
| TOTAL INSTITUTION | 57.00 | 48.00 | 160.20 | 3.34 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 57.00 | 48.00 | 160.20 | 3.34 |

********************** END OF TRANSCRIPT **********************

NORWICH UNIVERSITY, NORTHFIELD VT. OFFICE OF THE REGISTRAR

THE OFFICIAL SIGNATURE IS WHITE AND IS IMPOSED UPON THE INSTITUTIONAL SEAL

GRADING LEGEND IS PRINTED ON REVERSE

THE UNIVERSITY NAME APPEARS IN WHITE PRINT ACROSS THE FACE OF THIS RECORD

This official document is printed on maroon security paper and does not require a raised seal. A hidden security warning appears only when photocopied. When photocopied, the name of the institution appears on one line and the words "COPY" appears on the next. An official signature is white with a maroon background. Reject document as official if the signature is distorted or has been photocopied.

Interim Registrar
Diane Douglas, Registrar

In accordance with USC 438 (6) (4) (8) (The Family Educational Rights and Privacy Act of 1974) you are hereby notified that this information is provided upon the condition that you, your agent or employees, will not permit any other party access to this record without consent of the student. Alterations of this transcript may be a criminal offense.

A HIDDEN SECURITY COPY WARNING APPEARS ONLY WHEN PHOTOCOPIED

13:13

AA nelnet.com

Official Servicer of Federal Student Aid
What this means to you

Help | Atef

**Worried about affording your next payment?**

Tell us your financial situation, and we'll identify options that may help reduce or postpone your payments.

**Important COVID-19 Information**

Back | Loan Details

| Account: | E880671458 |
|---|---|
| **Current Balance:** | $198,636.90 |
| **Past Due Amount:** | $0.00 |
| **Current Amount Due:** | $0.00 |
| **Payment Amount:** | $0.00 |
| **Due Date:** | 03/25/2021 |

Hide Groups and Loan Details

**Group: AA**

| | |
|---|---|
| **Due Date:** | 10/25/2021 |
| **Fees:** | $0.00 |

Home | Loan Details | Payments | Documents

# American Military University

On the recommendation of the Faculty of American Public University System
and by the virtue of the authority vested in them, the Board of Trustees of the University,
have conferred upon

## Atef S. Abuelenin

the degree of

## Master of Arts, Intelligence Studies

with all the Rights, Privileges, and Honors thereunto appertaining. In testimony whereof, the
seal of the University and the signatures of its officers are hereunto affixed this
October 1, 2021

AMERICAN PUBLIC UNIVERSITY SYSTEM

Dr. Wade T. Dyke, President

Dr. Katherine Zatz, Chairwoman of the Board

Dr. Vernon C. Smith, Provost

Michelle Neuman, Registrar

PRINTED FROM CERTIFIED PDF

# AMERICAN PUBLIC UNIVERSITY SYSTEM

American Public University
American Military University
1-877-755-2787

111 West Congress Street
Charles Town, West Virginia 25414

Atef S. Abuelenin
69-62 Grand Ave
3
Maspeth NY 11378

Student Name: Atef S. Abuelenin
DOB: 10/20/XXXX
StudentID: 5648834

DocumentID: 40735950

## American Military University

| Admission Date | Program | GPA | Conferred |
|---|---|---|---|
| 09/06/2018 | Master of Arts in Intelligence Studies-Capstone Option (MA) Concentration in General | 3.2340 | 10/01/2021 |

## Transfer Credit Applied Toward Program

| Source | Semester Hours |
|---|---|
| Norwich University | 42.00 |
| **Total Transfer Credit Hours** | **9.00** |
| **Total Teach Out Credit Hours (above)** | **0.00** |
| **Total Institutional Credit Hours (above)** | **0.00** |
| **Total Prior Learning Assessment Credit Hours (above)** | **0.00** |
| **Total Transfer Credit Accepted But Not Program Applicable** | **33.00** |

## AMU Courses

| Semester\Course Number | Course Title | Course Start Date | Course End Date | Hours Att | Hrs Earned | Grade | Quality Points |
|---|---|---|---|---|---|---|---|
| **Fall 2018** | | | | | | | |
| SSGS500 | Research Design and Methods | 10/01/2018 | 11/25/2018 | 3.00 | 3.00 | A | 12.00 |



TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE

PRINTED FROM CERTIFIED PDF

# American Public University System
## Office of the Registrar
## 111 W. Congress Street
## Charles Town, WV 25414
## Official Transcript

**Statement of Authenticity**

This official transcript has been transmitted electronically to the recipient and is intended solely for use by that recipient. If you are not the intended recipient please notify American Public University System at apustranscripts@apus.edu. It is not permissible to replicate this document or forward it to any person or organization other than the identified recipient. Release of this record or disclosure of its contents to any third party without written consent of the record owner is prohibited.

This official transcript has been digitally signed and therefore contains special characteristics. If this document has been issued by American Public University System and for optimal results, we recommend that this document is viewed with the latest version of Adobe® Acrobat or Adobe® Reader it will reveal a digital certificate that has been applied to the transcript. This digital certificate will appear in a pop-up screen or status bar on the document, display a blue ribbon, and declare that the document was certified by American Public University System with a valid certificate issued by GlobalSign CA for Adobe®. This document certification can be validated by clicking on the Signature Properties of the document. The blue ribbon symbol is your assurance that the digital certificate is valid, the document is authentic, and the contents of the transcript have not been altered.

If you have any questions regarding the authenticity of this transcript, please contact us at apustranscripts@apus.edu.

**Recipient:** **Atef Abuelenin** **Student:** **Atef S Abuelenin**

PRINTED FROM CERTIFIED PDF

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| INTL508 | Intelligence Analysis | 12/03/2018 | 01/27/2019 | 3.00 | 3.00 | A | 12.00 |
| **Winter 2019** | | | | | | | |
| INTL616 | Ethical Challenges in the Intelligence Community | 02/04/2019 | 03/31/2019 | 3.00 | 3.00 | A- | 11.01 |
| **Spring 2019** | | | | | | | |
| INTL627 | Advanced Geospatial Intelligence | 04/01/2019 | 05/26/2019 | 3.00 | 3.00 | B+ | 9.99 |
| INTL631 | Criminal Intelligence Analysis | 06/03/2019 | 07/28/2019 | 3.00 | 3.00 | B | 9.00 |
| **Summer 2019** | | | | | | | |
| INTL653 | Deception, Propaganda and Disinformation | 08/05/2019 | 09/29/2019 | 3.00 | 0.00 | F | 0.00 |
| **Fall 2019** | | | | | | | |
| INTL652 | Terrorism: Assessing the Past to Forecast the Future | 10/07/2019 | 12/01/2019 | 3.00 | 0.00 | W | |
| **Spring 2020** | | | | | | | |
| INTL501 | Strategic Intelligence | 04/06/2020 | 05/31/2020 | 3.00 | 3.00 | A | 12.00 |
| INTL507 | Intelligence Operations | 06/01/2020 | 07/26/2020 | 3.00 | 3.00 | A- | 11.01 |
| **Summer 2020** | | | | | | | |
| INTL502 | Collection | 08/03/2020 | 09/27/2020 | 3.00 | 0.00 | W | |
| **Winter 2021** | | | | | | | |
| INTL502 | Collection | 02/01/2021 | 03/28/2021 | 3.00 | 3.00 | A- | 11.01 |
| **Spring 2021** | | | | | | | |
| SSGS696 | Master's Project Capstone Seminar | 06/07/2021 | 09/26/2021 | 3.00 | 3.00 | B | 9.00 |
| **Summary:** | **Cum GPA: 3.2340** | | | **36.00** | **27.00** | | **97.0** |

Michelle Newman - University Registrar

AMERICAN PUBLIC UNIVERSITY SYSTEM

An official electronic transcript is available as a document with a digital certificate available through a secure portal. An official paper transcript is printed on blue security paper with the name of the university printed in white type across the face of the document. A raised seal is not required. Official paper transcripts are placed in sealed envelopes.

 Atef S. Abuelenin Issue Date: 03/06/2023

TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE

**AMERICAN PUBLIC UNIVERSITY SYSTEM**
American Public University - American Military University
111 West Congress Street
Charles Town, WV 25414
877-755-2787 www.apus.edu

**Official Transcript:** An official transcript consists of a copy of the student's permanent record signed by the Registrar and listing those courses for which a grade has been assigned. Course credit accepted from another institution will be included for all graduated students and all active students, once awarded. Transfer credit for students who are no longer enrolled may not appear as it will no longer be considered valid. Transcripts are not issued for CEU or MOOC coursework.

**Academic Calendar:** The unit of credit used at member institutions of the American Public University System (APUS) is the semester hour. Courses may be 8 or 16 weeks in duration.

**Member Institutions:** American Community College (ACC), American Public University (APU), and American Military University (AMU) were incorporated as members of the American Public University System on June 17, 2002. ACC operations were transferred to other member institutions in June 2005.

**Accreditation:** APUS is accredited by the Higher Learning Commission.

Date of last revision: July 1, 2019

191609

**Grading System:** Letter grades and quality points are assigned for all courses except for those specifically designated below:

| | |
|---|---|
| A: | 4.0 Quality Points |
| A-: | 3.67 Quality Points |
| B+: | 3.33 Quality Points |
| B: | 3.0 Quality Points |
| B-: | 2.67 Quality Points |
| C+: | 2.33 Quality Points |
| C: | 2.0 Quality Points |
| C-: | 1.67 Quality Points |
| D+: | 1.33 Quality Points |
| D: | 1.0 Quality Points |
| D-: | 0.67 Quality Points |
| F: | 0.0 Quality Points |
| PD: | Pass w/Distinction |
| P: | Pass |
| FAIL: | Failed Comp Exam |
| W: | Withdrawal/No Grade |
| WP: | Withdrew Passing |
| WF: | Withdrew Failing |
| S: | Satisfactory |
| X: | Knowledge Only/Audit |
| I: | Incomplete |
| PLA: | Prior Learning Assessment |
| R: | Course Retaken |
| U: | Unsatisfactory |

Grades without quality points and any transfer credit awarded are not factored when computing a student's GPA. Only A through F letter grades are factored into the student GPA.

Graduate Courses: Any grade below "C" is considered failing as of April 1, 2007.

Doctoral Courses: Any grade below "B-" is considered failing as of January 1, 2018

**Course Numbers:** Courses numbered less than 100 are remedial and do not meet undergraduate or graduate degree requirements. Courses numbered 100-499 are designed to meet undergraduate degree requirements. Courses numbered 500 and 600 are designed to meet master's degree requirements. Courses numbered 700 and above are designed to meet doctoral degree requirements.

**Degree and Residency Requirements:** Effective January 2018, Associate degree students must complete a minimum of 60 semester hours, 15 of which must be at an APUS institution. Bachelor's degree students must complete a minimum of 120 semester hours, 30 of which must be at an APUS institution. Master's degree students must complete a minimum of 36 semester hours, 21 of which must be at an APUS institution. Doctoral degree students must complete a minimum of 58 semester hours, all of which must be completed at an APUS institution.

2007 – 2017 Associate degree students must complete a minimum of 61 semester hours, 16 of which must be at an APUS institution. Bachelor's degree students must complete a minimum of 121 semester hours, 31 of which must be at an APUS institution. Master's degree students must complete a minimum of 36 semester hours, 21 of which must be at an APUS institution.

PRIMARY CERTIFIED PDF

# Norwich University

The Trustees of Norwich University by authority of the laws of the State of Vermont and on the recommendation of the Faculty of the University hereby confer upon

**Atef Abuelenin**

the Degree of

**Master of Arts in Diplomacy**

together with all the rights, privileges, and honors which pertain there to. In testimony thereof and as evidence of satisfactorily fulfilling all the requirements for the Degree as stated by the Faculty, we affix to this diploma the Seal of the University and the signatures of the President and Secretary.

September 15, 2015

NORWICH UNIVERSITY 1819

[signature]
Secretary

[signature]
President

***Sample Paper***

Towards Identifying China's Mercurial Economic Regime

Atef Abuelenin

The dramatic surge in foreign direct investment into the Chinese market, even in the aftermath of the devastating global financial crisis of 2008, has ignited widespread interest among scholars, policymakers, and economists in understanding the unique characteristics of China's economic structure. Historically, China's alignment with the former Soviet Union firmly entrenched Marxist ideologies within its political and economic institutions, shaping the foundation of the nation's governance and industrial policies. However, the nation's transformative period from 1966 to 1976 marked a significant shift in its economic strategy, opening the door to more flexible economic approaches that retained the core tenets of Marxism while cautiously incorporating liberal principles. This hybrid economic framework allowed China to partially transition from the utopian ideals of Marxism toward the pragmatic realities of liberalism, creating a distinctive economic model that is deeply rooted in realism.

The remarkable economic achievements of China over the past four decades vividly illustrate the effectiveness of this blended model. Since Deng Xiaoping initiated sweeping economic reforms aimed at integrating capitalist principles into the state's policies, China's economy has experienced an extraordinary average annual growth rate of 10 percent in GDP. The scale of this transformation is unprecedented, with the economy expanding nearly fifty-fold from the early 1980s to 2012. This

meteoric rise not only underscores China's resilience and adaptability but also reflects its ability to balance the competing demands of state intervention and market liberalization.

On a practical level, China's economic policies exhibit a strategic fusion of state control and free-market mechanisms. The government's deliberate efforts to devalue its currency, maintain trade surpluses, and implement protectionist measures to promote exports highlight its ability to harmonize Marxist labor regulations with liberal trade practices. Moreover, the state's reforms in the agricultural sector during the 1980s and 1990s marked a pivotal moment in the country's economic evolution. By transitioning from collective farming to household-based production, China gradually liberalized agricultural prices while decentralizing fiscal control. This decentralization empowered local enterprises, increased productivity, and aligned economic practices with the nation's overarching strategic objectives.

The rise of e-commerce in China exemplifies the success of this economic strategy. Platforms such as Aladdin symbolize the nation's ability to integrate free-market principles into its economic framework while leveraging technological advancements to reduce trade barriers and enhance its global presence. However, this success is not without criticism. Some observers argue that China's restrictive measures on private enterprises, including excessive state intervention, stifle innovation and limit the potential of the private sector. Despite this, state-owned enterprises (SOEs) continue to dominate key industries, accounting for a significant portion of China's industrial output. The government's appointment of specialized agencies to oversee SOEs underscores its commitment to nationalism and its determination to preserve aspects of Marxist economic policies.

China's regional and global initiatives further reflect its realist approach to economic expansion. The nation's active participation in the East Asia Economic Caucus and its leadership role in

Case 1:25-cv-04601-RRK Document 1 26 Filed 08/19/25 Page 126 of 236 PageID #: 638


ASEAN-related trade frameworks illustrate its strategic efforts to counterbalance Western influence in the Asia-Pacific region. Bilateral agreements, such as those with the European Union, highlight China's determination to deepen trade relationships and assert its economic dominance on the global stage.

Domestically, China's conservative financial policies, characterized by an emphasis on savings and a preference for cash-based transactions, reveal a cautious approach to economic management. While these policies have provided stability, they also highlight the need for structural reforms to stimulate local consumption, encourage transparent currency valuation, and expand access to consumer credit. Without such reforms, China risks economic stagnation, particularly as the government prioritizes state interests over the growth and dynamism of the private sector.

On the international front, China has implemented innovative financial strategies to challenge the global dominance of the U.S. dollar. By initiating currency swap agreements with countries such as Brazil, Argentina, and Indonesia, China aims to elevate the yuan as a reserve currency. The government's encouragement of stakeholders to settle transactions in yuan is part of a broader effort to reshape global financial systems. Additionally, China's engagement in Africa demonstrates its ambition to expand economic influence through infrastructure projects and low-cost solutions. This approach not only secures loyalty from emerging markets but also strengthens China's position as a key player in the global economic order.

Despite these advancements, China's prioritization of nationalism over human rights and quality standards raises significant concerns. The lack of adherence to international safety norms in industries such as manufacturing undermines the nation's economic credibility. Furthermore, the

reliance on cost-cutting measures in exports and overseas investments presents long-term challenges to the sustainability of its economic model.

The current framework of global economic integration, dominated by established powers, remains inadequate to address the ambitions of emerging players like China. The economic crisis of 2008, coupled with the rise of anti-globalization movements, underscores the urgent need for a reimagined economic system. Such a system must accommodate rising powers like China while inviting marginalized players in regions such as Africa to participate more effectively. The unchecked continuation of random offshoring practices threatens to destabilize the current globalization model. In the long term, the advent of technological innovations may render some industries obsolete, prompting a shift toward a hybrid economic system that integrates elements of the Bretton Woods framework with the principles of globalization.

The pressing question remains: can the existing global integration model adequately address the wild economic aspirations of emerging powers like China? The answer appears to be no. The Chinese regime is actively working to weaken the European Union's semi-stable economy and exhaust the already indebted United States through strategies that include reducing the cost of exports in agricultural, textile, and technological sectors while promoting low-cost industries overseas. These efforts reflect a broader competition between China and the West, where each side seeks to impose its distinct and biased economic systems.

In conclusion, the ongoing rivalry between China and the West is a testament to the evolving dynamics of global economic power. As nations vie for supremacy, the global community faces the daunting task of developing inclusive and sustainable economic frameworks that balance technological advancement, political strategy, and economic integration. The race for economic

dominance is far from over, and the world stands on the brink of a new order that will redefine the landscape of international economics for generations to come.

NYC Children

## ACS ACKNOWLEDGES

# *Atef Abuelenin*

## Forestdale, Inc.

## FOR EXCELLENCE IN PRACTICE

*The Administration for Children's Services thanks you for your hard work, dedication and partnership in serving the children and families of New York City.*

INA MENDEZ, DEPUTY COMMISSIONER
FAMILY PERMANENCY SERVICES

JUNE 1, 2023


NEW YORK STATE USA
LEARNER PERMIT
[redacted]
Class D
ABUELENIN
ATEF,SABRY
[redacted]
DOB 10/20/1980
Issued 07/15/2022
Expires 10/20/2025
E NONE
R B
Sex M Height 6'-00" Eyes GRN
OCT 80
EXCELSIOR

[redacted]

**SOCIAL SECURITY ADMINISTRATION**

September 10, 2014

Michelle Jimenez
LEGAL INTERPRETING SERVICES, INC.
26 Court Street
Suite 1005
Brooklyn, NY 112420103

Based on an initial background check/verification conducted by the Social Security Administration (SSA), the following individual is authorized to perform on this award:

**Name: ABUELENIN, ATEF**
[redacted]

**Determination Date:** 9/4/2014
**Type of Investigation:** NACI

This determination is final unless information obtained during the remainder of the full background investigation being conducted by the Office of Personnel Management (OPM) is such that SSA would find the individual identified above unsuitable to continue performing under this award. Should such information be obtained during the remainder of the background investigation being conducted by OPM, you will be notified and authorization to perform on this award will be rescinded, at which time, the individual must be immediately removed.

Please note that this determination pertains only to suitability and does not affect any other requirements of the award. The individual is authorized to perform on the award number listed above only. If this authorization is required for access, you may submit a copy of this notice with the access request form or contact the awarding official for instructions.

Sincerely,

Leslie G. Herman

Leslie G. Herman
SSA Personnel Security and Suitability Program

Cc:
Denita Patterson, Contracting Officer
Sandra Lopez-Carter, COTR

Disclaimer:
This letter is intended for official Social Security Administration use only. It should not be used by any other Federal agency for the purpose of reciprocity. To verify that a complete background investigation has been conducted and favorably adjudicated, please contact SSA's security office at charles.n.dibley@ssa.gov.

RELIAS

# Certificate of Completion

This certifies that

***Atef Abuelenin***

has successfully completed

***Corporate Compliance and Ethics***

**on**

**1/27/2021**

**Training Hours: 1.00**

This certificate may not meet your organization or certification needs for continuing education. See your administrator or board for specific guidelines.

Amy M Johnson MSN, RN, CPN
Accreditations Manager
1010 Sync Street, Suite 100
Morrisville, North Carolina 27560
www.relias.com

# Solution Based Casework

*The Official Status of Certified Supervisor of Solution Based Casework*

*Has Hereby Been Awarded to:*

*Atef Abuelenin*

*Officially Granted on this day of:*

December 10 , 2023

Dana N. Christensen PhD.

Dana N Christensen, PhD
Professor Emeritus
University of Louisville

Family Solutions™
SOLUTION BASED CASEWORK TRAINING

SBC CERTIFIED

---

## White House Referral and USCIS Deflection as Evidence of Bad Faith and Unreasonable Delay

On or about [July 2nd,2025], Plaintiff contacted the Office of the President of the United States to seek redress concerning the prolonged and unjustified delay in the adjudication of his Form N-400, Application for Naturalization, which had been pending without decision for well over 120 days following his naturalization interview in September 2022. In response, the White House referred Plaintiff's communication to the U.S. Citizenship and Immigration Services (USCIS) Contact Center, which subsequently issued a letter dated [insert date of USCIS response], assigned Case Number 39949978 and WH Reference Number 1006614. A true and correct copy of that letter is attached hereto as Exhibit (W.H).

In said correspondence, USCIS reiterated boilerplate language regarding the necessity of background checks and the cooperation of third-party agencies (such as the FBI) but conspicuously failed to provide any individualized or case-specific information, timeline, or statutory basis justifying the prolonged delay. Moreover, USCIS expressly disclaimed any obligation to inform Plaintiff of the "results, nature, or status" of any purported background investigation, rendering Plaintiff unable to meaningfully challenge, clarify, or correct any potential misinformation that may be impeding adjudication. USCIS further declined to provide any estimated timeline or projected resolution date, effectively rendering the agency's delay indefinite and unaccountable, in violation of 8 C.F.R. § 335.3(a) and the due process standards embodied in the Fifth Amendment.

Plaintiff submits that the above-described conduct constitutes further evidence of USCIS's pattern of administrative evasiveness, procedural opacity, and bad faith, and demonstrates that all reasonable administrative remedies have been exhausted. Plaintiff respectfully argues that even when his case was elevated to the Executive Branch, USCIS continued to provide vague, generic responses without legal justification for its inaction. This failure to adjudicate, particularly following more than 120 days since Plaintiff's naturalization interview, constitutes an unreasonable delay under 8 U.S.C. § 1447(b), warranting this Court's immediate intervention and de novo review.

---

Gmail Atef Abuelenin <eleynin@gmail.com>

# USCIS Contact Center Case #39949978_1006614

1 message

**CRU** <cru@uscis.dhs.gov> Wed, Aug 6, 2025 at 10:10 AM
To: "eleynin@gmail.com" <eleynin@gmail.com>

Dear Atef Abuelenin:

Thank you for your letter to President Donald J. Trump regarding the status of your Form N-400, Application for Naturalization, and your Form I-130, Petition for Alien Relative, filed on behalf of your wife.

The White House referred your letter to the U.S. Citizenship and Immigration Services (USCIS) Contact Center. Your letter has been assigned case number 39949978, and your WH reference number is 1006614. As part of our commitment to helping the public, we strive to resolve any problems you may experience when applying for immigration services. We understand your concerns and will give you accurate information and guidance.

We conduct background checks for all cases involving a petition or application for an immigration service or benefit. We do this to enhance national security and ensure the integrity of the immigration process.

Everyone applying for a U.S. immigration benefit is subject to criminal and national security background checks to ensure they are eligible for that benefit. These background checks require time, resources, and patience, and we understand that the process is slower for some petitioners/applicants than they would like. As a result, we work closely with the FBI and other agencies to make sure we can complete the background checks quickly as possible. However, USCIS will never grant an immigration service or benefit before the required background checks are completed, regardless of how long those checks take. We strive to balance the need for timely, fair, and accurate service with the need to ensure a high level of integrity in the decision-making process.

Our field offices regularly review their pending caseloads to determine when cases have cleared and are ready to be adjudicated.

We do not share information about the results, nature, or status of any investigation with petitioners/applicants or their representatives.

Finally, we cannot predict an exact date for when we will complete your background investigation. However, as soon as it is complete, we will make every effort to make a decision on your cases.

USCIS suggests that you seek legal advice, if you find it necessary; visit our USCIS Find Legal Services web page to get more information.

If you need additional help or filing instructions, please visit our USCIS Tools and Resources web page. You can also create a USCIS online account, where you can file forms online and track your case anytime from anywhere.

Sincerely,

Kimberley Coleman-Bearden, Chief

USCIS Contact Center

\cml

------

**Please do not reply directly to this email. This email was sent from a notification-only address that cannot accept incoming email.**

ref:_00DG0hO5S._500SJ00000gdcd7:ref

Begin forwarded message:

**From:** USCIS No Reply <no-reply@uscis.dhs.gov>
**Date:** August 1, 2025 at 07:24:06 EDT
**To:** eleynin@gmail.com
**Subject: Service Item Number: 39576154**

U.S. Citizenship and Immigration Services

Dear ATEF SABRY ABUELENIN,

Thank you for your inquiry dated July 01, 2025.

Thank you for your inquiry regarding your N-400 Application for Naturalization.

Our system shows that a Service Request was created for you on May 6, 2025 regarding the status of your form. Your Service Request was assigned to the **Queens Field Office** and given Referral ID number **SR11262500867RPA**.

The **Queens Field Office** responded to your Service Request on June 24, 2025. Their response stated:

Thank you for contacting USCIS concerning the above-referenced application. Below is a summary of what we have found. Due to workload factors not related to your application, USCIS anticipates a delay in completing your case. We anticipate the delay to be approximately 6 months from the date of this notice. We assure you that we are working to complete adjudication of your application as quickly as available resources allow. If you do not receive a decision or other notice of action from USCIS by that date, please reach out to the USCIS Contact Center for additional assistance.

If you need more assistance with your USCIS online account, you can send USCIS Contact Center a secure message from your inbox located under the **MyAccount** drop-down menu. If you are having technical issues with accessing your account, go to my.uscis.gov/account/v1/needhelp to submit a request for assistance.

If you haven't done so already, visit myaccount.uscis.gov to sign up for a USCIS online account where you can explore filing online, send us secure messages through your account inbox and get instant updates on the status of your case. If you have any other questions, please visit the USCIS Contact Center, where you can access our online tools 24/7.

If you move, you must update your address in the USCIS online account within 10 days, or you can download Form AR-11, Alien's Change of Address Card at uscis.gov/addresschange to submit a paper copy.

*This mailbox is not monitored for incoming messages. Please do not reply to this message.*

ref:_00DG0hO5S._500SJ00000dXqr6:ref

# CERTIFICATE OF SERVICE

I, Atef Abuelenin, hereby certify that a true and correct copy of the foregoing Complaint and all attached exhibits will be served via certified mail, return receipt requested, upon the following parties within 7 to 12 business days from the date of filing. Proof of service will be submitted to the Court upon completion.

Parties to be served:

1. Office of the U.S. Attorney for the Eastern District of New York

   Civil Process Clerk

   271-A Cadman Plaza East

   Brooklyn, NY 11201

2. Attorney General of the United States

   U.S. Department of Justice

   950 Pennsylvania Avenue, NW

   Washington, D.C. 20530-0001

3. United States Citizenship and Immigration Services (USCIS)

   Attn: General Counsel

   5900 Capital Gateway Drive

   Camp Springs, MD 20746

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 19th, 2025

Signature:

Rego Park, New York

*Atef Sabry Abuelenin*

# SWORN STATEMENT OF ATEF SABRY ABUELENIN REGARDING COUNTERTERRORISM, NATIONAL SECURITY, AND PUBLIC SAFETY CONTRIBUTIONS

I, **Atef Sabry Abuelenin**, Alien Registration Number A201-132-868, respectfully submit this sworn statement under penalty of perjury, pursuant to **28 U.S.C. § 1746**, in further support of my naturalization application and to provide clarity regarding my unwavering commitment to the national security interests of the United States, my professional contributions to public safety, and my consistent opposition to terrorism, radicalization, and extremist ideology:

## Personal History and Opposition to Extremism

1. I am a survivor of political persecution, sectarian violence, and extremist retaliation in the Arab Republic of Egypt. I was systematically targeted, physically assaulted, and subjected to egregious human rights abuses because of my outspoken rejection of radicalization, authoritarianism, and political Islam, and because of my unwavering admiration for the United States and its constitutional principles of freedom, democracy, and secular governance.
2. I have endured abuse at the hands of both state actors and non-state extremist groups due to my vocal opposition to ideologies that promote terrorism, sectarian hatred, and destabilization in Egypt and abroad. My personal history of suffering as a result of my pro-American, anti-extremist stance is thoroughly documented and formed the basis for my grant of asylum in the United States.

## Educational Credentials in National Security and Counterterrorism

3. I hold advanced academic credentials in fields that directly advance the protection of national security and the fight against terrorism, including:

- **Master of Arts in International Terrorism**, Norwich University (Vermont);

- **Master of Arts in International Relations and Global Security**, Norwich University (Vermont);
- **Master of Arts in Data and Intelligence Analysis**, American Military University (West Virginia).

4. My educational journey was not merely academic; it was driven by my life-long mission to contribute meaningfully to the global fight against terrorism, to strengthen the rule of law, and to safeguard vulnerable populations from violence and exploitation.
5. My coursework, research, and practical studies have focused on areas including:

- Counterterrorism policy development;
- Intelligence operations with adherence to human rights and legal frameworks;
- Methods for de-radicalization and preventing extremist recruitment;
- Data-driven threat assessments;
- Protection of civil liberties while ensuring public safety.

## Documented Record of Anti-Extremist Advocacy

6. I have a well-documented, consistent, and public record of opposing extremist organizations, including, but not limited to:

- The **Muslim Brotherhood**, whose ideology and operations have contributed to regional instability, sectarian violence, and radicalization efforts targeting vulnerable communities;
- Other groups and individuals promoting radical, anti-democratic, or violent agendas, regardless of their political or religious affiliations.

7. I have participated in peaceful, lawful demonstrations in the United States opposing extremist movements, speaking out against the global threats posed by violent ideology, and advocating for policies rooted in democracy, human rights, and secular governance.
8. My positions have sometimes made me a target of threats and intimidation, yet I have remained steadfast in supporting U.S. interests and in rejecting all forms of extremism.

## Contributions to Public Safety and National Integrity

9. As a lawful permanent resident of the United States, I have served in professional roles that directly advance public safety, national integrity, and the protection of vulnerable populations, including:

- **Child Welfare Investigations**, where I protected minors from abuse, neglect, trafficking, and exploitation, ensuring that perpetrators were held accountable under the law;
- **Corporate Compliance and Medicaid Fraud Prevention**, where I upheld the integrity of public health care resources, identified fraud schemes, and ensured adherence to federal and state regulatory standards;
- **Cultural and Linguistic Support to Law Enforcement**, providing translation, interpretation, and cultural analysis to U.S. agencies working on national security, immigration, and counterterrorism operations.

10. My professional service reflects not only my commitment to the safety of this nation but also my alignment with American values of justice, accountability, and protection of human dignity.

## Rebuttal of False Foreign Agent Allegations

11. I categorically deny any and all allegations that I have ever engaged in espionage, unlawful intelligence operations, or any activity that undermines the national security of the United States.
12. Claims to the contrary arise from a deeply flawed and coercive 2020 interaction with FBI agents, which I entered under the good faith belief that I was being recruited for legitimate government service, consistent with my academic background in counterterrorism and intelligence.
13. During that interaction, my responses were distorted under psychological distress, manipulation, and the misunderstanding of the encounter's true nature. These statements do not reflect my actual conduct, intentions, or unwavering loyalty to the United States.
14. There exists no lawful evidence to support the conclusion that I have ever served as a foreign agent, nor have I ever been required to register under the **Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq.**, or been subjected to any criminal charges implicating national security concerns.

## Commitment to Upholding U.S. National Security

15. My life experiences as a survivor of extremist violence, coupled with my academic qualifications and professional service, uniquely position me to contribute positively to U.S. counterterrorism efforts through research, policy advocacy, intelligence analysis, and public education—not through unlawful or clandestine means.
16. I have consistently advocated for:

- Respect for human rights in counterterrorism operations;
- The development of ethical intelligence practices that preserve constitutional protections;
- Community-based de-radicalization efforts to prevent extremist recruitment;
- Safeguarding children from ideological indoctrination and human trafficking;
- Strengthening the rule of law and combating corruption that enables terrorism.

17. I remain unequivocally committed to the safety, security, and prosperity of the United States. I have demonstrated through my education, professional service, and advocacy that I am aligned with, and dedicated to, advancing the interests of this nation.
18. My lifelong embrace of American values, my rejection of extremism, and my efforts to serve this country stand in stark opposition to the defamatory and unfounded allegations I have faced during my naturalization process.

## Conclusion

19. I submit this sworn statement to reaffirm my absolute loyalty to the United States, my rejection of extremist ideologies, and my readiness to continue contributing to public safety, national security, and the protection of democratic values.
20. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Executed:** July 7, 2025

**Location:** Rego Park, New York

*Atef Sabry Abuelenin*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

ATEF ABUELENIN,

Plaintiff,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES (USCIS), et al.,

Defendants.

PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER

TO THE HONORABLE JUDGE:

Plaintiff, Atef Abuelenine, respectfully moves this Court to issue a Protective Order barring Defendants, including USCIS and the Department of Homeland Security (DHS), from issuing any adverse decision on Plaintiff's pending Form N-400, Application for Naturalization, after the filing of this Complaint, unless such adjudication occurs under direct supervision of this Court.

I. LEGAL GROUNDS AND URGENCY

1. Under 8 U.S.C. § 1447(b), this Court has exclusive jurisdiction over Plaintiff's delayed naturalization application after USCIS failed to render a determination within 120 days of Plaintiff's examination, which occurred in September 2022.

2. Plaintiff respectfully submits that there exists a substantial and well-founded risk that Defendants may attempt to issue a retaliatory, pretextual, or procedurally defective denial after the filing of this action, solely for the purpose of divesting this Court of jurisdiction, in violation of the spirit and purpose of § 1447(b).

3. Federal courts have recognized that actions designed to circumvent judicial review undermine both administrative fairness and the integrity of the naturalization process. See Ibrahim v. DHS, 538 F. Supp. 3d 327 (D. Mass. 2021); Alqarqaz v. Nielsen, No. 1:17-cv-00393, 2019 WL 157093 (E.D. Va. Jan. 9, 2019).

4. Plaintiff has exhausted all administrative remedies, including:

- Numerous inquiries to USCIS, including the Service Request ID SR11262500867RPA;
- A Congressional inquiry submitted through Senator Kirsten Gillibrand;

- A Freedom of Information Act (FOIA) request currently pending, underscoring Plaintiff's efforts to secure transparency and accountability;

- A formal demand letter served on the USCIS Queens Field Office dated July 1, 2025, requesting lawful adjudication in accordance with 8 U.S.C. § 1427, 8 C.F.R. § 316.10, and due process standards under the Fifth Amendment.

5. The prolonged delay and adverse treatment suffered by Plaintiff over nine (9) years has imposed significant psychological harm, career stagnation, and deprivation of the benefits and rights to which eligible lawful permanent residents are entitled under the Immigration and Nationality Act, including:

- The right to timely adjudication under 8 C.F.R. § 335.3(a);

- Protection from arbitrary action under 5 U.S.C. §§ 555(b) and 706(1) of the Administrative Procedure Act;

- Constitutional due process under the Fifth Amendment.

II. REQUEST FOR COURT SUPERVISION AND PROTECTION

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Issue an Order prohibiting USCIS from issuing a denial or other final decision on Plaintiff's pending N-400 application after the filing of this Complaint, unless:

1. Such adjudication occurs under the express supervision of this Court;

2. Defendants provide this Court and Plaintiff with advance written notice of any proposed decision;

3. The Court grants Plaintiff an opportunity to object, rebut, or present evidence before any final adverse action is taken.

B. Order that jurisdiction over Plaintiff's naturalization application shall remain exclusively with this Court under 8 U.S.C. § 1447(b) until full and fair adjudication occurs.

C. Grant such other relief as this Court deems just, equitable, and necessary to prevent retaliation, abuse of process, or deprivation of Plaintiff's statutory and constitutional rights.

III. CONCLUSION

Plaintiff's fears of retaliatory denial are reasonable, given Defendants' prior history of adverse treatment, misuse of national security pretext, and unexplained administrative delays. The balance of equities, public interest, and statutory framework favor judicial supervision to ensure transparency, fairness, and lawful adjudication.

Case 1:25-cv-04361-RPK Document 1 Filed 08/19/25 Page 148 of 236 PageID #: 148

Respectfully submitted,

Atef Abuelenine, Pro Se

[redacted]

# UNITED STATES DISTRICT COURT

Eastern District of New York

**Atef Sabry Abuelenin,**
Petitioner,

v.

**United States Citizenship and Immigration Services (USCIS),**

**Current or acting director of USCIS**
**Alejandro Mayorkas, former Secretary of Homeland Security,**
**Ur Mendoza Jaddou, former Director of USCIS,**
**Christopher A. Wray, former Director of the FBI,**
**Merrick Garland, Attorney General of the United States,**
Respondents.

**Case No.: to be assigned**

# SUMMONS IN A CIVIL ACTION

TO THE ABOVE-NAMED RESPONDENTS:

You are hereby SUMMONED and required to serve an answer to the Complaint filed in this action, or otherwise move, pursuant to the Federal Rules of Civil Procedure, within **60 days** after service of this Summons and Complaint upon the United States, or within **21 days** for other Defendants, exclusive of the day of service.

If you fail to respond, judgment by default will be entered against you for the relief demanded in the Complaint.

**Note from Petitioner:** Due to a well-founded fear that USCIS may attempt to issue a retaliatory denial of my pending naturalization application immediately upon learning of this lawsuit, I will personally affect service of this Summons and the Complaint upon all required parties in accordance with **Rule 4(i)** of the Federal Rules of Civil Procedure.

I will provide the Court with proof of service (including certified mail receipts and delivery confirmations) within **7 to 10 business days** of filing this Summons.

Respectfully submitted,

**Dated:** July 7, 2025
**Signed:** *Atef Abuelenin*
Atef Sabry Abuelenin
Petitioner, pro se
[redacted]

# LIST OF EXHIBITS

## *I. Identity, Status & Procedural History*

**☑Exhibit 1:**
Copy of:
(a) USCIS's denial letter dated January 25, 2021, regarding Plaintiff's first Form N-400 application;
(b) Receipt Notice for Plaintiff's second N-400 (filed in 2022); and
(c) USCIS Interview Appointment Notice for Plaintiff's September 2022 naturalization examination.

**☑Exhibit 2:**
Screenshots and official printouts from the USCIS Case Status system, along with records of varied USCIS responses and documented attempts by Plaintiff to obtain status updates via Congressional inquiries, service requests, and Ombudsman filings.

**☑Exhibit 3:**
Photocopies of Plaintiff's U.S. Permanent Resident Card (front and back), New York State Identification Card, and any additional government-issued identification establishing legal status and residence.

## *II. Denial & Delay Evidence*

**☑Exhibit 4:**
(a) Plaintiff's sworn narrative rebutting USCIS's denial grounds;
(b) Official letter from New York City Department of Homeless Services confirming Plaintiff's shelter residency history, undermining USCIS's security risk assertions and providing evidence of hardship, transparency, and lack of clandestine conduct.

## *III. Good Moral Character, Rehabilitation & Contributions*

**☑Exhibit 5:**
(a) Diplomas and/or certified transcripts for three graduate degrees:
- M.A. in International Terrorism – Norwich University

• M.A. in International Relations – Norwich University
• M.S. in Data & Intelligence Analysis – American Military University

(b) Selected professional certifications (e.g., LexisNexis compliance training, trauma-informed care, ethics);
(c) Academic research papers authored by Plaintiff and published in peer-reviewed journals;
(d) Any awards, commendations, or recognitions reflecting Plaintiff's public service, ethical standing, and civic engagement.

***IV. Rebuttal Evidence & Legal Defense***

**✅Exhibit 6:**
Plaintiff's signed affidavit or sworn declaration expressly denying allegations of foreign agency affiliation, affirming loyalty to the U.S. Constitution, and explaining the deceptive and coercive nature of the 2020 FBI interview cited in USCIS's denial.

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
26 Federal Plaza
New York, NY 10278

U.S. Citizenship and Immigration Services

January 25, 2021

IOE0901197938

A201-132-868

ATEF MUHAMED SABRI MAHMOUD ABUELENIN
[redacted]

RE: N-400, Application for Naturalization

**DECISION**

Dear ATEF ABUELENIN:

On August 5, 2016 you filed a Form N-400, Application for Naturalization, with U.S. Citizenship and Immigration Services (USCIS) under section 316 of the Immigration and Nationality Act (INA).

After a thorough review of the information provided in your application for naturalization, the documents supporting your application, and your testimony during your naturalization interview, USCIS has determined that you are not eligible for naturalization. Accordingly, USCIS must deny your application for naturalization.

Generally, to qualify for naturalization, under INA 316, an applicant must:

- Be 18 years of age or older at the time of filing Form N-400;
- Be lawfully admitted for permanent residence;
- Be a lawful permanent resident for at least 5 years at the time of filing Form N-400;
- Demonstrate good moral character for at least 5 years prior to the Form N-400 filing date, and during the period leading to administration of the Oath of Allegiance;
- Have resided continuously in the United States for at least 5 years as a lawful permanent resident before filing Form N-400;
- Have resided for at least 3 months in the State or USCIS District where residency is claimed before filing Form N-400;
- Have resided continuously in the United States from the date of filing Form N-400 up to the time of administration of the Oath of Allegiance;
- Be physically present in the United States for at least 2½ years at the time of filing Form N-400;
- Demonstrate a basic knowledge of U.S. history and government;
- Demonstrate the ability to read, write, and speak words in ordinary usage in the English language; and
- Establish an attachment to the principles of the U.S. Constitution and be disposed to the good order and happiness of the United States.

**Statement of Facts and Analysis Including Ground(s) for Denial**

On July 25, 2011, you obtained permanent resident status as an asylee in immigrant classification AS6. USCIS received your Form N-400 on August 5, 2016, and on December 10, 2020, you appeared for an interview to determine your eligibility for naturalization.

During the interview and review of your application with an Immigration Services Officer, you testified that the information on your Form N-400, along with any amendments made during the naturalization interview, and the documents submitted by you were true and correct.

USCIS records indicate that you first entered the U.S. on November 5, 2010 as a tourist. You applied for asylum in the U.S. by filing Form I-589, Application for Asylum and for Withholding of Removal, on November 22, 2010 and March 16, 2011. Your first asylum application was rejected on January 4, 2011 due to incomplete filing. On April 27, 2011, you were interviewed by an asylum officer regarding your second asylum application. On your asylum application and during your interview with the asylum officer on April 27, 2011, you testified that you feared for your life in Egypt because you would be jailed and or imprisoned there for your pro-American views.

Your asylum was granted on May 17, 2011.

On May 21, 2012, you filed Form I-485, Application for to Register Permanent Residence or Adjust Status, seeking to adjust your status to one of a lawful permanent resident. On July 25, 2012, USCIS approved your Form I-485 and you were accorded a status of a lawful permanent resident with the rollback date as July 25, 2011.

On August 5, 2016, you filed the instant Form N-400 and on December 10, 2020 you appeared for your naturalization interview before the immigration services officer and gave testimony under oath.

During the interview, you testified that subsequent to your approval of Form I-485 you traveled to Egypt on the following dates:

- September 8, 2014 to November 4, 2014 (USCIS notes that your actual dates of travel were from October 7, 2014 to December 4, 2014, using Egyptian passport #A00883536)
- December 25, 2016 to February 9, 2017
- February 13, 2018 to May 8, 2018
- August 25, 2018 to January 19, 2019

It was additionally noted that you traveled using your Egyptian passports #A19901874 and A24002162 which were issued to you on January 23, 2017, and December 31, 2018, respectively by the Egyptian authorities subsequent to your grant of asylum in the U.S..

As the records indicate, on your asylum application and during your asylum interview you testified that you were afraid to return to Egypt due to fear of imprisonment and/or death, however subsequent to the grant of your asylum and obtainment of the status of a lawful permanent resident, not only did you travel to Egypt, the very country of your past persecution, but you also applied for and were issued two passports by the Egyptian authorities. During the interview you were asked to explain these inconsistencies.

You testified under oath that sometime in 2014 you were able to secure an agreement with the "security official" of Egyptian Consulate in New York, under which, you were allowed to travel back to Egypt unharmed.

According to your recollection, you were promised "a leading position" at Egypt's anticipated counterterrorism and counterinsurgency center. You then admitted that you started working with an officer of the Egyptian Consulate in New York as early as 2014 and provided him with information that you found in social media and internet on various topics ranging from the Muslim Brotherhood, terrorism, U.S./Egypt relationships, 2016 U.S. elections, American politicians such as Ted Cruz and Mark Rubio and their views on Egypt and Israel. You claimed that you also did physical surveillance of several Islamic centers in New York and submitted your reports to the same security officer at the Egyptian Consulate in New York.

You further testified that the individual who you worked with was an intelligence officer of the Egyptian Intelligence Service Mukhabarat.

It is evident that not only you collected and passed information to a foreign intelligence service for several years immediately prior to filing your naturalization application, but you were also promised employment and safe passage to Egypt in return for your cooperation. You have not submitted any evidence indicating that you registered under the Foreign Agents Registration Act (FARA) as a foreign agent or that you are otherwise exempted from FARA. See 22 USC 611; 28 CFR Pt. 5. Your violation of FARA constitutes unlawful acts that adversely reflect upon your good moral character. See INA(f); 8 CFR 316.10(b)(3)(iii).

Furthermore, on your Form N-400 and during the interview, you testified that you were arrested three times on the following occasions:

On July 18, 2013, you were arrested in New York and charged with TAR 1050.6 (Panhandling) . On January 17, 2014, the charges against you were dismissed.

On December 5, 2013, while the criminal proceedings against you were still pending, you were arrested again and charged with NYPL 240.30 (Aggravated Harassment in the 2nd degree), NYPL 110-120.00 (Attempted Assault) and NYPL 240.26 (Harassment in the 2nd Degree). On April 22, 2014, you were convicted of NYPL 240.20 (Disorderly Conduct), placed under conditional discharge for 1 year and ordered community service for 2 days.

On May 14, 2018, you were arrested in New York and charged with NYPL 155.25 (Petit Larceny) and NYPL 165.40 (Criminal Possession of Stolen Property in the 5th degree). On January 17, 2019, the charges against you were dismissed.

However, USCIS records indicate that you were also fingerprinted for law enforcement purposes on May 22, 2014. During the interview, you adamantly denied that you were arrested, however under further questioning admitted that you were confronted by undercover police officers when you were attempting to gain entry to NYC subway by asking other riders for a "swipe " and blocking the entrance to turnstile.

To be eligible for naturalization, you must demonstrate that you are a person of good moral character. USCIS finds that your criminal history as well as the intelligence collection efforts for the benefit of a foreign intelligence service, including collecting information on U.S. politicians, without registering under FARA, adversely reflect upon your moral character. You have not established any extenuating circumstances that would warrant a departure from this finding. See INA 101(f) and 316(a)(3) and Title 8, Code of Federal Regulations (8 CFR), section 316.10 (b)(3)(iii).

Finally, USCIS finds that based on your testimony of serving as a foreign agent, you are not able to fulfill the obligations of the Oath of Allegiance as required. See INA 337(a); 8 CFR 337.1(c) (requiring in the oath that you "renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a

subject or citizen.").

As a result, you are statutorily precluded from establishing eligibility for naturalization. See INA 316(a); INA 337(a). Therefore, your application is denied.

If you believe that you can overcome the grounds for this denial, you may submit a request for a hearing on Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, within 30 calendar days of service of this decision (33 days if this decision was mailed). See attached 8 CFR 336.2 (a) and 103.8(b). Without a properly filed Form N-336, this decision will become final. See INA 336.

For questions about your application, you can use our many online tools (uscis.gov/tools) including our virtual assistant, Emma. If you are not able to find the information you need online, you can reach out to the USCIS Contact Center by visiting uscis.gov/contactcenter.

---

Sincerely,

Brian J. Meier

Brian J. Meier
Director

cc:

IOE0901197938

A201-132-868

**Attachment**
**(Applicable Law/Regulations)**

To better assist you, the sections of the law referenced in your decision are provided below:

**INA 316**
(a) No person, except as otherwise provided in this title, shall be naturalized, unless such applicant,

(3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

**INA 101**
(f) For the purposes of this Act—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

(1) a habitual drunkard;

(2) Repealed. Pub. L. 97-116, § 2(c)(1), Dec. 29, 1981, 95 Stat. 1611.

(3) a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D), (6)(E), and (10)(A) of section 1182(a) of this title; or subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marijuana), if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

(4) one whose income is derived principally from illegal gambling activities;

(5) one who has been convicted of two or more gambling offenses committed during such period;

(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter;

(7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;

(8) one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43) of this section); or

(9) one who at any time has engaged in conduct described in section 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 1182(a)(2)(G) of this title (relating to severe violations of religious freedom).

The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character. In the case of an alien who makes a false statement or claim of citizenship, or who registers to vote or votes in a Federal, State, or local

election (including an initiative, recall, or referendum) in violation of a lawful restriction of such registration or voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such statement, claim, or violation that he or she was a citizen, no finding that the alien is, or was, not of good moral character may be made based on it.

**8 CFR 316.10**
(b)Finding of a lack of good moral character.

(3) Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant:

(iii) Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts although the acts do not fall within the purview of §316.10(b) (1) or (2).

**INA 336**
(a) If, after an examination under section 335, an application for naturalization is denied, the applicant may request a hearing before an immigration officer.

(b) If there is a failure to make a determination under section 335 before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

(c) The Attorney General shall have the right to appear before any immigration officer in any naturalization proceedings for the purpose of cross-examining the applicant and the witnesses produced in support of the application concerning any matter touching or in any way affecting the applicant's right to admission to citizenship, and shall have the right to call witnesses, including the applicant, produce evidence, and be heard in opposition to, or in favor of, the granting of any application in naturalization proceedings.

(d) The immigration officer shall, if the applicant requests it at the time of filing the request for the hearing, issue a subpoena for the witnesses named by such applicant to appear upon the day set for the hearing, but in case such witnesses cannot be produced upon the hearing other witnesses may be summoned upon notice to the Attorney General, in such manner and at such time as the Attorney General may by regulation prescribe. Such subpoenas may be enforced in the same manner as subpoenas under section 335(b) may be enforced.

(e) It shall be lawful at the time and as a part of the administration by a court of the oath of allegiance under section 337(a), for the court, in its discretion, upon the bona fide prayer of the applicant included in an appropriate petition to the court, to make a decree changing the name of said person, and the certificate of naturalization shall be issued in accordance therewith.

**8 CFR 336.2**
(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

**8 CFR 103.8**

This section states authorized means of service by the Service on parties and on attorneys and other interested persons of notices, decisions, and other papers (except warrants and subpoenas)in administrative proceedings before Service officers as provided in this chapter.

(b) Effect of service by mail. Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice upon him and the notice is served by mail, 3 days shall be added to the prescribed period. Service by mail is complete upon mailing.

| Receipt Number | USCIS Online Account Number | Case Type |
|---|---|---|
| IOE9753943125 | 028356788975 | N400 - APPLICATION FOR NATURALIZATION |
| **Received Date** 02/21/2022 | **Priority Date** | **Applicant** [redacted] ABUELENIN, ATEF SABRY |
| **Notice Date** 08/22/2022 | **Page** 1 of 1 | |

ATEF SABRY ABUELENIN
c/o ATEF ABUELENIN
[redacted]

**Please come to:**

26 FEDERAL PLAZA 9TH FL RM 9-901
JACOB K. JAVITS FEDERAL BUILDING
NEW YORK, NY 10278
USA

**On (Date):** Tuesday, September 27, 2022
**At (Time):** 08:35AM

You are notified to appear before a USCIS officer regarding the application identified above at the date, time, and place indicated above. *Failure to appear for the scheduled appointment without prior notification and without good cause may result in the denial of your application.* (8 CFR 103.2)

***To ensure visitor and employee health and safety, please pay special attention to the sections entitled, "COVID-19 Safety Precautions" and "Who should come with you?"***

*YOU MUST APPEAR FOR THIS APPOINTMENT* - However, if you are under self-isolation or quarantine, are ill, have any symptoms of illness or are at heightened risk due to age or an underlying health condition and would like to reschedule your appointment, call the U.S. Citizenship and Immigration Services (USCIS) Contact Center at 1-800-375-5283 (TTY 1-800-767-1833) as soon as possible to reschedule your appointment. There is no penalty for requesting that your appointment be rescheduled.

*COVID-19 Safety Precautions* - To ensure the health and safety of all who enter USCIS facilities, you must take the following safety precautions when arriving for your appointment:

- DO NOT arrive more than 15 minutes prior to your appointment time. You will not be permitted entry into the office until 15 minutes before your appointment.
- Check www.cdc.gov for the county COVID-19 Community Level where you will appear for your appointment to understand the prevention steps for that location.
- Follow local USCIS guidance while inside USCIS facilities.
- You may have to answer health screening questions before entering.
- Bring a black or blue ink pen with you to your appointment.

*Who should come with you?* - You may be limited in who may attend your appointment with you in person.

- **If you do not speak English fluently and are eligible to take the appointment in a language other than English, you should arrange to have an interpreter come with you to the appointment or be available via phone.** If you need a Sign Language Interpreter or Certified Deaf Interpreter, call the USCIS Contact Center at 1-800-375-5283 as soon as possible.
- Your attorney or authorized representative may come with you to the appointment or be available via phone.
- If you have a disability and have an individual who assists you, that individual may come with you.

If you are applying for citizenship for yourself, you will be tested on your knowledge of the government and history of the United States. You will also be tested on reading, writing, and speaking English, unless on the day you filed your application, you have been living in the United States for a total of at least 20 years as a lawful permanent resident and are over 50 years old, or you have been living in the United States for a total of 15 years as a lawful permanent resident and are over 55 years old, or unless you have a medically determinable disability.

If you filed your Form N-400, Application for Naturalization, on or after Dec. 1, 2020, and are required to take the 2020 version of the civics test, you may now have the option to take the 2008 version of the civics test. To learn if this option is available to you, visit the USCIS Citizenship Resource Center at uscis.gov/citizenship/2020test.

**You MUST BRING the following with you to the interview:**

- This letter.
- Your Alien Registration Card ("green card").
- Any evidence of Selective Service Registration.
- Your passport and/or any other documents you used in connection with any entries into the United States.
- Those items noted below which are applicable to you:

If applying for NATURALIZATION AS THE SPOUSE of a United States Citizen;

- Your marriage certificate.
- Proof of death or divorce for each prior marriage of yourself or spouse.
- Your spouse's birth or naturalization certificate or certificate of citizenship.

If applying for NATURALIZATION as a member of the United States Armed Forces;

- Your discharge certificate, or form DD214.

If copies of a document were submitted as evidence with your N400 application, the originals of those documents should be brought to the interview.

**PLEASE keep this appointment, even if you do not have all the items indicated above.**

To request a disability accommodation, go to **www.uscis.gov/accommodations** or call the USCIS Contact Center at **1-800-375-5283** (TTY: **1-800-767-1833**) as soon as possible, **even if you indicated on your application that you require an accommodation.**

If you have any questions or comments regarding this notice or the status of your case, please contact the USCIS Contact Center toll free at 1-800-375-5283. If you are hearing impaired, please call the USCIS Contact Center TTY at 1-800-767-1833.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

QUEENS FIELD OFFICE
U.S. CITIZENSHIP & IMMIGRATION SVC
26 FEDERAL PLAZA, 8th FLOOR
JACOB K. JAVITS FEDERAL BLDG
NEW YORK NY 10278

A Number

Receipt Number

**USCIS Contact Center: www.uscis.gov/contactcenter**

← Back

# Control Number: NRC2025303776

FOIA/PA STATUS CHECK

DOCUMENT LIBRARY

## Request Details

| | |
|---|---|
| Request Description | |
| Date Submitted | 06/25/2025 |
| Request Type | FOIA Request |

## Request Status

| | |
|---|---|
| Place in Queue | 4854 of 12150 pending requests |
| Status | Files Requested |
| Estimated Completion Date | 07/31/2025 |

**Note: This is an estimated date based on average processing times. Availability of records and complexity of request may effect completion date.**

**For more information about making a FOIA/PA request or submitting an Administrative Appeal, please see the link How to Request Records through the Freedom of Information Act or Privacy Act (uscis.gov) .**

✓ Received

The request was received by USCIS.

✓ In Process

USCIS is performing activities such as reviewing the request, searching for records, and preparing records for release.

3 Completed

USCIS completed processing the request, and a letter was sent to the requester explaining the actions taken

## USCIS FOIA/PA Headquarters Office

USCIS Contact Center
1-800-375-5283 or TTY 800-767-1833
FOIAPAQuestions@uscis.dhs.gov

Case 1:25-cv-04060-RPK Document 1 26 Filed 08/19/25 Page 162 of 236 PageID #: 162

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*National Records Center*
P.O. Box 648010
Lee's Summit, MO 64064-8010

**U.S. Citizenship and Immigration Services**

August 11, 2025

**Control Number: NRC2025303776**

ATEF ABUELENIN
[redacted]

Dear ATEF ABUELENIN:

This letter is in response to your request for records under the Freedom of Information Act (FOIA) Privacy Act (PA), which was received in this office on June 25, 2025, regarding your N-400.

We have considered the foreseeable harm standard when reviewing the record set and have applied the FOIA exemptions as required by the statute and the Attorney General's guidance. We have completed th review of all documents and have identified 46 pages that are responsive to your request. Enclosed ar pages released in their entirety and 6 pages released in part. We have reviewed and have determined t release all information except those portions that are exempt pursuant to 5 U.S.C. § 552 (b)(6) of th FOIA.

The following exemptions are applicable:

Exemption (b)(6) permits the government to withhold all information about individuals in personnel, medical and similar files where the disclosure of such information would constitute a clearly unwarra invasion of personal privacy. The types of documents and/or information that we have withheld may consist of birth certificates, naturalization certificates, drivers' licenses, social security number addresses, dates of birth, or various other documents and/or information belonging to a third party t considered personal.

There may be additional documents that contain discretionary releases of exempt information. If made, these releases are specifically identified in the responsive record. These discretionary releases do waive our ability to invoke applicable FOIA exemptions for similar or related information in the futu

The enclosed record consists of the best reproducible copies available. Certain pages contain marks t appear to be blacked-out information. The black marks were made prior to our receipt of the file and not information we have withheld under the provisions of the FOIA or PA.

You have the right to file an administrative appeal within 90 days of the date of this letter. By fil appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider yo request and the agency's decision. You may file an administrative FOIA appeal electronically to USCI through your online portal by selecting Appeal in the Actions drop down window. You may also file an administrative FOIA appeal to USCIS at: USCIS FOIA/PA Appeals Office, 150 Space Center Loop, Suite 500, Lee's Summit, MO 64064-2139. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

If you would like to discuss our response before filing an appeal to attempt to resolve your dispute without going through the appeals process, you may contact our USCIS FOIA Public Liaison at U.S. Citizenship and Immigration Services, National Records Center, FOIA/PA Office, P.O. Box 648010, Lee's Summit, MO 64064-8010, or by email at FOIAPAQuestions@uscis.dhs.gov.

A USCIS FOIA Public Liaison is an agency official to whom FOIA requesters can raise concerns about

the service the requester has received from the agency's FOIA Office. USCIS FOIA Public Liaisons are responsible for assisting in reducing delays, increasing transparency, and understanding of the statu requests, and assisting in the resolution of disputes.

If you are unable to resolve your FOIA dispute through our USCIS FOIA Public Liaison, you may contac the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001; email ogis@nara.gov; telephone 202-741-5770; toll free 877-684-6448; or facsimile 202-741-5769.

The National Records Center does not process petitions, applications, or any other type of benefit un the Immigration and Nationality Act. If you have questions or wish to submit documentation relating t matter pending with USCIS, please visit the Contact Us page at www.uscis.gov or call the USCIS Contac Center at 800-375-5283 (TTY 800-767-1833).

How to submit Questions or Changes

Questions concerning this FOIA/PA request may be mailed to U.S. Citizenship and Immigration Services, National Records Center, FOIA/PA Office, P.O. Box 648010, Lee's Summit, MO 64064-8010 or emailed to FOIAPAQuestions@uscis.dhs.gov. All FOIA/PA related requests, including address changes must be submitted in writing, and signed by the requester. Please include the control number listed above on correspondence. For more information regarding the USCIS FOIA Program, please visit the USCIS website at www.uscis.gov/FOIA.

Sincerely,

Jarrod T Panter
Acting Chief FOIA Officer
Freedom of Information Act & Privacy Act Unit

Enclosure(s)

Gmail

Atef Abuelenin <eleynin@gmail.com>

**Reply from Senator Gillibrand**

Senator Kirsten Gillibrand <casework@gillibrand.senate.gov>
To: eleynin@gmail.com

Tue, Jul 29, 20:

**KIRSTEN GILLIBRAND**
NEW YORK
SENATOR
RUSSELL SENATE OFFICE BUILDING
SUITE 478
WASHINGTON, DC 20510-3205
202-224-4451

**United States Senate**
**WASHINGTON, DC 20510-3205**

COMMITTEES:
ARMED SERVICES
SELECT COMMITTEE ON INTELLIG
SPECIAL COMMITTEE ON AGI
APPROPRIATIONS

Case Number: 711744

Dear Mr. Abuelenin,

Thank you for contacting my office regarding your matter. I have contacted US Citizenship & Immigration Services on your behalf. According to the agency:

"Thank you for your inquiry regarding the status of your constituent's pending Form I-130, Petition for Alien Relative, IOE9253447530.

According to U.S. Citizenship and Immigration Services (USCIS) records, your constituent's Form I-130 was received on February 13, 2022, and is currently under the jurisdiction of the USC Field Office. Your constituent's petition is within our current field office processing times and remains pending with USCIS. Please see our Web site at www.uscis.gov for processing times.

Therefore, we have forwarded your inquiry to the Queens Field Office for review and a direct response.

Case status may be monitored online at https://egov/casestatus/landing.do.

If your constituent needs to update their address at any time, please advise them to update his/her address with USCIS at www.uscis.gov/addresschange, contact the USCIS Contact Center 375-5283 or TTY (800) 767-1833 (for people who are deaf, hard of hearing, or have a speech disability) or through their existing USCIS online account if the form was filed online.

Respectfully,

Congressional Liaison
U.S. Citizenship and Immigration Services
Department of Homeland Security"

I regret that I do not have a more positive agency response to share. Please do not hesitate to contact my office again via email at casework@gillibrand.senate.gov.

Sincerely,

Kirsten Gillibrand

Kirsten Gillibrand
United States Senator

KEG/ba

Gmail — Atef Abuelenin <eleynin@gmail.com>

## Thank you for contacting USCIS

**USCIS No Reply** <no-reply@uscis.dhs.gov> — Tue, Jul 1, 2025 at 7:39 PM
To: "eleynin@gmail.com" <eleynin@gmail.com>

U.S. Citizenship and Immigration Services

Dear ATEF,

Thank you for contacting us. An immigration officer will call or email you to answer your question(s), or schedule an appointment for you, if that is needed. You will receive a text message and/or email one to two business days before we contact you. Officers will begin calls starting at 7am local time.

| **If you have…** | **We will respond to you** |
|---|---|
| an urgent situation | within 72 hours, Monday thru Friday |
| a question that is not urgent | within 30 calendar days |
| a technical issue like a password reset | within 2-3 business days |

If by phone, callbacks will begin at 7am local, Monday thru Friday (on occasion, we may also respond to inquiries by phone on Saturday). To verify the return call is coming from USCIS, the number on your caller id will be **202-838-2104**. Please write down the following service item number and have it available for verification when we call you. If you do not have Caller ID, the USCIS officer will confirm the service item number you were given when you first contacted us. If by email, the sender will be no-reply@uscis.dhs.gov. Please add this address to your contacts to ensure any messages are not sent to a spam folder.

If you missed our first call, please be patient. We will try to call you twice. Please do not call us back unless you miss both of our return calls. The USCIS Contact Center hours of operation are Monday through Friday from 8 a.m. to 6 p.m. Eastern.

Gmail

**Atef Abuelenin <eleynin@gmail.com>**

---

## USCIS Contact Center-DC Response

---

**CRU** <cru@uscis.dhs.gov> Wed, Jul 30, 2025 at 10:00 AM
To: "eleynin@gmail.com" <eleynin@gmail.com>

U.S. Citizenship and Immigration Services (USCIS) has received your inquiry, and our USCIS Contact Center is currently researching your issue. Your letter has been assigned case #[[INSERT NUMBER HERE: 39949978]].

USCIS is committed to helping the public resolve any problems they might have encountered when applying for immigration services and benefits. We understand your concerns and are dedicated to providing you with accurate information and guidance. Please allow 60 business days from the date of this letter for us to respond to your inquiry.

If you need additional help or filing instructions, go to our Tools web page at www.uscis.gov/tools.

We hope this information is helpful.

Sincerely,

Kimberley Coleman Bearden, Chief
USCIS Contact Center
\[[MS Initials in Lower Case]]

-----------

**Please do not reply directly to this email. This email was sent from a notification-only address that cannot accept incoming email.**

Gmail

**Atef Abuelenin <eleynin@gmail.com>**

## Response to your message (Intranet Quorum IMA00)

**The White House(imailagent)** <noreply@contact.whitehouse.gov> Wed, Jul 2, 2025 at 7:05 PM
To: eleynin@gmail.com

THE WHITE HOUSE

WASHINGTON

July 2, 2025

Thank you for taking the time to write and share your story with President Donald J. Trump. After careful review, we have provided the appropriate federal government agency with a copy of your letter for possible assistance or further action.

For additional information about Federal government services, please visit www.USA.gov or call 1-800-FED-INFO.

Sincerely,

Office of Presidential Correspondence

## N-400, Application for Naturalization

**Submitted on** February 21, 2022 | **Receipt #** IOE9753943125

**Download PDF**

**Case Status** | **myProgress** | **Case History** | **Documents**

Estimated time until your case decision:

7 Months

This is an estimate and will be periodically updated as we process your case.

> In some cases, a biometrics appointment and/or an interview will not be necessary. For more information regarding biometrics, visit the USCIS biometrics page.

| ✓ | ✓ | 3 | 4 | 5 |
|---|---|---|---|---|
| Step 1 of 5 (completed): Case received | Step 2 of 5 (completed): Attend biometrics appointment (if necessary) | **Step 3 of 5 (current step): Interview scheduled** | Step 4 of 5 (not started): Case decision | Step 5 of 5 (not started): Attend oath ceremony (if approved) |

Current as of today at 11:26 a.m. EDT

## Your Cases

### N-400, Application for Naturalization

**Submitted on** February 21, 2022 | **Receipt #** IOE9753943125

**Download PDF** ▼

**Case Status** | **myProgress** | **Case History** | **Documents**

**June 5, 2024**

### Case Is Being Actively Reviewed By USCIS

As of June 5, 2024, we are actively reviewing your Form N-400, Application for Naturalization, Receipt Number IOE9753943125. Our records show nothing is outstanding at this time. We will let you know if we need anything from you. If you move, go to www.uscis.gov/addresschange to give us your new mailing address.

Current as of today at 11:26 a.m.

# Your Cases

## N-400, Application for Naturalization

**Submitted on** February 21, 2022 | **Receipt #** IOE9753943125

**Download PDF**

**Case Status** | **myProgress** | **Case History** | **Documents**

### Case history

| Status | Date |
| --- | --- |
| Case Is Being Actively Reviewed By USCIS | June 5, 2024 |
| We scheduled an interview for your Form N-400, Application for Naturalization. | August 22, 2022 |
| We are actively reviewing your Form N-400, Application for Naturalization. Our records showed nothing is outstanding at this time. | February 21, 2022 |
| We received your Form N-400, Application for Naturalization, and sent you a receipt notice. | February 21, 2022 |

**Atef Abuelenin**
[redacted]

**Date:** July 1, 2025

**U.S. Citizenship and Immigration Services**
Queens Field Office
31-00 47th Ave, Suite 5001
Long Island City, NY 11101

**Attn:** Queens District Director

## Subject: Request for Prompt Adjudication of Naturalization Application

**Receipt Number:** IOE9753943125 | **Alien Number:** A201132868

Dear Queens County District Director and Esteemed Officers of USCIS,

I write with the utmost respect and sincerity as a lawful permanent resident of the United States and as an applicant for naturalization under Form N-400, receipt number IOE9753943125. I am profoundly committed to the foundational values of this nation and to the lawful processes that preserve the integrity of its immigration system.

I submitted my application in **February 2022** and successfully completed my naturalization interview in **September 2022**, fully satisfying the statutory requirements of **8 U.S.C. § 1423** regarding English proficiency and civics knowledge. Despite fulfilling all eligibility criteria, my application remains pending nearly three years later, and I now respectfully request its **prompt adjudication.**

I have unequivocally demonstrated **sustained rehabilitation and good moral character for more than seven years since 2018, as required under 8 U.S.C. § 1427(a)**, which mandates that naturalization applicants demonstrate good moral character during the statutory period preceding their application. The **Immigration and Nationality Act (INA) § 101(f)** also emphasizes that an applicant's conduct should be assessed within the relevant statutory timeframe, recognizing the individual's capacity for change and rehabilitation. In the American legal tradition, the principle of **rehabilitation and second chances is deeply embedded in the justice system**, including doctrines reflected in **18 U.S.C. § 3553(a)**, which encourages courts to impose sentences that promote rehabilitation and reintegration into society.

Additionally, the **United States Constitution and the Universal Declaration of Human Rights (UDHR), Article 8**, establish that everyone has the right to an effective remedy by competent national authorities for acts that violate fundamental rights. **Article 10 of the UDHR** further

guarantees the right to a fair and public hearing by an impartial tribunal, which includes the fair and timely resolution of administrative matters. U.S. immigration law, through **8 C.F.R. § 316.10(a)(2)**, recognizes that the assessment of moral character should be made based on the totality of circumstances, including evidence of rehabilitation, contributions to society, and sustained lawful behavior.

The **American Bar Association (ABA) Standards on Treatment of Prisoners, Standard 23-8.1**, and broader human rights frameworks affirm that individuals are entitled to meaningful opportunities for redemption and community reintegration. These guiding principles reflect the core values of the United States: that individuals are not defined by their past, but by their consistent efforts to contribute positively to society over time.

Notably, I have served in **child welfare services, specializing in high-risk investigations involving cases of child abuse, neglect, and sex trafficking.** I worked on the front lines to protect vulnerable children, manage complex family dynamics, and collaborate with law enforcement and legal entities to safeguard at-risk minors. This work demanded a high level of ethical responsibility, integrity, and resilience under pressure.

Further, I have developed extensive **professional expertise in corporate compliance and ethics,** contributing to the protection of organizations and communities by upholding federal, state, and institutional regulations. My combined experience reflects a career devoted to advancing child safety, regulatory compliance, and ethical practice—values that deeply align with the mission and spirit of the United States. In addition to my service record, I hold **multiple master's degrees from U.S. military graduate schools,** where I acquired advanced knowledge in data analysis, international relations, and counterterrorism, all of which reflect my dedication to intellectual growth and national security principles. I have continuously committed myself to the betterment of society and the advancement of this nation's core interests.

U.S. immigration law and USCIS policy explicitly recognize that individuals are capable of growth, rehabilitation, and genuine reform. According to **8 U.S.C. § 1427(a)** and **8 C.F.R. § 316.10(a)(2)**, the determination of good moral character is based on the applicant's conduct during the statutory period, typically the five years preceding the naturalization application. Past infractions or mistakes that occurred outside this statutory period are not automatically disqualifying, particularly when applicants present credible evidence of sustained rehabilitation, lawful behavior, and community contribution. USCIS officers are required to evaluate an applicant's life as a whole, considering positive factors, service to the community, and post-offense conduct that clearly demonstrates reformation. The **USCIS Policy Manual (Volume 12, Part F, Chapter 5)** further instructs officers to give weight to an applicant's efforts to rehabilitate and reintegrate, reaffirming the principle that the immigration system is not inherently punitive but is designed to allow for fair adjudication based on the totality of circumstances.

Additionally, the **Board of Immigration Appeals (BIA)** has long held, as in **Matter of Marin, 16 I&N Dec. 581 (BIA 1978)**, that the discretionary relief process must balance past negative factors with present positive equities, including rehabilitation, service, and demonstrated moral

growth. The **Immigration and Nationality Act § 101(f)** reinforces that unless an applicant has committed a permanently disqualifying offense, they retain the right to be fairly considered for immigration benefits. The spirit of U.S. immigration law aligns with broader humanitarian and constitutional protections, including the **Universal Declaration of Human Rights (UDHR), Article 8 and Article 10,** which guarantee the right to an effective remedy and a fair process. These combined legal and ethical frameworks uphold the belief that individuals should not be perpetually defined by their past but should be afforded meaningful opportunities to earn second chances and contribute positively to the society they now call home.

The prolonged delay in adjudicating my application has inflicted **clinically significant emotional and psychological harm.** According to behavioral health standards and the **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5),** sustained exposure to uncertainty of this nature can contribute to chronic stress responses, generalized anxiety, depressive episodes, and functional impairments in occupational and social domains.

Over this extended period, I have experienced **persistent depressive symptoms, including profound hopelessness, diminished concentration, and disruptions in sleep patterns.** These adverse mental health outcomes are directly attributable to the unresolved status of my application, which remains a central determinant of my stability, identity, and long-term security.

The **USCIS Policy Manual (Volume 12, Part F, Chapter 5)** further emphasizes that applicants should be judged by the totality of their lives, not solely by isolated past mistakes. Additionally, the principles of fairness and the right to timely administrative resolution are supported by **the Universal Declaration of Human Rights (UDHR), Articles 8 and 10**, which guarantee access to an effective remedy and a fair process. U.S. immigration jurisprudence, including **Matter of Marin, 16 I&N Dec. 581 (BIA 1978)**, encourages the balancing of positive contributions and rehabilitation against any negative history.

Under **the Administrative Procedure Act (APA), 5 U.S.C. §§ 555(b) and 706(1),** USCIS is obligated to resolve matters within a reasonable time. The U.S. Supreme Court in **Brock v. Roadway Express, Inc., 481 U.S. 252 (1987)**, reinforced that extended administrative delays can inflict real-world harm and undermine the principles of due process. Additionally, **8 C.F.R. § 335.3(a)** emphasizes timely adjudication following the naturalization interview, and **the Fifth Amendment's Due Process Clause** guarantees fair and prompt consideration for lawful permanent residents.

My respectful request is not for mere updates but for the **final adjudication of my naturalization application** in accordance with statutory, regulatory, and constitutional standards. I trust that USCIS will consider the holistic impact of this delay, including the psychological burden and the societal contributions I have consistently made through public service and professional integrity.

I remain fully committed to the lawful processes of this country and appreciate the complexity and magnitude of your office's responsibilities. I place my full trust in USCIS to resolve this matter fairly and in alignment with its longstanding commitment to justice and human dignity.

Case 1:25-cv-04660 Document 1 Filed 08/19/25 Page 174 of 236 PageID #: 174

Thank you for your time, attention, and dedicated service.

Respectfully,

**Atef Abuelenin**
Alien Number: [redacted]
Receipt Number: [redacted]
DOB: 10/20/1980


UNITED STATES OF AMERICA
PERMANENT RESIDENT
Surname
ABUELENIN
Given Name
ATEF S
USCIS#
Category
[redacted]
Country of Birth
Egypt
Date of Birth
20 OCT 1980
Sex
M
Card Expires:
08/04/30
Resident Since:
07/25/11
USA


FORM I-551
Rev (02-2016)
[redacted]
TED STATES OF AMERICA
63
If found, drop in any US Mailbox. USPS: Mail to USCIS, 7 Product Way, Lees Summit, MO 64002
[redacted]

W-2-620
Rev. 09/22

**NYC**
**Department of Social Services**
Human Resources Administration
Department of Homeless Services

**Office of Legal Affairs**

**Legal Process Unit**

**Gary P. Jenkins**
Commissioner

**Ann Marie Scalia**
General Counsel

**Paul Ligresti**
Deputy General Counsel

**150 Greenwich Street**
**New York, NY 10007**

January 31, 2023

Via Email
Atef Abuelenin
Email: eleynin@gmail.com

Dear: Atef Abuelenin

According to the New York City Department of Homeless Services' (DHS) Client Assistance & Rehousing Enterprise System (CARES) **Atef Abuelenin (DOB: 11/20/1980)** resided in the DHS shelter system on the following dates at the listed shelter facilities:

| Shelter Name | Start Date | Exit Date |
|---|---|---|
| Red Lion | 2020-06-24 | 2020-07-06 |
| Red Lion | 2019-12-31 | 2020-06-24 |
| Red Lion | 2019-12-04 | 2019-12-31 |
| BRC McGuinness Men's Assessment Shelter | 2019-11-24 | 2019-12-03 |
| 30th St. Men's Shelter | 2018-05-27 | 2018-08-27 |
| 30th St. Men's Shelter | 2018-05-10 | 2018-05-24 |
| 30th St. Men's Shelter | 2018-05-09 | 2018-05-10 |
| 30th St. Men's Shelter | 2017-06-24 | 2017-10-31 |
| 30th St. Men's Shelter | 2017-04-11 | 2017-06-24 |
| 30th St. Men's Shelter | 2017-02-22 | 2017-04-07 |
| 30th St. Men's Shelter | 2016-02-02 | 2016-07-10 |

| | | |
|---|---|---|
| 30th St. Men's Assessment | 2016-01-21 | 2016-02-02 |
| 30th St. FastTrack | 2016-01-20 | 2016-01-21 |
| Willow Men's Shelter | 2014-09-13 | 2014-09-13 |
| Willow Men's Shelter | 2014-06-20 | 2014-09-13 |
| Willow Men's Shelter | 2014-04-30 | 2014-06-20 |
| Willow Men's Shelter | 2013-12-11 | 2013-12-24 |
| 126th Street Shelter | 2013-08-04 | 2013-10-12 |
| 126th Street Shelter | 2013-07-21 | 2013-07-28 |
| 126th Street Shelter | 2013-07-20 | 2013-07-20 |
| 126th Street Shelter | 2013-06-17 | 2013-07-18 |
| 126th Street Shelter | 2013-06-04 | 2013-06-16 |
| 126th Street Shelter | 2013-02-25 | 2013-02-25 |
| 126th Street Shelter | 2012-12-05 | 2013-02-23 |
| Eddie Harris Men's Shelter | 2012-08-11 | 2012-10-03 |
| Eddie Harris Men's Shelter | 2012-08-02 | 2012-08-11 |
| Eddie Harris Men's Shelter | 2012-03-28 | 2012-04-20 |
| Eddie Harris Men's Shelter | 2012-03-04 | 2012-03-27 |
| Eddie Harris Men's Shelter | 2012-02-28 | 2012-02-29 |
| Eddie Harris Men's Shelter | 2011-12-23 | 2012-02-27 |
| Eddie Harris Men's Shelter | 2011-11- | 2011-12- |

| | | |
|---|---|---|
| | 13 | 16 |
| Eddie Harris Men's Shelter | 2011-10-31 | 2011-11-07 |
| Eddie Harris Men's Shelter | 2011-07-17 | 2011-09-22 |
| Eddie Harris Men's Shelter | 2010-12-09 | 2011-07-16 |
| 30th St. FastTrack | 2010-11-16 | 2010-11-16 |
| 30th St. Men's Shelter | 2010-11-16 | 2010-12-09 |

This letter contains CONFIDENTIAL INFORMATION that is needed per your written request.

Sincerely,

Anna Montebello
Office of Legal Affairs/Legal Process and Record Access Unit
New York City Department of Social Service
4 WTC – 150 Greenwich Street, 38th Floor, New York, NY 10007


WAITING
AB
5
Promised: 10/8/22 6:22 PM
[redacted]
Abuelenin, Atef S
Counsel New Drug
Prescription Information
1 TABLET
MORNING
MIDDAY
EVENING
BEDTIME
PHARMACY ADVICE
See back for more information
[redacted]
follow-up visits with your healthcare provider and call between visits if
tablets are started or when the dose is changed
Get important updates to help you stay on track with your health. See back for details.
OPEN HERE
CVS pharmacy



2016119975580 2002197 015300 64 d331750 050315 03:07 050515 ca/pa00_ELES-650060

**Elmhurst Hospital Center**
**New York Health and Hospital Corporation**

# Progress Record

**Do not use Abbreviations List:**
**U; IU; Q.D.; Q.O.D.; (X.0 mg); (.X mg); MS; MSO4; MgSO4; AU; AS; AD; µg; T.I.W.**
**Write Legibly**
**Use stamp after signing**

Abay El-Emin-Ahmed
2922291

| Date & Time | Title/ Discipline | Problems/ Issues | Progress Notes - Include Opinions of Health Care team members. - Relate Documentation to the current problem. - New problems require a priority, goal and outcome - to be documented in the body of the progress note |
|---|---|---|---|
| 4/5/11 | CSW | Supervisor Note | SW Intern consulted with SW Supervisor about this intake. This is a 30 year old Egyptian male referred [redacted] He has a history of political and academic persecution. He denies substance abuse history. Medical history is significant for [redacted] Patient has poor social supports and is undocumented in the US. He is seeking political asylum. Patient will be evaluated for medication and will be referred for therapy. |
| | | | [signature] Tamar Green, LCSW |

ELM 100

Continue notes on other side

## C. Balance of Equities

The balance of equities overwhelmingly favors Petitioner:

- USCIS has already delayed adjudication far beyond statutory limits;
- Enjoining premature action imposes no material hardship on the agency;
- Petitioner faces life-altering harm absent judicial protection;
- Allowing rushed agency action would reward procedural gamesmanship.

Preserving the status quo pending judicial review imposes minimal burden on Respondents while protecting Petitioner's constitutional and statutory rights.

## D. Public Interest

The public interest is served by:

- Upholding congressional intent behind **8 U.S.C. § 1447(b)**;
- Deterring agency manipulation of jurisdictional statutes;
- Ensuring fairness and due process in naturalization adjudications;
- Preserving trust in the integrity of the judicial system.

Allowing retaliatory denials to defeat judicial oversight undermines public confidence in lawful governance. An injunction reinforces respect for statutory processes and constitutional protections.

# IV. CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Court:

- Enjoin Respondents from issuing any final adjudication on Petitioner's Form N-400, Application for Naturalization, absent supervision by this Court;
- Alternatively, order that any such decision remains subject to this Court's full review and authority;
- Grant such further relief as justice requires.

A proposed order is attached.

**Dated:** July 7, 2025

**Respectfully submitted,**

*Atef Sabry Abuelenin*

[redacted]

Email: eleynin@gmail.com

Phone: (626) 437-3332

# ORDER GRANTING PRELIMINARY INJUNCTION

Upon consideration of Petitioner's Motion for Preliminary Injunction, and for good cause shown, the Court hereby ORDERS:

1. Respondents are ENJOINED from issuing any final decision on Petitioner's pending Form N-400 Application for Naturalization while this matter is under judicial review, unless such decision is made under this Court's supervision;
2. Respondents shall not take any adverse adjudicative action intended to divest this Court of jurisdiction under **8 U.S.C. § 1447(b)**;
3. This Order remains in effect until the Court issues a final ruling on the merits or until further order of the Court.

**SO ORDERED.**

Dated: ___________

United States District Judge

# DECLARATION OF ATEF ABUELENIN

I, **Atef Sabry Abuelenin**, pursuant to **28 U.S.C. § 1746**, declare:

1. I am the Petitioner in this action, seeking naturalization under USCIS Receipt Number IOE9753943125;
2. I filed my N-400 application in **February 2022** and completed my naturalization interview in **September 2022**;
3. Over **650 days** have passed with no final decision issued;
4. Recently, USCIS issued vague notices indicating an "additional delay," leading me to believe the agency may retaliate by issuing a rushed denial intended to avoid judicial oversight under **8 U.S.C. § 1447(b)**;
5. I have made exhaustive good-faith efforts to resolve this delay, including FOIA requests, Congressional outreach, and direct communications with USCIS;
6. I have faced retaliation, psychological distress, and reputational harm resulting from false foreign agent allegations and prolonged adjudication;
7. I fear imminent harm if USCIS issues a bad-faith denial outside Court supervision, undermining my rights and this Court's jurisdiction;
8. I respectfully request that the Court protect its jurisdiction, prevent retaliatory adjudication, and supervise further proceedings to ensure fairness.

I declare under penalty of perjury that the foregoing is true and correct.

**Executed:** July 7, 2025

2021A1S9975593 2003SS3 01S320 64 0333750 0C3S16 03:07 036S16 Aajm400_ELSS-C8000

**PATIENT NAME:** Abu El-Enin, Atef
**MEDICAL RECORD NUMBER:** [redacted]
**Date of Initial Treatment Plan** 4/7/11

| MEDICATIONS PRESCRIBED (NAME, DOSE, ROUTE, FREQUENCY): | |
|---|---|
| [redacted] | ...... |
| ...... | ...... |
| ...... | ...... |

**STATEMENT OF PATIENT PARTICIPATION IN TREATMENT PLAN**

[redacted]

| PATIENT STATEMENT: | | |
|---|---|---|
| I have received a copy of the Patient Bill of Rights, Advanced Directives and Informed Consent. | | |
| I have had the opportunity to participate in the formation of this treatment plan and would like to make comments as follows: | | |
| | | |
| I would like the following to be involved in my treatment: | | |
| Name | Title/Relationship to patient | |
| | | |
| | | |
| | | |
| Patient Signature: | | Date: |
| Staff Signature: [signature]<br>Legible name and credential: Lauren Clifford, SW intern | | Date: 4/7/11 |
| Attending MD Note (If Resident Case):<br>☐ Case was presented, discussed and reviewed.<br>☐ I agree with the plan. | | |
| Attending MD Signature: [signature]<br>Legible name and credential: Richard Young, MD Lic# 201189 Hospital ID# 802421 | | Date: 4/7/11 |

20181120071500 2830297 015320 64 4331730 002216 03:07 000316 tarjvd00_0125-650050

**Patient Name: Abu El-Enin, Atef** **MR#: 2927291** **Date: 4/5/11**

***Psychiatrist in Egypt 2001*** ***Suicide attempt*** ***Only attended one session***

[redacted]

20161399755590 2902192 015320 64 d331750 080816 03:08 080516 RejN400_ELIS-660060



Bellevue Hospital Center
Chart Review Print

| Location | Patient Name | | Age | Sex |
|---|---|---|---|---|
| DIS-16N-44-B | Abuelenin,Atef | [redacted] | 35Y | M |

| Attending Physician | D.O.B. |
|---|---|
| Leibert,Eric | 10/20/1980 |

---

Unscheduled ED RN Progress/Reassessment
Event Time: Tue, 26 Jan 16 2335 Status: complete

Tue, 26 Jan 16 2336 Documented by Folasade K Idowu, LPN

[redacted]
ED Alerts : None;
Suspected Sepsis : no

---

Unscheduled Vital Signs ED
Event Time: Tue, 26 Jan 16 2337 Status: complete

Tue, 26 Jan 16 2337 Documented by Richard Williams, RN

Temperature : 102.2 F (39.0 C)
Temperature Method: Oral
Pain Screen : no change from last pain screen

---

Unscheduled Vital Signs ED
Event Time: Wed, 27 Jan 16 0053 Status: complete

Wed, 27 Jan 16 0054 Documented by Richard Williams, RN

Pulse : 116 bpm
O2 Saturation : 97 %
Pain Screen : patient denies pain issues at this time

---

Unscheduled Vital Signs ED
Event Time: Wed, 27 Jan 16 0257 Status: complete

Wed, 27 Jan 16 0257 Documented by Renee M Padmore, PCT

Blood Pressure : 161/86 mmHg
Pulse : 98 bpm
Respirations : 18
Temperature : 98.7 F (37.1 C)
Temperature Method: Oral
O2 Saturation : 99 %
Pain Screen : patient denies pain issues at this time

---

5590 2902192 015320 64 d311750 050315 03:07 050515 Aej9400_ELIS-640050

| | |
|---|---|
| **PATIENT NAME:** | **Abu El-Enin, Atef** |
| **MEDICAL RECORD NUMBER:** | **2927291** |
| **Date of Initial Treatment Plan** | **4/7/11** |

**ELMHURST HOSPITAL CENTER**
**DEPARMENT OF PSYCHIATRY**
**AMBULATORY BEHAVIORAL HEALTH SERVICES**

## INITIAL COMPREHENSIVE TREATMENT PLAN

**Next Review Due:** 7/7/11

[redacted]

| | |
|---|---|
| **Axis V: Current GAF: 60** | **Past Year GAF:** |

**STRENGTHS:** *Educated, multilingual, skilled*

**WEAKNESSES:** *Undocumented, uninsured, unemployed, social isolation*

**DISCHARGE PLANNING:** Anticipated length of stay from date of admission: *6-12 months*

**KEY DISCHARGE PLANNING PROBLEMS:** None at present.

**DISCHARGE CRITERIA:**
Patient will be discharged when symptoms are in full remission without treatment for at least 3-6 months or if patient decides to stop treatment or transfer care to another provider outside of our clinic.

[redacted]

**Categories:**

| | | | |
|---|---|---|---|
| A. Psychiatric/psychological | B. Personality/ Developmental | C. Medical/ Physical/Self-care | D. Family |
| E. Educational | F. Vocational | G. Social | H. Leisure |
| I. Housing | J. Financial | K. Disposition | L. Other |

**Reason Not Addressed Codes:**
1. Not currently active problem.
2. Patient currently refusing to address.
3. Acute symptoms too active to address this problem and will be addressed when patient stabilizes.
4. Other: Describe reason

5390 2902192 015320 64 d331750 030310 03:07 080516 RajN400_EL15-660030



Background:

Mr Abu El-Enin is from a small village about 130 miles outside of Cairo, Egypt. He was raised in a conservative Muslim household. His parents divorced after 30 days when he was a young child. At the age of 15, his father died, and he was left alone with his mother. He describes his father as being from "a different race" than other Egyptians, and so he always felt like an outcast. He is fairer than other Egyptians.

He went to an Arabic school as a child. At age 15 he was molested at school, shortly after the death of his father. [redacted] He was frightened and young, and so did not tell his mother. He feared telling her also because she was an uneducated, divorced, single-mother. He also did not go to the authorities.

Mr Abu El-Enin began University in Cairo in 1999. In November of 1999, while running to catch a bus, Mr El-Enin was struck by a car. He was hospitalized for four weeks at the University hospital in Cairo. He describes being left on the floor of his room, with no bedding, and covered in blood. He left this hospital and went to a private hospital for the rest of his care. He states he required two surgeries to repair the damage to his leg. An internal titanium fixture was placed to stabilize the fracture. Due to a complication concerning blood clots, he was placed in an intensive care unit (ICU) for 4-5 days. After being discharged, Mr El-Enin returned home where he stayed for about a year while he recovered. He returned to University in 2000.

At University, Mr El-Enin studied languages and translation. His professors were all Egyptian, and Mr El-Enins different appearance again set him apart. While at University, he also described himself as a liberal Muslim. He refused to pray the 5-times a day that his classmates and professors would do. He was criticized and persecuted for not praying. He was also struck in the head with a stone on one occasion for not participating in the daily prayers.

Mr El-Enin describes being harassed and persecuted on several occasions for his thoughts and the writing that he produced while a student. He wrote a paper on Animal Farm as a first year student comparing the short story with the political climate in Egypt. He states that his professor was offended by this essay, and began informing other professors that Mr El-Enin was "dangerous". After this, students from other regions would harass and threaten him for his thoughts. Mr El-Enin felt that he was being treated unfairly by his professors, who would give him low grades, and falsify his exam results, and accuse him of plagiarism. He also describes an event where the Dean of the University approached him and warned him to "walk behind the walls".

Mr El-Enin describes the universities in Egypt as being very strictly controlled by the government, and he expresses the notion that free thought is not encouraged or appreciated. He gives an example of a professor who became Dean not on his qualifications, but because he supported the government. He states that these positions

Copyright July 2010

Elmhurst Hospital Center
New York Health and Hospital Corporation

# Progress Record

**Do not use Abbreviations List:**
U; IU; Q.D.; Q.O.D.; (X.0 mg); (.X mg); MS; MSO4; MgSO4; AU; AS; AD; µg; T.I.W.
**Write Legibly**
**Use stamp after signing**

Abou El-Einn-Alef
[redacted]

| Date & Time | Title/ Discipline | Problems/ Issues | **Progress Notes** - Include Opinions of Health Care team members. - Relate Documentation to the current problem. - New problems require a priority, goal and outcome - to be documented in the body of the progress note |
|---|---|---|---|
| 9/7/11 | LMSW | Supervisor Note: | SW Intern consulted with SW Supervisor about the treatment plan. Supervisor agrees with goals and [redacted] |
| | | | Tamar Green, LCSW |

ELM 100

Continue notes on other side

90 2902192 015320 64 d131790 030515 03:07 030516 Ra|DOO_ELIS-660050

| | |
|---|---|
| PATIENT NAME: | Abu El-Enin, Atef |
| MEDICAL RECORD NUMBER: | 2927291 |
| Date of Initial Treatment Plan | 4/7/11 |

## PROBLEM # 3

**DESCRIPTION OF PROBLEM** (include statement as manifested by):

Social isolation

**DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved):

Patient will participate in social groups or activities with others.

| CHECK ONE: | Short Term Goal ☐ | Long Term Goal ☒ |
|---|---|---|

[redacted]

Modalities:

| | | |
|---|---|---|
| 1. Individual Psychotherapy | 2. Family Therapy | 3. Group Psychotherapy |
| 4. Psychoeducation | 5. Social Services | 6. Medication Treatment |
| 7. Vocational Services | 8. Case Management | 9. Other |

## PROBLEM # 4

**DESCRIPTION OF PROBLEM** (include statement as manifested by):

**DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved):

| CHECK ONE: | Short Term Goal ☐ | Long Term Goal ☐ |
|---|---|---|

**OBJECTIVES (PATIENT WILL...)** (Steps to address the problem stated in measurable terms):

**ESTIMATED DATE ACHIEVED:**

| MODALITY OF TREATMENT | FREQUENCY | RESPONSIBLE CLINICIAN |
|---|---|---|
| N/A | Monthly | |
| N/A | N/A | |
| N/A | N/A | |
| N/A | N/A | |

Modalities:

| | | |
|---|---|---|
| 1. Individual Psychotherapy | 2. Family Therapy | 3. Group Psychotherapy |
| 4. Psychoeducation | 5. Social Services | 6. Medication Treatment |
| 7. Vocational Services | 8. Case Management | 9. Other |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amphetamines | ☐ | | | | | | |
| *Other: Specify* | ☐ | | | | | | |

**Impact of Substance Abuse** (patient's report of negative consequences or losses that have been experienced as a result of substance use) on:
Family Relationships:
Social Relationships:
Work/School Performance:
Living Situation:
Legal Status:
Mood/Emotional Reactions:
Health/Medical Problems:
PATIENT'S MOTIVATION TO ADDRESS SUBSTANCE USE:
☐ Denies having problem with substances
☐ **Admits problem but refusing treatment**
☐ **Acknowledges problem and accepts treatment**

[redacted]

Medication compliance: ☐ Consistent ☐ Inconsistent ☐ Poor
Use of herbal products: ☒ No ☐ Yes, explain:
Allergies: ☒ NKDA ☐ Yes, explain:
Problems with Psychotropic Medications: ☐ No ☐ Yes, explain:
**PAIN ASSESSMENT:** ☒ No pain reported by patient (Skip to Family History)
☐ Pain reported by patient (Complete questions 1-7.)



| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

20161399755900 2902102 015320 64 d331750 080816 03:08 080516 AxjN400_ELIS-080000

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

☐ Significant alcohol and drug abuse within the last two years and an additional risk factor from the list above.

**DISPOSITION**

Presented at disposition conference on: ____________________

☐ **Not accepted for treatment because:** (Check reasons below)

☐ Patient's symptoms have resolved without treatment.
☐ Patient is not a danger to self or others.
☐ Patient missed follow-up appointments.
☐ Missed appointment letter was sent but patient did not respond to reschedule.
☐ Patient moved to
☐ Patient refused further treatment.
☐ Patient connected with another provider.
☐ Confirmed that patient connected to new provider:

New Provider: Tel #

Address/Fax #

If not confirmed, explain:

[**If high risk patient, not accepted because:**]

☐ Mobile crisis unit was unable to re-engage patient.
☐ Patient was readmitted to the hospital. Where?
☐ Other (*explain*):

☐ **Accepted for treatment.**

**Type(s) of Treatment** Clinician (s) assigned:

☐ Medication Management REZK
☐ Individual Therapy
☐ Group Therapy
☐ Other:
☐ Other:

| | Signature | Stamp | Date |
|---|---|---|---|
| **Intake Clinician(s):** | [signature] | *Lauren Clifford, SW intern* | *4/5/11* |
| **Supervising Psychiatrist:** | [signature] | Richard Young, MD Lic:# 201199 Hospital ID# 802421 | 4/21/11 |

Patient logged into system.

| | |
|---|---|
| Clerk's Initials: TP | Date: 6/16/11 |

Med Eval:

[signature] Rafael Mustafa, MD Psychiatry 18366 4/5/11

Queens Health Network
Elmhurst Hospital CenterElmhurst Hospital CenterElmhurst Hospital Center
Chart Review Print

| Location | Patient Name | Patient Number | Visit Number | DOB | Sex |
|---|---|---|---|---|---|
| DIS-CP | Abuelenin,Atef | 2927291 | 2927291-1 | 10/20/80 | M |

Attending Physician

---

Unscheduled Adult Comprehensive/Initial History
Event Time: Thu, 10 Feb 11 1408 Status: complete

Thu, 10 Feb 11 1416 Documented by Chang Yoo, MD

Chief Complaint : [redacted]

Hx of PI : [redacted]

Signif Hx/Dx/Proc(s) : [redacted]

Med Allergy/Adverse Effect: no known medication allergies
Other Allergies : no known other allergies
HIV Status : Tested: yes Knows Status: yes Test Date: Dec 2010 Result: negative

Last Smoking Status : [redacted]
Pain : [redacted]

General : Negati[redacted]
HEENT : Negative
Gastrointestinal : Negative
GU/Reproductive : Negative
Hematologic/Lymph : Negative

---

2016189875190 2902192 015329 64 d321250 050816 01:07 080516 Raj0400_EL11-060050

| | |
|---|---|
| PATIENT NAME: | Abu El-Enin, Atef |
| MEDICAL RECORD NUMBER: | 2927291 |
| Date of Initial Treatment Plan | 4/7/11 |

## PROBLEM # 1

**DESCRIPTION OF PROBLEM** (include statement as manifested by):

Depression as manifested by sad mood, compulsive over eating, over sleeping, fatigue, poor concentration, anhedonia, and feelings of helplessness.

**DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved):

Patient's depression will be reduced or resolved.

CHECK ONE: Short Term Goal ☐ Long Term Goal ☒

[redacted]

| | | |
|---|---|---|
| N/A | N/A | |
| N/A | N/A | |

**Modalities:**
1. Individual Psychotherapy
2. Family Therapy
3. Group Psychotherapy
4. Psychoeducation
5. Social Services
6. Medication Treatment
7. Vocational Services
8. Case Management
9. Other

## PROBLEM # 2

**DESCRIPTION OF PROBLEM** (include statement as manifested by):

PTSD symptoms manifested by nightmares and flashbacks.

**DESCRIPTION OF GOAL** (Broad statements / outcomes to be achieved):

Symptoms of PTSD will be reduced or resolved.

CHECK ONE: Short Term Goal ☐ Long Term Goal ☒

**OBJECTIVES (PATIENT WILL...)** (Steps to address the problem stated in measurable terms):

Patient will report decreased nightmares and flashbacks at each session.

ESTIMATED DATE ACHIEVED: 7/7/11

MODALITY OF TREATMENT AND RESPONSIBLE CLINICIAN:

| MODALITY | FREQUENCY | RESPONSIBLE CLINICIAN |
|---|---|---|
| 6 | Monthly | R. Mustafa, MD |
| N/A | N/A | |
| N/A | N/A | |

**Modalities:**
1. Individual Psychotherapy
2. Family Therapy
3. Group Psychotherapy
4. Psychoeducation
5. Social Services
6. Medication Treatment
7. Vocational Services
8. Case Management
9. Other

2016129075590 2902192 015320 64 d331750 080816 03:07 080516 #ej#400_0131-600000



Current situation:

Mr El-Enin is currently living in New York City, where he hopes to file for asylum. He initially filed by himself (without a lawyer) on November 19, 2010, but provided the wrong address. He then reapplied with the proper address of his residence, a men's shelter in Brooklyn, but the application was returned to him because of an inaccuracy. He would like to apply again, but has met with Bitta, who told him that he is better off applying with the help of an attorney.

Medical information current/past:

[redacted]

Mental health current/past:

[redacted]

Social support/relationship/strengths:

Mother remains in Egypt. Uncle in LA. Otherwise, unknown.

Treatment Plan:

1. Refer to ABHC
2. Refer to Diagnostic

Reason for acceptance into Libertas:

Copyright July 2010

16139975390 2902192 015320 44 d311750 050318 03:07 050518 ta]H00_ELIS-660000

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

**Elmhurst Hospital Center, Department of Psychiatry**
**AMBULATORY BEHAVIORAL HEALTH SERVICES**
**INITIAL EVALUATION**

Length of Visit: *1 hour*

☒ Normal Risk

☐ HIGH RISK

**IDENTIFICATION:** (Check accuracy of information on face sheet)
Address: Eddie Harris Shelter, 629 Chauncey St., Brooklyn, NY 11207
Telephone: *303-319-4905.* / 347-228-0123
Next of Kin: *Mida Gaurdel (aunt)* [contact phone number]: *818-422-1446*
DOB: *10/20/80* Age: *30* ☒ Male ☐ Female
Patient's Spoken Languages: *English, Arabic* [Interview Conducted in]: *English*
Patient consenting to translator? ☐ Yes : (name of translator) ☐ No
Referral Source: *Libertas*
List of Records Requested & Reviewed:
Means of Payment: ☐ Medicaid ☐ Medicare ☒ Self-Pay ☐ Managed Care ☐ADAP

**CHIEF COMPLAINT** (In patient's, parent's, guardian's, school's words.):
*"I need hope for relief"*

[redacted]

**INPATIENT TREATMENT :** ☒ No ☐ Yes, see below

| Provider | Dates | Reason | Outcome |
|---|---|---|---|

**OUTPATIENT TREATMENT :** ☐ No ☒ Yes, see below

| Provider | Dates | Reason | Outcome |
|---|---|---|---|

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

[redacted]

Each affirmative response earns one point. **SCORE:** *0/4*

2/4 or greater = positive screening and further evaluation is indicated.

☒**NO SUBSTANCE ABUSE** (Go to Medical History)

**ALCOHOL AND SUBSTANCE ABUSE:** (Check applicable Yes ☒ and fill out below)

| Substance | Yes | Route | Age of Onset | Frequency & Quantity of Use | Amount past five days | Date of last use |
|---|---|---|---|---|---|---|
| Alcohol | ☐ | | | | | |
| Tobacco | ☐ | | | | | |
| Marijuana | ☐ | | | | | |
| Cocaine | ☐ | | | | | |
| Opiates | ☐ | | | | | |
| Heroin | ☐ | | | | | |
| PCP | ☐ | | | | | |
| BZD's | ☐ | | | | | |
| Hallucinogens | ☐ | | | | | |

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

| No pain | | | | Moderate | | | | | | Worst Pain |
|---|---|---|---|---|---|---|---|---|---|---|

1. LOCATION: Where is your pain located? Mark drawing:



Or state:

2. QUALITY: Have patient describe pain in their own words, e.g.
☐ Ache ☐ Burn ☐ Throb ☐ Pull ☐ Sharp

Please explain:

3. ONSET: Include duration, variations, rhythms:
4. PRESENT PAIN MANAGEMENT REGIMEN & ITS EFFECTIVENESS:
5. WHAT CAUSES OR INCREASES THE PAIN?
6. WHAT RELIEVES THE PAIN?
7. PLAN FOR PAIN MANAGEMENT:

**FAMILY HISTORY** of Psychiatric Illness, Substance Abuse, Suicide & Violence:
☐ No ☒ Yes, describe: *Patient's uncle struggles with alcoholism.*

**PSYCHOSOCIAL HISTORY:**

**Family of Origin** (Describe members, ages, religious/ethnic background, occupation, family dynamics): *Patient was born and raised in Cairo, Egypt by his mother and grandmother. Patient reports that his parents divorced after 30 days of marriage, and patient never met his father who died when patient was 15. Patient reports a strained relationship with his mother and grandmother because he did not support the government or strict Islamic beliefs. Patient reports that his mother worked a lot so they rarely spent time together. Patient states that he and his mother are working to repair their relationship over the phone. Patient reports that his grandmother mostly cared for him as a child but he and his grandma constantly fought*

[redacted]

**Development** (Include information about prenatal course, delivery, developmental milestones in the first year of life, motor development, language, feeding, toilet training, sleeping, sexual development): *Patient reports normal development.*

Was childhood development within normal limits? ☒ Yes ☐ No, explain:

**Education** (Highest grade completed; Special education? Ability to read and write): *Patient completed 4 years of college, split between two Universities in Egypt. Patient tried to pursue a Graduate degree but was denied because the schools did not agree with patient's interests.*

**Work History:** ☐ No ☒ Yes, describe: *Patient worked at Berlitz Language Center in Cairo where he taught English for 9 months. Patient then began working for a small training company where he became Director of Marketing and Training, while again teaching English to students. Patient was fired after 1 year for using American films in his classes. Patient next*

20161309975590 2902192 015320 64 d331750 080516 00:08 080516 [illegible]

[redacted]

Rev 09/01/2009

Bellevue Hospital Center
Chart Review Print

| Location | Patient Name | | Age | Sex |
|---|---|---|---|---|
| DIS-16N-44-B | Abuelenin,Atef | [redacted] | 35Y | M |

| Attending Physician | D.O.B. |
|---|---|
| Leibert,Eric | 10/20/1980 |

---

Unscheduled ED MD Disposition Note/Order (ED MD Disposition Note)
Event Time: Wed, 27 Jan 16 0316 Status: complete

Wed, 27 Jan 16 0316 Documented by Farzon Nahvi, MD

ED Attending : Soma Pathak, MD
Provider : Farzon Nahvi, MD
Disposition : Admitted as an Inpatient
Disposition Date/Time : Wed, 27 Jan 2016 0316
Primary Dx :
Secondary Dx(s) :
Special Bed Needs :
Select Dx(es) at Adm :
Admit To :
Service (Medicine) :
(Service) :
Team (Medicine) :
(Team) :
Condition :
Summary :
HIV Test Results :
Med Decision Making :
Tests Reviewed :
[redacted]

---

Unscheduled ED RN Progress/Reassessment
Event Time: Wed, 27 Jan 16 0623 Status: complete

Wed, 27 Jan 16 0624 Documented by Richard Williams, RN

Progress Note : Patient with middle lobe pneumonia treated with antibiotics, now remain afebrile, spont breath, awake and alert, await sbed assignment
ED Alerts : None;
Suspected Sepsis : no

---

2016139975590 2902192 015320 64 4511750 080826 03:08 080516 hajW400_2115-600000



Bellevue Hospital Center
Chart Review Print

| Location | Patient Name | | Age | Sex |
|---|---|---|---|---|
| DIS-16N-44-B | Abuelenin,Atef | [redacted] | 35Y | M |

| Attending Physician | D.O.B. |
|---|---|
| Leibert,Eric | 10/20/1980 |

---

Unscheduled ED RN Initial Assessment
Event Time: Tue, 26 Jan 16 2251 Status: complete

Tue, 26 Jan 16 2258 Documented by Desmond Smith, RN

Vital Signs :
Pain Screen :
ESI Level :
Chief Complaint :
Focused Assessment : [redacted]

Past Medical/Surgical Hx :
Medications on Arrival :
Allergies - Medications :
Allergies - Other :
Med Allergy(ies) Documented/Revw'd?:
Domestic Violence :
Psych Risk Assessment :
ED Alerts :
HIV Test Offering :
Preferred Language :
Communication Ability :
Language Used :
Suspected Sepsis :

---

ED Full Registration
Event Time: Tue, 26 Jan 16 2315 Status: complete

Tue, 26 Jan 16 2315 Documented by Gary Bryan

Full Reg Completed?: Yes

---

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

ed 10/04

Patient Name: Abu El-Enin, Atef MR#: 2927291 Date: 4/5/11

**Elmhurst Hospital Center, Department of Psychiatry**
**AMBULATORY BEHAVIORAL HEALTH SERVICES**
**INITIAL EVALUATION**

Length of Visit: *1 hour*

☒ Normal Risk
☐ HIGH RISK

**IDENTIFICATION:** (Check accuracy of information on face sheet)
Address: Eddie Harris Shelter, 629 Chauncey St., Brooklyn, NY 11207
Telephone: *303-319-4905.* / 347 - 227-0123
Next of Kin: *Mida Gaurdel (aunt)* [contact phone number]: *818-422-1446*
DOB: *10/20/80* Age: *30* ☒ Male ☐ Female
Patient's Spoken Languages: *English, Arabic* [Interview Conducted in]: *English*
Patient consenting to translator? ☐ Yes : (name of translator) ☐ No
Referral Source: *Libertas*
List of Records Requested & Reviewed:
Means of Payment: ☐ Medicaid ☐ Medicare ☒ Self-Pay ☐ Managed Care ☐ ADAP
**CHIEF COMPLAINT** (In patient's, parent's, guardian's, school's words.):
*"I need hope for relief"*
**HISTORY OF PRESENT ILLNESS:**
[redacted]
*floor bloodied for a week before his mother transferred him to a private hospital. Patient developed a blood clot, and after recently developing a blood clot in his finger, he has again been having nightmares about the incident. Patient began meeting with Libertas on 1/19/11 and asked for a referral to ABHS due to anxiety and sad mood. Patient underwent political and academic persecution in Egypt due to his light skin and liberal beliefs. Due to the* [redacted]

**PAST PSYCHIATRIC HISTORY:** (Describe initial presentation [include age], past episodes of mental illness, previous treatment and diagnoses):
[redacted]

**INPATIENT TREATMENT :** ☒ No ☐ Yes, see below

| Provider | Dates | Reason | Outcome |
|---|---|---|---|

**OUTPATIENT TREATMENT :** ☐ No ☒ Yes, see below

| Provider | Dates | Reason | Outcome |
|---|---|---|---|



[redacted]

# AFTER VISIT SUMMARY

NYU Langone Health

**Atef S. Abuelenin** Date of Birth: 10/20/1980

2/20/2021 Tisch Hospital - Perelman Emergency Department 212-263-5550

Emergency Department Follow-Up & Care Transition Center 212-263-6695

## Instructions

Your personalized instructions can be found at the end of this document.

**AMB REFERRAL TO ORTHOPEDIC SURGERY**
Expires: 2/20/2022 (requested)

**Follow up with the orthopedist**

## Today's Visit

**Diagnosis**
Suprapatellar effusion of knee

[redacted]

Blood Pressure
158/100

BMI
33.91

Weight
250 lb

Height
6'

Temperature (Oral)
98.2 °F

Pulse
73

Respiration
16

Oxygen Saturation
99%

## What's Next

You currently have no upcoming appointments scheduled.

## Patient Demographics

[redacted]

## Emergency Department Treatment Team

1. Tina Wu, MD
2. Lauren Nash, PA

## Follow Up Call

You will get a call from our Emergency Department (ED) Follow-Up & Care Transition Center. They will talk with you about your visit to the ED. If you have any questions about your discharge instructions, please call us between 9 am and 7 pm at **212-263-6696** or **212-263-6695.**

## Your Medication List

You have not been prescribed any medications.

---

## MyChart at NYU Langone

- Sign up for NYU Langone Health MyChart to stay connected to your care anytime and anywhere.
- You can schedule appointments, view test results, request prescription refills, send secure messages to your providers, and more.
- To enroll, download the NYU Langone Health app and select "Activate MyChart Account" on the login screen. Or you can visit https://mychart.nyulmc.org and select "Sign Up Now."
- For technical support, please call 1-866-262-6458.

---

it to apply the ice pack, or heat, directly to the knee. Never put ice directly on the skin. Always wrap the ice in a t[...] or other type of cloth.

- You may use over-the-counter pain medicine to control pain, unless another pain medicine was prescribed. If you have chronic liver or kidney disease or have ever had a stomach ulcer or GI bleeding, talk with your healthcare provider before using these medicines.
- If crutches or a walker have been recommended, do not put weight on the injured leg until you can do so without pain. Check with your healthcare provider before returning to sports or full work duties.
- If you have a hook-and-loop knee brace, you can remove it to bathe and sleep, unless told otherwise.

## Follow-up care

Follow up with your healthcare provider as advised.

If you are overweight, talk to your healthcare provider about a weight loss program. The excess weight puts extra strain on your knees.

## When to seek medical advice

Call your healthcare provider right away if any of these occur:

- Increasing pain, redness, or swelling of the knee
- Fever of 100.4°F (38°C) or above lasting for 24 to 48 hours

**Date Last Reviewed:** 11/23/2015

© 2000-2017 The StayWell Company, LLC. 800 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

# Allergies as of 2/20/2021

No Known Allergies

[redacted]

structions

## Water on the Knee




Water on the knee is also known as knee effusion. The knee joint normally has less than 1 ounce of fluid. Injury or inflammation of the knee joint causes extra fluid to collect there. When this happens, the knee joint looks swollen and is usually painful. It may be hard to fully bend the knee.

The most common cause of water on the knee is osteoarthritis due to wear and tear on the joint cartilage. Other causes include injury to the cartilage, inflammatory arthritis such as gout or rheumatoid arthritis, and infection of the joint.

You may need a needle aspiration, if the cause of your water on the knee is not certain. This procedure removes a sample of joint fluid from the knee for testing. This is done with a local anesthetic. Removing excess fluid may also relieve swelling and pain.

## Home care

- Limit your activities. Stay off the injured leg as much as possible until pain improves.
- Keep your leg elevated to reduce pain and swelling. When sleeping, place a pillow under the injured leg. When sitting, support the injured leg so it is level with your waist. This is very important during the first 48 hours.
- Apply an ice pack over the injured area for 15 to 20 minutes every 3 to 6 hours. You should do this for the first 24 to 48 hours. You can make an ice pack by filling a plastic bag that seals at the top with ice cubes and then wrapping it with a thin towel. Continue to use ice packs for relief of pain and swelling as needed. As the ice melts, be careful to avoid getting your wrap, splint, or cast wet. After 48 hours, apply heat(warm shower or warm bath) for 15 to 20 minutes several times a day, or alternate ice and heat. If you have to wear a hook-and-loop knee brace, you can open

istory: Pain

Technique: XR KNEE 4 OR MORE VIEWS RIGHT

Comparison: No prior imaging

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Mikell Yuhasz MD 2/20/2021 2:53 PM

IMPRESSION:

No acute fracture or dislocation. Tricompartmental osteoarthrosis. Chronic proximal fibular diaphyseal fracture. Circumferential soft tissue swelling and small suprapatellar effusion.

**If you feel that any of the information in this summary is inaccurate, please talk with your healthcare provider.**

## Information About Medication Safety

It is important to keep an updated record of the medications you are taking, and to bring this updated list of medications every time you visit your Health Care Provider and when you come to the hospital. We want to help you in managing your medications safely after your visit or discharge. This includes the potential side effects of your medications. If you have any questions regarding the medications you are taking, please speak to your Health Care Provider or Pharmacist.

## Finding a Physician Within NYU Langone Health

As one of the nation's premier academic medical centers, NYU Langone Health is devoted to excellence in patient care, education, and research. We are proud that our care team includes leading specialists for every condition.

Should you need assistance finding a physician or service, please visit us on our website at https://nyulangone.org/doctors.

To reach us by phone:
NYU Langone Physician Referral Services – (855) 314-2978
NYU Langone Orthopedic Hospital – (888) 453-3627
Family Health Centers at NYU Langone – (718) 630-7942

Additional resources include:

National Suicide Prevention Hotline – **(800) 273-8255**
NYC Suicide Hotline – **(888) 692-9355**

## Have questions about your bills?

Our physician and hospital customer service representatives are available to answer any billing questions: https://nyulangone.org/insurance-billing-financial-assistance

# Norwich University

The Trustees of Norwich University by authority of the laws of the
State of Vermont and on the recommendation of the Faculty of the University hereby confer upon

## Atef Abuelenin

the Degree of

## Master of Arts in International Relations

together with all the rights, privileges, and honors which pertain there to. In testimony thereof and as evidence of satisfactorily fulfilling all the requirements for the Degree as stated by the Faculty, we affix to this diploma the Seal of the University and the signatures of the President and Secretary.

June 22, 2018

Secretary

Richard W. Schneider
President

A PHOTOCOPY OF THIS TRANSCRIPT IS NOT OFFICIAL

Student No: A00805275 Date of Birth: 20-OCT-1980 Date Issued: 26-JUN-2018

Page: 1

Record of: Atef Sabry Abuelenin
Current Name: Atef Sabry Abuelenin
PO Box 114
New York, NY 10021-0005

Issued To: STUDENT

Course Level: Graduate Studies
First Admit: Spring 2014 (Graduate)
Last Admit: Summer 2016 (Graduate)

Degrees Awarded Master of Arts 15-SEP-2015
Ehrs: 36.00 GPA-Hrs: 36.00 QPts: 122.40 GPA: 3.40
Primary Degree
College : College Graduate Con Studies
Major : Diplomacy
Maj/Concentration : MDY Conc. Intl Terrorism

Degrees Awarded Master of Arts 22-JUN-2018
Ehrs: 21.00 GPA-Hrs: 12.00 QPts: 37.80 GPA: 3.15
Primary Degree
College : College Graduate Con Studies
Major : MA International Relations
Maj/Concentration : MIR Conc InternationalSecurity

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|
| INSTITUTION CREDIT: | | | | | | |
| Spring 2014 (Graduate) | | | | | | |
| Diplomacy | | | | | | |
| GD | 511 | Hist Diplomacy in Intnatl Syst | 6.00 | C | 12.00 | |
| GD | 520 | Law & International System | 6.00 | A- | 22.20 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 34.20 | GPA: | 2.85 | |
| Probation 1 | | | | | | |
| Fall 2014 (Graduate) | | | | | | |
| Diplomacy | | | | | | |
| GD | 530 | Econ & International System | 6.00 | A | 24.00 | |
| GD | 542 | Terrorism; Intro & State Spons | 6.00 | A | 24.00 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 48.00 | GPA: | 4.00 | |
| Academic Warning | | | | | | |
| Spring 2015 (Graduate) | | | | | | |
| Diplomacy | | | | | | |
| GD | 552 | Int'l Terrorism Non-State Actr | 6.00 | A- | 22.20 | |
| GD | 555 | Comprehensive Exam | 0.00 | S | 0.00 | |

******************** CONTINUED ON NEXT COLUMN ********************

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|
| Institution Information continued: | | | | | | |
| GD | 562 | Int'l Resp Trnsntl Terrorism | 6.00 | B | 18.00 | |
| GD | 575 | Exit Portfolio | 0.00 | S | 0.00 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 40.20 | GPA: | 3.35 | |
| Academic Warning | | | | | | |
| Residency 2015 | | | | | | |
| Diplomacy | | | | | | |
| GD | 595 | Residency | 0.00 | S | 0.00 | |
| | | Ehrs: 0.00 GPA-Hrs: 0.00 QPts: | 0.00 | GPA: | 0.00 | |
| Academic Warning | | | | | | |
| Summer 2016 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 520 | American Foreign Policy | 6.00 | B+ | 19.80 | |
| IR | 530 | International Security | 6.00 | B | 18.00 | |
| | | Ehrs: 12.00 GPA-Hrs: 12.00 QPts: | 37.80 | GPA: | 3.15 | |
| Good Standing | | | | | | |
| Winter 2016 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 590 | Masters Research Paper | 9.00 | F | 0.00 | E |
| | | Ehrs: 0.00 GPA-Hrs: 0.00 QPts: | 0.00 | GPA: | 0.00 | |
| Probation 2 | | | | | | |
| Summer 2017 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 555 | Field Exam | 0.00 | S | 0.00 | |
| | | Ehrs: 0.00 GPA-Hrs: 0.00 QPts: | 0.00 | GPA: | 0.00 | |
| Good Standing | | | | | | |
| Winter 2017 (Graduate) | | | | | | |
| MA International Relations | | | | | | |
| IR | 590 | Masters Research Paper | 9.00 | S | 0.00 | I |

******************** CONTINUED ON PAGE 2 ********************

THE OFFICIAL SIGNATURE IS WHITE AND IS IMPOSED UPON THE INSTITUTIONAL SEAL

GRADING LEGEND IS PRINTED ON REVERSE

THE UNIVERSITY NAME APPEARS IN WHITE PRINT ACROSS THE FACE OF THIS RECORD

This official document is printed on maroon security paper and does not require a raised seal. A hidden security warning appears only when photocopied. When photocopied, the name of the institution appears on one line and the words "COPY" appears on the next. An official signature is white with a maroon background. Reject document as official if the signature is distorted or has been photocopied.

Interim Registrar

In accordance with USC 438 (6) (4) (8) (The Family Educational Rights and Privacy Act of 1974) you are hereby notified that this information is provided upon the condition that you, your agent or employees, will not permit any other party access to this record without consent of the student. Alterations of this transcript may be a criminal offense.

A HIDDEN SECURITY COPY WARNING APPEARS ONLY WHEN PHOTOCOPIED

A PHOTOCOPY OF THIS TRANSCRIPT IS NOT OFFICIAL

Student No: A00805275 Date of Birth: 20-OCT-1980 Date Issued: 26-JUN-2018

Record of: Atef Sabry Abuelenin Page: 2
Level: Graduate Studies

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|

Institution Information continued:
Ehrs: 9.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00
Good Standing

Residency 2017
MA International Relations

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|---|
| IR | 595 | MIR Residency | 0.00 | S | 0.00 | |

Ehrs: 0.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00

********************** TRANSCRIPT TOTALS **********************

| | Earned Hrs | GPA Hrs | Points | GPA |
|---|---|---|---|---|
| TOTAL INSTITUTION | 57.00 | 48.00 | 160.20 | 3.34 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 57.00 | 48.00 | 160.20 | 3.34 |

********************** END OF TRANSCRIPT **********************

NORWICH UNIVERSITY, NORTHFIELD VT. OFFICE OF THE REGISTRAR

THE OFFICIAL SIGNATURE IS WHITE AND IS IMPOSED UPON THE INSTITUTIONAL SEAL

GRADING LEGEND IS PRINTED ON REVERSE

THE UNIVERSITY NAME APPEARS IN WHITE PRINT ACROSS THE FACE OF THIS RECORD

This official document is printed on maroon security paper and does not require a raised seal. A hidden security warning appears only when photocopied. When photocopied, the name of the institution appears on one line and the words "COPY" appears on the next. An official signature is white with a maroon background. Reject document as official if the signature is distorted or has been photocopied.

Interim Registrar
Diane Douglas, Registrar

In accordance with USC 438 (6) (4) (8) (The Family Educational Rights and Privacy Act of 1974) you are hereby notified that this information is provided upon the condition that you, your agent or employees, will not permit any other party access to this record without consent of the student. Alterations of this transcript may be a criminal offense.

A HIDDEN SECURITY COPY WARNING APPEARS ONLY WHEN PHOTOCOPIED

13:13

AA nelnet.com

Official Servicer of Federal Student Aid
What this means to you

Help Atef

**Worried about affording your next payment?** >

Tell us your financial situation, and we'll identify options that may help reduce or postpone your payments.

**Important COVID-19 Information** >

< Back Loan Details

| Account: | E880671458 |
|---|---|
| **Current Balance:** | $198,636.90 |
| **Past Due Amount:** | $0.00 |
| **Current Amount Due:** | $0.00 |
| **Payment Amount:** | $0.00 |
| **Due Date:** | 03/25/2021 |

Hide Groups and Loan Details

**Group: AA**

| | |
|---|---|
| **Due Date:** | 10/25/2021 |
| **Fees:** | $0.00 |

Home | Loan Details | Payments | Documents

# American Military University

On the recommendation of the Faculty of American Public University System
and by the virtue of the authority vested in them, the Board of Trustees of the University,
have conferred upon

## Atef S. Abuelenin

the degree of

## Master of Arts, Intelligence Studies

with all the Rights, Privileges, and Honors thereunto appertaining. In testimony whereof, the
seal of the University and the signatures of its officers are hereunto affixed this
October 1, 2021

Dr. Wade T. Dyke, President

Dr. Katherine Zatz, Chairwoman of the Board

AMERICAN PUBLIC UNIVERSITY SYSTEM

Dr. Vernon C. Smith, Provost

Michelle Newman, Registrar

# AMERICAN PUBLIC UNIVERSITY SYSTEM

American Public University
American Military University
1-877-755-2787

111 West Congress Street
Charles Town, West Virginia 25414

Atef S. Abuelenin
69-62 Grand Ave
3
Maspeth NY 11378

Student Name: Atef S. Abuelenin
DOB: 10/20/XXXX
StudentID: 5648834

DocumentID: 40735950

## American Military University

| Admission Date | Program | GPA | Conferred |
|---|---|---|---|
| 09/06/2018 | Master of Arts in Intelligence Studies-Capstone Option (MA)<br>Concentration in General | 3.2340 | 10/01/2021 |

## Transfer Credit Applied Toward Program

| Source | Semester Hours |
|---|---|
| Norwich University | 42.00 |
| **Total Transfer Credit Hours** | **9.00** |
| **Total Teach Out Credit Hours (above)** | **0.00** |
| **Total Institutional Credit Hours (above)** | **0.00** |
| **Total Prior Learning Assessment Credit Hours (above)** | **0.00** |
| **Total Transfer Credit Accepted But Not Program Applicable** | **33.00** |

## AMU Courses

| Semester\Course Number | Course Title | Course Start Date | Course End Date | Hours Att | Hrs Earned | Grade | Quality Points |
|---|---|---|---|---|---|---|---|
| **Fall 2018** | | | | | | | |
| SSGS500 | Research Design and Methods | 10/01/2018 | 11/25/2018 | 3.00 | 3.00 | A | 12.00 |



PRINTED E CERTIFIED PDF

TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE

PRINTED FROM CERTIFIED PDF

# American Public University System
# Office of the Registrar
# 111 W. Congress Street
# Charles Town, WV 25414
# Official Transcript

**Statement of Authenticity**

This official transcript has been transmitted electronically to the recipient and is intended solely for use by that recipient. If you are not the intended recipient please notify American Public University System at apustranscripts@apus.edu. It is not permissible to replicate this document or forward it to any person or organization other than the identified recipient. Release of this record or disclosure of its contents to any third party without written consent of the record owner is prohibited.

This official transcript has been digitally signed and therefore contains special characteristics. If this document has been issued by American Public University System and for optimal results, we recommend that this document is viewed with the latest version of Adobe® Acrobat or Adobe® Reader it will reveal a digital certificate that has been applied to the transcript. This digital certificate will appear in a pop-up screen or status bar on the document, display a blue ribbon, and declare that the document was certified by American Public University System with a valid certificate issued by GlobalSign CA for Adobe®. This document certification can be validated by clicking on the Signature Properties of the document. The blue ribbon symbol is your assurance that the digital certificate is valid, the document is authentic, and the contents of the transcript have not been altered.

If you have any questions regarding the authenticity of this transcript, please contact us at apustranscripts@apus.edu.

**Recipient:** **Atef Abuelenin** **Student:** **Atef S Abuelenin**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| INTL508 | Intelligence Analysis | 12/03/2018 | 01/27/2019 | 3.00 | 3.00 | A | 12.00 |
| **Winter 2019** | | | | | | | |
| INTL616 | Ethical Challenges in the Intelligence Community | 02/04/2019 | 03/31/2019 | 3.00 | 3.00 | A- | 11.01 |
| **Spring 2019** | | | | | | | |
| INTL627 | Advanced Geospatial Intelligence | 04/01/2019 | 05/26/2019 | 3.00 | 3.00 | B+ | 9.99 |
| INTL631 | Criminal Intelligence Analysis | 06/03/2019 | 07/28/2019 | 3.00 | 3.00 | B | 9.00 |
| **Summer 2019** | | | | | | | |
| INTL653 | Deception, Propaganda and Disinformation | 08/05/2019 | 09/29/2019 | 3.00 | 0.00 | F | 0.00 |
| **Fall 2019** | | | | | | | |
| INTL652 | Terrorism: Assessing the Past to Forecast the Future | 10/07/2019 | 12/01/2019 | 3.00 | 0.00 | W | |
| **Spring 2020** | | | | | | | |
| INTL501 | Strategic Intelligence | 04/06/2020 | 05/31/2020 | 3.00 | 3.00 | A | 12.00 |
| INTL507 | Intelligence Operations | 06/01/2020 | 07/26/2020 | 3.00 | 3.00 | A- | 11.01 |
| **Summer 2020** | | | | | | | |
| INTL502 | Collection | 08/03/2020 | 09/27/2020 | 3.00 | 0.00 | W | |
| **Winter 2021** | | | | | | | |
| INTL502 | Collection | 02/01/2021 | 03/28/2021 | 3.00 | 3.00 | A- | 11.01 |
| **Spring 2021** | | | | | | | |
| SSGS696 | Master's Project Capstone Seminar | 06/07/2021 | 09/26/2021 | 3.00 | 3.00 | B | 9.00 |
| **Summary:** | **Cum GPA: 3.2340** | | | **36.00** | **27.00** | | **97.0** |

PRINTED FROM CERTIFIED PDF

Michelle Newman - University Registrar

An official electronic transcript is available as a document with a digital certificate available through a secure portal. An official paper transcript is printed on blue security paper with the name of the university printed in white type across the face of the document. A raised seal is not required. Official paper transcripts are placed in sealed envelopes.

 Atef S. Abuelenin Issue Date: 03/06/2023

TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE

**AMERICAN PUBLIC UNIVERSITY SYSTEM**
American Public University - American Military University
111 West Congress Street
Charles Town, WV 25414
877-755-2787 www.apus.edu

PRINTED FROM CERTIFIED PDF

**Official Transcript:** An official transcript consists of a copy of the student's permanent record signed by the Registrar and listing those courses for which a grade has been assigned. Course credit accepted from another institution will be included for all graduated students and all active students, once awarded. Transfer credit for students who are no longer enrolled may not appear as it will no longer be considered valid. Transcripts are not issued for CEU or MOOC coursework.

**Academic Calendar:** The unit of credit used at member institutions of the American Public University System (APUS) is the semester hour. Courses may be 8 or 16 weeks in duration.

**Member Institutions:** American Community College (ACC), American Public University (APU), and American Military University (AMU) were incorporated as members of the American Public University System on June 17, 2002. ACC operations were transferred to other member institutions in June 2005.

**Accreditation:** APUS is accredited by the Higher Learning Commission.

Date of last revision: July 1, 2019

**Grading System:** Letter grades and quality points are assigned for all courses except for those specifically designated below:

| | |
|---|---|
| A: | 4.0 Quality Points |
| A-: | 3.67 Quality Points |
| B+: | 3.33 Quality Points |
| B: | 3.0 Quality Points |
| B-: | 2.67 Quality Points |
| C+: | 2.33 Quality Points |
| C: | 2.0 Quality Points |
| C-: | 1.67 Quality Points |
| D+: | 1.33 Quality Points |
| D: | 1.0 Quality Points |
| D-: | 0.67 Quality Points |
| F: | 0.0 Quality Points |
| PD: | Pass w/Distinction |
| P: | Pass |
| FAIL: | Failed Comp Exam |
| W: | Withdrawal/No Grade |
| WP: | Withdrew Passing |
| WF: | Withdrew Failing |
| S: | Satisfactory |
| X: | Knowledge Only/Audit |
| I: | Incomplete |
| PLA: | Prior Learning Assessment |
| R: | Course Retaken |
| U: | Unsatisfactory |

Grades without quality points and any transfer credit awarded are not factored when computing a student's GPA. Only A through F letter grades are factored into the student GPA.

Graduate Courses: Any grade below "C" is considered failing as of April 1, 2007.

Doctoral Courses: Any grade below "B-" is considered failing as of January 1, 2018

**Course Numbers:** Courses numbered less than 100 are remedial and do not meet undergraduate or graduate degree requirements. Courses numbered 100-499 are designed to meet undergraduate degree requirements. Courses numbered 500 and 600 are designed to meet master's degree requirements. Courses numbered 700 and above are designed to meet doctoral degree requirements.

**Degree and Residency Requirements:** Effective January 2018, Associate degree students must complete a minimum of 60 semester hours, 15 of which must be at an APUS institution. Bachelor's degree students must complete a minimum of 120 semester hours, 30 of which must be at an APUS institution. Master's degree students must complete a minimum of 36 semester hours, 21 of which must be at an APUS institution. Doctoral degree students must complete a minimum of 58 semester hours, all of which must be completed at an APUS institution.

2007 – 2017 Associate degree students must complete a minimum of 61 semester hours, 16 of which must be at an APUS institution. Bachelor's degree students must complete a minimum of 121 semester hours, 31 of which must be at an APUS institution. Master's degree students must complete a minimum of 36 semester hours, 21 of which must be at an APUS institution.

# Norwich University

The Trustees of Norwich University by authority of the laws of the State of Vermont and on the recommendation of the Faculty of the University hereby confer upon

**Atef Abuelenin**

the Degree of

**Master of Arts in Diplomacy**

together with all the rights, privileges, and honors which pertain there to. In testimony thereof and as evidence of satisfactorily fulfilling all the requirements for the Degree as stated by the Faculty, we affix to this diploma the Seal of the University and the signatures of the President and Secretary.

September 15, 2015

NORWICH UNIVERSITY ESTABLISHED 1819

Secretary

President

***Sample Paper***

Towards Identifying China's Mercurial Economic Regime

Atef Abuelenin

The dramatic surge in foreign direct investment into the Chinese market, even in the aftermath of the devastating global financial crisis of 2008, has ignited widespread interest among scholars, policymakers, and economists in understanding the unique characteristics of China's economic structure. Historically, China's alignment with the former Soviet Union firmly entrenched Marxist ideologies within its political and economic institutions, shaping the foundation of the nation's governance and industrial policies. However, the nation's transformative period from 1966 to 1976 marked a significant shift in its economic strategy, opening the door to more flexible economic approaches that retained the core tenets of Marxism while cautiously incorporating liberal principles. This hybrid economic framework allowed China to partially transition from the utopian ideals of Marxism toward the pragmatic realities of liberalism, creating a distinctive economic model that is deeply rooted in realism.

The remarkable economic achievements of China over the past four decades vividly illustrate the effectiveness of this blended model. Since Deng Xiaoping initiated sweeping economic reforms aimed at integrating capitalist principles into the state's policies, China's economy has experienced an extraordinary average annual growth rate of 10 percent in GDP. The scale of this transformation is unprecedented, with the economy expanding nearly fifty-fold from the early 1980s to 2012. This

meteoric rise not only underscores China's resilience and adaptability but also reflects its ability to balance the competing demands of state intervention and market liberalization.

On a practical level, China's economic policies exhibit a strategic fusion of state control and free-market mechanisms. The government's deliberate efforts to devalue its currency, maintain trade surpluses, and implement protectionist measures to promote exports highlight its ability to harmonize Marxist labor regulations with liberal trade practices. Moreover, the state's reforms in the agricultural sector during the 1980s and 1990s marked a pivotal moment in the country's economic evolution. By transitioning from collective farming to household-based production, China gradually liberalized agricultural prices while decentralizing fiscal control. This decentralization empowered local enterprises, increased productivity, and aligned economic practices with the nation's overarching strategic objectives.

The rise of e-commerce in China exemplifies the success of this economic strategy. Platforms such as Aladdin symbolize the nation's ability to integrate free-market principles into its economic framework while leveraging technological advancements to reduce trade barriers and enhance its global presence. However, this success is not without criticism. Some observers argue that China's restrictive measures on private enterprises, including excessive state intervention, stifle innovation and limit the potential of the private sector. Despite this, state-owned enterprises (SOEs) continue to dominate key industries, accounting for a significant portion of China's industrial output. The government's appointment of specialized agencies to oversee SOEs underscores its commitment to nationalism and its determination to preserve aspects of Marxist economic policies.

China's regional and global initiatives further reflect its realist approach to economic expansion. The nation's active participation in the East Asia Economic Caucus and its leadership role in

ASEAN-related trade frameworks illustrate its strategic efforts to counterbalance Western influence in the Asia-Pacific region. Bilateral agreements, such as those with the European Union, highlight China's determination to deepen trade relationships and assert its economic dominance on the global stage.

Domestically, China's conservative financial policies, characterized by an emphasis on savings and a preference for cash-based transactions, reveal a cautious approach to economic management. While these policies have provided stability, they also highlight the need for structural reforms to stimulate local consumption, encourage transparent currency valuation, and expand access to consumer credit. Without such reforms, China risks economic stagnation, particularly as the government prioritizes state interests over the growth and dynamism of the private sector.

On the international front, China has implemented innovative financial strategies to challenge the global dominance of the U.S. dollar. By initiating currency swap agreements with countries such as Brazil, Argentina, and Indonesia, China aims to elevate the yuan as a reserve currency. The government's encouragement of stakeholders to settle transactions in yuan is part of a broader effort to reshape global financial systems. Additionally, China's engagement in Africa demonstrates its ambition to expand economic influence through infrastructure projects and low-cost solutions. This approach not only secures loyalty from emerging markets but also strengthens China's position as a key player in the global economic order.

Despite these advancements, China's prioritization of nationalism over human rights and quality standards raises significant concerns. The lack of adherence to international safety norms in industries such as manufacturing undermines the nation's economic credibility. Furthermore, the

reliance on cost-cutting measures in exports and overseas investments presents long-term challenges to the sustainability of its economic model.

The current framework of global economic integration, dominated by established powers, remains inadequate to address the ambitions of emerging players like China. The economic crisis of 2008, coupled with the rise of anti-globalization movements, underscores the urgent need for a reimagined economic system. Such a system must accommodate rising powers like China while inviting marginalized players in regions such as Africa to participate more effectively. The unchecked continuation of random offshoring practices threatens to destabilize the current globalization model. In the long term, the advent of technological innovations may render some industries obsolete, prompting a shift toward a hybrid economic system that integrates elements of the Bretton Woods framework with the principles of globalization.

The pressing question remains: can the existing global integration model adequately address the wild economic aspirations of emerging powers like China? The answer appears to be no. The Chinese regime is actively working to weaken the European Union's semi-stable economy and exhaust the already indebted United States through strategies that include reducing the cost of exports in agricultural, textile, and technological sectors while promoting low-cost industries overseas. These efforts reflect a broader competition between China and the West, where each side seeks to impose its distinct and biased economic systems.

In conclusion, the ongoing rivalry between China and the West is a testament to the evolving dynamics of global economic power. As nations vie for supremacy, the global community faces the daunting task of developing inclusive and sustainable economic frameworks that balance technological advancement, political strategy, and economic integration. The race for economic

dominance is far from over, and the world stands on the brink of a new order that will redefine the landscape of international economics for generations to come.

NYC Children

**ACS ACKNOWLEDGES**

***Atef Abuelenin***

**Forestdale, Inc.**

**FOR EXCELLENCE IN PRACTICE**

*The Administration for Children's Services thanks you for your hard work, dedication and partnership in serving the children and families of New York City.*

INA MENDEZ, DEPUTY COMMISSIONER
FAMILY PERMANENCY SERVICES

JUNE 1, 2023


NEW YORK STATE USA
LEARNER PERMIT
[redacted]
Class D
ABUELENIN
ATEF,SABRY
[redacted]
DOB 10/20/1980
Issued 07/15/2022
Expires 10/20/2025
E NONE
R B
Sex M Height 6'-00" Eyes GRN
OCT 80
EXCELSIOR

[redacted]

# SOCIAL SECURITY ADMINISTRATION

September 10, 2014

Michelle Jimenez
LEGAL INTERPRETING SERVICES, INC.
26 Court Street
Suite 1005
Brooklyn, NY 112420103

Based on an initial background check/verification conducted by the Social Security Administration (SSA), the following individual is authorized to perform on this award:

**Name: ABUELENIN, ATEF**
[redacted]
**Determination Date:** 9/4/2014
**Type of Investigation:** NACI

This determination is final unless information obtained during the remainder of the full background investigation being conducted by the Office of Personnel Management (OPM) is such that SSA would find the individual identified above unsuitable to continue performing under this award. Should such information be obtained during the remainder of the background investigation being conducted by OPM, you will be notified and authorization to perform on this award will be rescinded, at which time, the individual must be immediately removed.

Please note that this determination pertains only to suitability and does not affect any other requirements of the award. The individual is authorized to perform on the award number listed above only. If this authorization is required for access, you may submit a copy of this notice with the access request form or contact the awarding official for instructions.

Sincerely,

Leslie G. Herman
SSA Personnel Security and Suitability Program

Cc:
Denita Patterson, Contracting Officer
Sandra Lopez-Carter, COTR

Disclaimer:
This letter is intended for official Social Security Administration use only. It should not be used by any other Federal agency for the purpose of reciprocity. To verify that a complete background investigation has been conducted and favorably adjudicated, please contact SSA's security office at charles.n.dibley@ssa.gov.

RELIAS

# Certificate of Completion

This certifies that

## *Atef Abuelenin*

has successfully completed

***Corporate Compliance and Ethics***

**on**

**1/27/2021**

**Training Hours: 1.00**

This certificate may not meet your organization or certification needs for continuing education. See your administrator or board for specific guidelines.

Amy M Johnson MSN, RN, CPN
Accreditations Manager
1010 Sync Street, Suite 100
Morrisville, North Carolina 27560
www.relias.com

# Solution Based Casework

*The Official Status of Certified Supervisor of Solution Based Casework*

*Has Hereby Been Awarded to:*

Atef Abuelenin

*Officially Granted on this day of:*

December 10 , 2023

Dana N. Christensen PhD.

Dana N Christensen, PhD
Professor Emeritus
University of Louisville

Family Solutions
SOLUTION BASED CASEWORK TRAINING

SBC CERTIFIED
Completion Certification

## White House Referral and USCIS Deflection as Evidence of Bad Faith and Unreasonable Delay

On or about [July 2nd,2025], Plaintiff contacted the Office of the President of the United States to seek redress concerning the prolonged and unjustified delay in the adjudication of his Form N-400, Application for Naturalization, which had been pending without decision for well over 120 days following his naturalization interview in September 2022. In response, the White House referred Plaintiff's communication to the U.S. Citizenship and Immigration Services (USCIS) Contact Center, which subsequently issued a letter dated [insert date of USCIS response], assigned Case Number 39949978 and WH Reference Number 1006614. A true and correct copy of that letter is attached hereto as Exhibit (W.H).

In said correspondence, USCIS reiterated boilerplate language regarding the necessity of background checks and the cooperation of third-party agencies (such as the FBI) but conspicuously failed to provide any individualized or case-specific information, timeline, or statutory basis justifying the prolonged delay. Moreover, USCIS expressly disclaimed any obligation to inform Plaintiff of the "results, nature, or status" of any purported background investigation, rendering Plaintiff unable to meaningfully challenge, clarify, or correct any potential misinformation that may be impeding adjudication. USCIS further declined to provide any estimated timeline or projected resolution date, effectively rendering the agency's delay indefinite and unaccountable, in violation of 8 C.F.R. § 335.3(a) and the due process standards embodied in the Fifth Amendment.

Plaintiff submits that the above-described conduct constitutes further evidence of USCIS's pattern of administrative evasiveness, procedural opacity, and bad faith, and demonstrates that all reasonable administrative remedies have been exhausted. Plaintiff respectfully argues that even when his case was elevated to the Executive Branch, USCIS continued to provide vague, generic responses without legal justification for its inaction. This failure to adjudicate, particularly following more than 120 days since Plaintiff's naturalization interview, constitutes an unreasonable delay under 8 U.S.C. § 1447(b), warranting this Court's immediate intervention and de novo review.

Gmail

Atef Abuelenin <eleynin@gmail.com>

# USCIS Contact Center Case #39949978_1006614

1 message

**CRU** <cru@uscis.dhs.gov> Wed, Aug 6, 2025 at 10:10 AM
To: "eleynin@gmail.com" <eleynin@gmail.com>

Dear Atef Abuelenin:

Thank you for your letter to President Donald J. Trump regarding the status of your Form N-400, Application for Naturalization, and your Form I-130, Petition for Alien Relative, filed on behalf of your wife.

The White House referred your letter to the U.S. Citizenship and Immigration Services (USCIS) Contact Center. Your letter has been assigned case number 39949978, and your WH reference number is 1006614. As part of our commitment to helping the public, we strive to resolve any problems you may experience when applying for immigration services. We understand your concerns and will give you accurate information and guidance.

We conduct background checks for all cases involving a petition or application for an immigration service or benefit. We do this to enhance national security and ensure the integrity of the immigration process.

Everyone applying for a U.S. immigration benefit is subject to criminal and national security background checks to ensure they are eligible for that benefit. These background checks require time, resources, and patience, and we understand that the process is slower for some petitioners/applicants than they would like. As a result, we work closely with the FBI and other agencies to make sure we can complete the background checks quickly as possible. However, USCIS will never grant an immigration service or benefit before the required background checks are completed, regardless of how long those checks take. We strive to balance the need for timely, fair, and accurate service with the need to ensure a high level of integrity in the decision-making process.

Our field offices regularly review their pending caseloads to determine when cases have cleared and are ready to be adjudicated.

We do not share information about the results, nature, or status of any investigation with petitioners/applicants or their representatives.

Finally, we cannot predict an exact date for when we will complete your background investigation. However, as soon as it is complete, we will make every effort to make a decision on your cases.

USCIS suggests that you seek legal advice, if you find it necessary; visit our USCIS Find Legal Services web page to get more information.

If you need additional help or filing instructions, please visit our USCIS Tools and Resources web page. You can also create a USCIS online account, where you can file forms online and track your case anytime from anywhere.

Sincerely,

Kimberley Coleman-Bearden, Chief

USCIS Contact Center

\cml

------

**Please do not reply directly to this email. This email was sent from a notification-only address that cannot accept incoming email.**

ref:_00DG0hO5S._500SJ00000gdcd7:ref

Begin forwarded message:

**From:** USCIS No Reply <no-reply@uscis.dhs.gov>
**Date:** August 1, 2025 at 07:24:06 EDT
**To:** eleynin@gmail.com
**Subject: Service Item Number: 39576154**

U.S. Citizenship and Immigration Services

Dear ATEF SABRY ABUELENIN,

Thank you for your inquiry dated July 01, 2025.

Thank you for your inquiry regarding your N-400 Application for Naturalization.

Our system shows that a Service Request was created for you on May 6, 2025 regarding the status of your form. Your Service Request was assigned to the **Queens Field Office** and given Referral ID number **SR11262500867RPA**.

The **Queens Field Office** responded to your Service Request on June 24, 2025. Their response stated:

Thank you for contacting USCIS concerning the above-referenced application. Below is a summary of what we have found. Due to workload factors not related to your application, USCIS anticipates a delay in completing your case. We anticipate the delay to be approximately 6 months from the date of this notice. We assure you that we are working to complete adjudication of your application as quickly as available resources allow. If you do not receive a decision or other notice of action from USCIS by that date, please reach out to the USCIS Contact Center for additional assistance.

If you need more assistance with your USCIS online account, you can send USCIS Contact Center a secure message from your inbox located under the **MyAccount** drop-down menu. If you are having technical issues with accessing your account, go to my.uscis.gov/account/v1/needhelp to submit a request for assistance.

If you haven't done so already, visit myaccount.uscis.gov to sign up for a USCIS online account where you can explore filing online, send us secure messages through your account inbox and get instant updates on the status of your case. If you have any other questions, please visit the USCIS Contact Center, where you can access our online tools 24/7.

If you move, you must update your address in the USCIS online account within 10 days, or you can download Form AR-11, Alien's Change of Address Card at uscis.gov/addresschange to submit a paper copy.

*This mailbox is not monitored for incoming messages. Please do not reply to this message.*

ref:_00DG0hO5S._500SJ00000dXqr6:ref

# CERTIFICATE OF SERVICE

I, Atef Abuelenin, hereby certify that a true and correct copy of the foregoing Complaint and all attached exhibits will be served via certified mail, return receipt requested, upon the following parties within 7 to 12 business days from the date of filing. Proof of service will be submitted to the Court upon completion.

Parties to be served:

1. Office of the U.S. Attorney for the Eastern District of New York

   Civil Process Clerk

   271-A Cadman Plaza East

   Brooklyn, NY 11201

2. Attorney General of the United States

   U.S. Department of Justice

   950 Pennsylvania Avenue, NW

   Washington, D.C. 20530-0001

3. United States Citizenship and Immigration Services (USCIS)

   Attn: General Counsel

   5900 Capital Gateway Drive

   Camp Springs, MD 20746

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 17th, 2025

Signature: